UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

Mark W. Ford, Esq.
Law Firm of Mark W. Ford, LLC
PO Box 110
4 1/2 North Broadway
Gloucester City, NJ 08030
Tel: 856-456-8811
*"Attorney for Debtor"*

In Re:

Rodney Jose Kelly aka Rodney J. Kelly aka
Rodney Kelly

                        Debtor

Case No.: 19-11490-MBK

Judge: Hon. Michael B. Kaplan

Chapter: 13

### CERTIFICATION OF DEBTOR RODNEY KELLY IN OPPOSITION OF PROOF OF CLAIM 3-1 FILED BY CARRINGTON MORTGAGE SERVICES, LLC IN THE NAME OF WELLS FARGO BANK, N.A., AS TRUSTEE FOR CARRINGTON MORTGAGE LOAN TRUST, SERIES 2006-FRE1 ASSET-BACKED PASS-THROUGH CERTIFICATES

I, Rodney Kelly, of full age, the debtor in this matter, and owner of 9 Spindletop

Lane Willingboro, NJ 08046, submits pursuant to Fed. R. Bankr. P. 3001 and 3007,

debtor's opposition to Proof of Claim 3-1 ("POC #3") filed in this matter on April 4, 2019

by KML Law Group, P.C. ("KML") as attorney for Wells Fargo Bank, N.A., as Trustee

for Carrington Mortgage Loan Trust, Series 2006-FRE1 Asset-Backed Pass-Through

Certificates ("WFB as Trustee for CMLT 2006-FRE1"), and Carrington Mortgage

Services, LLC ("CMS") as the purported creditor's agent, and debtor request an evidentiary

hearing for the reasons set forth immediately below:

## A. <u>POC #3 Does Not Comply With Rule 3001(b).</u>

1.    CMS through KML designated at Line 1 of Form 410 filed in this matter on April 4, 2019 WFB as Trustee for CMLT 2006-FRE1 as the "creditor" as it relates to the "mortgage loan" designated by debtor at Line 2.1 of Form 106D (Doc. 27).

2.    CMS through attorneys KML, not WFB as Trustee for CMLT 2006-FRE1, filed Form 410 on April 4, 2019.

3.    Rule 3001(b) provides *"Who May Execute"* a Proof of Claim by setting forth in relevant part that: "A proof of claim shall be executed by the creditor or the creditor's authorized agent...". See Fed. R. Bankr. P. 3001(b).

4.    Upon debtor's examination of the documents annexed to POC# 3, there is no power of attorney and or other letter of authorization wherein the purported creditor designated within Form 410, WFB as Trustee for CMLT 2006-FRE1, authorized CMS to appear in this matter on the alleged creditor's behalf as required by Rule 3001(b).

## B. <u>POC #3 Does Not Comply With Rule 3001(c).</u>

5.    The *"Supporting Information"* annexed to POC#3 is either missing, defective, forged, falsely notarized, and does not comply with Fed. R. Bankr. P. 3001(c) because:

   a. The *"Escrow Analysis"* annexed at Part 2 (pages 1 through 10) of POC#3 is defective, incomplete, and materially false because: (1) there is no breakdown of installments of principal and interest made towards the "mortgage loan" in dispute starting May 2006 throughout the year 2010.; (2) debtor did not make any payments towards the "mortgage loan" in dispute for the months of January, February, March, April, and

May of year 2011 as implied by CMS, KML, and or WFB as Trustee for CMLT 2006-FRE1; and (3) there are unjust charges accessed including, but limited to, inspection fees at which times debtor maintained and resided within the subject property.

b. the "Note" Instrument annexed at Part 5 (pages 1 through 10 of 48) of POC #3: is defective, forged, and or counterfeit because: (1) the instrument does not display an indorsement upon the instrument by FGC as the original lender as required by New Jersey Uniform Commercial Code (NJ UCC) (See 12A:3-204); (2) the separate page titled "ASSIGNMENT OF PROMISSORY NOTE" displayed at page 9 of 48, asserts that FGC assigned the note instrument to Fremont Investment & Loan ("FIL") on March 22, 2006 which renders the note instrument non-negotiable wherein an indorsement in blank by FIL would be rendered void ab initio as a matter of fact and law.; (3) the separate page titled "NOTE ALLONGE" displayed at page 10 of 48, is not attached and permanently affixed to the last page of the note instrument displayed at page 4 of 48 in order to qualify as an allonge.; (4) the separate and untitled page displayed at page 5 of 48 displays an undated stamp presented to be an indorsement by FIL paid to the order of WFB as Trustee for CMLT 2006-FRE1, is not an indorsement as described by 12A:3-204, and any indorsements after FGC allegedly created the "ASSIGNMENT OF PROMISSORY NOTE" displayed at page 9 of 48, rendered the instrument non-negotiable wherein an indorsement

thereafter is void *ab initio*.; (5) debtor denies the validity of his alleged

signature affixed upon page four of four of the note instrument displayed

at page 4 of 48; and (6) debtor avers the purported signatures affixed

upon the separate page titled "ASSIGNMENT OF PROMISSORY

NOTE" displayed at page 9 of 48, the separate page titled "NOTE

ALLONGE" displayed at page 10 of 48, and the separate and untitled

page displayed at page 5 of 48 are forgeries and or stamps displaying

the names and alleged signatures by persons who debtor avers lacked

the capacities claimed within, lacked knowledge as to the ownership and

transfer of the note in dispute, and they never physically held the

original note.

c.   the "Mortgage" a/k/a "Security Instrument" annexed at Part 5 (pages 11

through 31 of 48) of POC #3 displays a defective legal description upon

setting forth a lot and block of 42 / 140 and metes and bounds for a

property known as 7 Geraldine Road, North Arlington, Bergen County

New Jersey, 07031, not 9 Spindletop Lane, Willingboro, New Jersey

08046 as required by N.J.S.A. 25:1-11(a) and 46:3-16.;

d.   the instrument titled "ASSIGMENT OF MORTGAGE" annexed at Part

5 (pages 32 through 38 of 48) of POC #3 is void *ab initio*, displays

misrepresentations of fact, imposters, and a false notarization because:

(1) Mortgage Electronic Registration Systems, Inc. ("MERS") is

misrepresented to be the "nominee" for FGC on June 27, 2012 after

FGC filed a voluntary petition under Chapter 11 of the United States

Bankruptcy Code in the United States Bankruptcy Court for the Central

District of California, Santa Ana Division on June 18, 2008 (*In re*

*Fremont General Corporation*, a Nevada corporation, Case No. 8:08-

bk-13421), and after FGC emerged from Chapter 11 bankruptcy in Case

No. 8:08-bk-13421 under a court-approved reorganization plan, crafted

by private investment firm Signature Group Holdings ("SGH") and

order dated on June 9, 2010.; (2) MERS as the purported "nominee" for

FGC is declared to be the assignor of the "mortgage loan" in dispute on

June 27, 2012 when, at all relevant times, MERS had already admitted

it takes no interest in and is contractually prohibited from taking any

action upon mortgage loans.;[1] (3) WFB as Trustee for CMLT 2006-

FRE1 was unable to and did not take ownership and or possession of

the mortgage loan in dispute on June 27, 2012 or any other date after

the June 28, 2006 closing date set forth within the binding Pooling and

Servicing Agreement ("PSA") dated June 1, 2006 that was filed with

the United States Security and Exchange Commission ("SEC"),[2] for the

purported transfer and assignment after the closing date would

---

[1] See Exhibit A annexed hereto for MERS' own admissions on October 15, 2004 in Mortgage Electronic Registration Systems, Inc., Appellant v. Nebraska Department of Banking & Finance, Respondent (A-04-000786) (Id. at 22); See also Exhibit B annexed hereto for MERS' admissions before the Nebraska Supreme Court resulting in the opinion and order entered on October 15, 2005 in Mortgage Electronic Registration Systems, Inc. v. Nebraska Department of Banking & Finance, 704 N.W.2d 784, 788 (Neb. 2005); see also Exhibit C annexed hereto for the February 11, 2011 Certification of Mortgage Electronic Registration Systems, Inc., In Response to Administrative Order 01-2010 filed with the N.J. Sup. Ct. (Docket No.: F-238-11) wherein MERS declared in relevant part that: "MERS is not a mortgage servicer, nor does MERS own beneficial interests in promissory notes." (Id. at ¶9).

[2] See   http://www.sec.gov/Archives/edgar/data/1365984/000095013606005696/file2.htm   (last checked April 8, 2019).

jeopardize WFB as Trustee for CMLT 2006-FRE1's alleged status as a
Real Estate Mortgage Investment Conduit ("REMIC") pursuant to 26
U.S.C. §§ 860G(a)(3)(4), 860(d)(1), and the alleged assignment in
contravention of the aforementioned PSA is void pursuant to New York
Consolidated Laws, Estates, Powers and Trusts Law - EPT § 7-2.4.[3];

e.  the names and purported signatures of Joe Loots and Besty Ostermann
    displayed within the aforementioned instrument as "Assistant
    Secretary" for MERS, and the alleged notarization by California notary
    public Rosario Navarro constitutes the crime of fictitious persons in
    violation of 18 U.S.C. § 1342 and notary fraud because, at all relevant
    times: (1) Joe Loots, Besty Ostermann, and Rosario Navarro were
    employees of CMS for MERS has never had any such employees, and
    Rosario Navarro never witnessed identification from Joe Loots and
    Besty Ostermann to confirm their purported identities as officers of
    MERS.;[4] and (2) Joe Loots and Besty Ostermann lacked knowledge
    about the whereabouts, ownership, and transfer of the "mortgage loan"

[3] See New York Consolidated Laws, Estates, Powers and Trusts Law - EPT § 7-2.4 stating: "If the
trust is expressed in the instrument creating the estate of the trustee, every sale, conveyance or other
act of the trustee in contravention of the trust, except as authorized by this article and by any other
provision of law, is void."; see also See Allison & Ver Valen Co. v. McNee, 9 N.Y.S. 2D 708 (N.Y.
Sur. 1939); Dye v. Lewis (New York, Sup. Crt., 1971) 67 Misc.2d 426, 324 N.Y.S.2d 172. (The
authority of the trustee is subject to any limitations imposed by the trust instrument [EPTL, s 11—
1.1, subd. (b)(8)], and every act in contravention of the Trust is void. [EPT, s 7—2.4]).   See also
In re Saldivar, Case No. 11-1-0689 (June 5, 2013); Glaski v. Bank of America, N.A., 218 Cal. App.
4th 1079 (2013); Horace vs. LaSalle Bank, N.A. from the Alabama Circuit Court of Russell County
(Case No.: 57-CV-2008-000362.00).

[4] See the April 7, 2010 deposition of William Hultman as an executive of MERSCORP Holdings,
Inc. ("MERSCORP") in Bank of New York as trustee vs. Victor Ukpe, et al. (Docket No. F-10209-
08) from the Superior Court of New Jersey (Id. at Page 69, Lines 13 - 18, 25, and Page 70, Lines
1-9)

in dispute, and they never physically held and or inspected the same.;
and

    f.   the purported "modification" annexed at Part 5 (pages 38 through 48)
of POC #3 is defective, predatory, unexecuted, and void ab initio
because: (1) the debtor is the only person who allegedly signed the
instrument on May 24, 2011 without any notarization to acknowledge
debtor's alleged signature.; (2) the instrument is dated May 24, 2011
while, at all relevant times, MERS remained the purported "mortgagee"
of record for the mortgage loan in dispute, and CMS has failed to
demonstrate its authority to modify the mortgage loan.; and (3) the
instrument displays an unconscionable balloon feature which is
prohibited under applicable state and federal laws.

Further, the debtor avers for the record that an instrument similar to the aforementioned
document submitted in this matter by CMS, KML, and WFB as Trustee for CMLT 2006-
FRE1 on April 4, 2019 titled "ASSIGNMENT OF MORTGAGE", which misrepresents a
transfer of a mortgage loan to a trust entity after the latter closed, and displays the names
and alleged signatures of CMS' employees impersonating officers of a non-existing entity,
resulted in a jury award on November 6, 2015 for $5.4 Million that is annexed hereto as
Exhibit G in Wolfe v. Wells Fargo Bank, as Trustee, and Carrington Mortgage Services
from the District Court of Harrison County, Texas (Cause No. 2011-36476).

### C. POC #3 Does Not Comply With Rule 3001(d).

    6.    For the foregoing reasons set forth above within ¶5 and its subparts, and re-
stated herein as though fully incorporated by reference, CMS, KML, and WFB as Trustee

for CMLT 2006-FRE1 have failed to present to this Court "Evidence of Perfection of Security Interest" as provided by Fed. R. Bankr. P. 3001(d) which provides: "If a security interest in property of the debtor is claimed, the proof of claim shall be accompanied by evidence that the security interest has been perfected."

7.    Specifically, because the "Mortgage" a/k/a "Security Instrument" annexed at Part 5 (pages 11 through 31 of 48) of POC #3 does not comply with N.J.S.A. 25:1-11(a) and 46:3-16 upon including a defective legal description setting forth a lot and block of 42 / 140 and metes and bounds for a property known as 7 Geraldine Road, North Arlington, Bergen County New Jersey, 07031, not 9 Spindletop Lane, Willingboro, New Jersey 08046, CMS, KML, and WFB as Trustee for CMLT 2006-FRE1 have failed to present "Evidence of Perfection of Security Interest" as provided by Fed. R. Bankr. P. 3001(d).

**D. POC #3 Constitutes Criminal Conduct in Violation of 18 U.S.C. §§ 152, 157, and 3571.**

8.    For the foregoing reasons set forth above within ¶¶1-7, and re-stated herein as though fully incorporated by reference, CMS, KML, and WFB as Trustee for CMLT 2006-FRE1 knew or should have known POC #3 and the documents annexed thereto in support constitutes concealment, false oaths and claims in violation of 18 U.S.C. § 152 because CMS, KML, and WFB as Trustee for CMLT 2006-FRE1: (1) knowingly and fraudulently made false oaths or accounts in or in relation to debtor's case under title 11; (2) knowingly and fraudulently made false declarations or statements under penalty of perjury in or in relation to debtor's case under title 11; (3) knowingly and fraudulently presented a false claim for proof against the estate of debtor; and (4) after the filing of debtor's case under title 11 or in contemplation thereof, knowingly and fraudulently concealed, destroyed, mutilated, falsified, or made false entries in any recorded information

8

(including books, documents, records, and papers) relating to the property or financial affairs of debtor.

9.    For the foregoing reasons set forth above within ¶¶1-7, and re-stated herein as though fully incorporated by reference, CMS, KML, and WFB as Trustee for CMLT 2006-FRE1 knew or should have known POC #3 and the documents annexed thereto in support constitutes bankruptcy fraud in violation of 18 U.S.C. § 157 because CMS, KML, and WFB as Trustee for CMLT 2006-FRE1: (1) devised or intended to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so, they filed documents in debtor's proceeding under title 11; and (2) made a false or fraudulent representation, or claim concerning or in relation to debtor's proceeding under title 11.

10.    For the foregoing reasons set forth above within ¶¶1-7, and re-stated herein as though fully incorporated by reference, CMS, KML, and WFB as Trustee for CMLT 2006-FRE1 knew or should have known POC #3 and the documents annexed thereto in support constitutes alteration and falsification of records in bankruptcy in violation of 18 U.S.C. §1519 because CMS, KML, and WFB as Trustee for CMLT 2006-FRE1 knowingly altered, concealed, covered up, falsified, and made false entries of record and documents, with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of the debtor's case filed under title 11.

11.    Additionally, CMS, KML, and WFB as Trustee for CMLT 2006-FRE1 knew about, should have known about, and or omitted and concealed from this Court:

a.    the existence and location of the transferable record a/k/a electronic promissory note ("eNote") that is associated with the "mortgage loan"

in dispute, dated March 17, 2006, worth at least $151,920.00, and currently registered on the MERS® eRegistry and assigned an eighteen-digit Mortgage Identification Number ("MIN") of 1001944-8000081440-8 which serves as the unique identifier for eNotes registered on the MERS® System.;

b.  the mortgage loan in dispute is subject to and cover by the March 7, 2007 cease and desist issued by the Federal Deposit Insurance Corporation ("FDIC") against debtor's original creditor FGC[5] and the latter's subsidiary FIL for illegal mortgage origination practices including, but not limited to, baiting consumers with false and deceptive promises of fixed interest rate mortgage loans wherein the monthly installments would include an escrow for property taxes and hazard insurance premiums, and then switching mortgagors into predatory mortgage loans consisting of adjustable interest rates without an escrow for taxes and insurance causing unsuspecting consumers to experience "payment shocks" upon the interest rate adjustment and delinquency notices for unpaid property taxes and hazard insurance premiums.; and

c.  before the falsely declared transfer of the mortgage loan from MERS as the alleged nominee for FGC on June 27, 2012 as uttered within the instrument titled "ASSIGNNMENT OF MORTGAGE" annexed to POC #3, debtor's original lender FGC filed a voluntary petition under

---

[5] See Exhibit D annexed hereto for the March 7, 2007 Order to Cease and Deist from In the Matter of Fremont Investment & Loan, et al. (Docket No. FDIC-07-035b).

Chapter 11 of the United States Bankruptcy Code in the United States

Bankruptcy Court for the Central District of California, Santa Ana

Division on June 18, 2008 (See Exhibit E annexed hereto for the petition

from *In re Fremont General Corporation, a Nevada corporation*, Case

No. 8:08-bk-13421), and after FGC emerged from Chapter 11

bankruptcy in Case No. 8:08-bk-13421 under a court-approved

reorganization plan, crafted by private investment firm Signature Group

Holdings ("SGH"), and ordered dated on June 9, 2010 that is annexed

hereto as Exhibit F.

12.    Last, and certainly not least, the debtor designated FGC, not WFB as

Trustee for CMLT 2006-FRE1 (or any other party) as the secured creditor for the 1st

mortgage loan in dispute designated in Line 2.1 of Form 106D filed in this matter on

February 25, 2019 (Doc. 27) because WFB as Trustee for CMLT 2006-FRE1 has never

forwarded a *"Notice of Sale / Transfer"* communication to debtor as required by 15 U.S.C.

§ 1641(g) - Notice of new creditor.

## CONCLUSION

13.    Wherefore, at a minimum, the debtor respectfully request this Court deny

the POC filed by CMS through KML as the purported (emphasis added) servicing agent

and attorneys, respectively, for WFB as Trustee for CMLT 2006-FRE1, and disallow Proof

of Claim 3-1 pursuant to Rule 3001 and 11 U.S. Code § 502.

I certify that the foregoing statements made by me are true, and the motion along with the bankruptcy petition at bar, are made in good faith.   I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Dated: _____

Respectfully Submitted

Rodney Kelly
*"Debtor"*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

Mark W. Ford, Esq.
Law Firm of Mark W. Ford, LLC
PO Box 110
4 1/2 North Broadway
Gloucester City, NJ 08030
Tel: 856-456-8811
*"Attorney for Debtor"*

Case No.: 19-11490-MBK

In Re:

Judge: Hon. Michael B. Kaplan

Rodney Jose Kelly aka Rodney J. Kelly aka
Rodney Kelly

Chapter: 13

                    Debtor

## CERTIFICATION OF DEBTOR RODNEY KELLY IN OPPOSITION OF PROOF OF CLAIM 3-1 FILED BY CARRINGTON MORTGAGE SERVICES, LLC IN THE NAME OF WELLS FARGO BANK, N.A., AS TRUSTEE FOR CARRINGTON MORTGAGE LOAN TRUST, SERIES 2006-FRE1 ASSET-BACKED PASS-THROUGH CERTIFICATES

I, Rodney Kelly, of full age, the debtor in this matter, and owner of 9 Spindletop Lane Willingboro, NJ 08046, submits pursuant to Fed. R. Bankr. P. 3001 and 3007, debtor's opposition to Proof of Claim 3-1 ("POC #3) filed in this matter on April 4, 2019 by KML Law Group, P.C. ("KML") as attorney for Wells Fargo Bank, N.A., as Trustee for Carrington Mortgage Loan Trust, Series 2006-FRE1 Asset-Backed Pass-Through Certificates ("WFB as Trustee for CMLT 2006-FRE1"), and Carrington Mortgage Services, LLC ("CMS") as the purported creditor's agent, and debtor request an evidentiary hearing for the reasons set forth immediately below:

1

**A. POC #3 Does Not Comply With Rule 3001(b).**

1.      CMS through KML designated at Line 1 of Form 410 filed in this matter on April 4, 2019 WFB as Trustee for CMLT 2006-FRE1 as the "creditor" as it relates to the "mortgage loan" designated by debtor at Line 2.1 of Form 106D (Doc. 27).

2.      CMS through attorneys KML, not WFB as Trustee for CMLT 2006-FRE1, filed Form 410 on April 4, 2019.

3.      Rule 3001(b) provides *"Who May Execute"* a Proof of Claim by setting forth in relevant part that: "A proof of claim shall be executed by the creditor or the creditor's authorized agent...". See Fed. R. Bankr. P. 3001(b).

4.      Upon debtor's examination of the documents annexed to POC# 3, there is no power of attorney and or other letter of authorization wherein the purported creditor designated within Form 410, WFB as Trustee for CMLT 2006-FRE1, authorized CMS to appear in this matter on the alleged creditor's behalf as required by Rule 3001(b).

**B. POC #3 Does Not Comply With Rule 3001(c).**

5.      The *"Supporting Information"* annexed to POC#3 is either missing, defective, forged, falsely notarized, and does not comply with Fed. R. Bankr. P. 3001(c) because:

    a. The *"Escrow Analysis"* annexed at Part 2 (pages 1 through 10) of POC#3 is defective, incomplete, and materially false because: (1) there is no breakdown of installments of principal and interest made towards the "mortgage loan" in dispute starting May 2006 throughout the year 2010.; (2) debtor did not make any payments towards the "mortgage loan" in dispute for the months of January, February, March, April, and

May of year 2011 as implied by CMS, KML, and or WFB as Trustee

for CMLT 2006-FRE1; and (3) there are unjust charges accessed

including, but limited to, inspection fees at which times debtor

maintained and resided within the subject property.

b.  the "Note" Instrument annexed at Part 5 (pages 1 through 10 of 48) of

POC #3: is defective, forged, and or counterfeit because: (1) the

instrument does not display an indorsement upon the instrument by FGC

as the original lender as required by New Jersey Uniform Commercial

Code (NJ UCC) (See 12A:3-204); (2) the separate page titled

"ASSIGNMENT OF PROMISSORY NOTE" displayed at page 9 of 48,

asserts that FGC assigned the note instrument to Fremont Investment &

Loan ("FIL") on March 22, 2006 which renders the note instrument non-

negotiable wherein an indorsement in blank by FIL would be rendered

void ab initio as a matter of fact and law.; (3) the separate page titled

"NOTE ALLONGE" displayed at page 10 of 48, is not attached and

permanently affixed to the last page of the note instrument displayed at

page 4 of 48 in order to qualify as an allonge.; (4) the separate and

untitled page displayed at page 5 of 48 displays an undated stamp

presented to be an indorsement by FIL paid to the order of WFB as

Trustee for CMLT 2006-FRE1, is not an indorsement as described by

12A:3-204, and any indorsements after FGC allegedly created the

"ASSIGNMENT OF PROMISSORY NOTE" displayed at page 9 of 48,

rendered the instrument non-negotiable wherein an indorsement

thereafter is void *ab initio*.; (5) debtor denies the validity of his alleged

signature affixed upon page four of four of the note instrument displayed

at page 4 of 48; and (6) debtor avers the purported signatures affixed

upon the separate page titled "ASSIGNMENT OF PROMISSORY

NOTE" displayed at page 9 of 48, the separate page titled "NOTE

ALLONGE" displayed at page 10 of 48, and the separate and untitled

page displayed at page 5 of 48 are forgeries and or stamps displaying

the names and alleged signatures by persons who debtor avers lacked

the capacities claimed within, lacked knowledge as to the ownership and

transfer of the note in dispute, and they never physically held the

original note.

c.   the "Mortgage" a/k/a "Security Instrument" annexed at Part 5 (pages 11

through 31 of 48) of POC #3 displays a defective legal description upon

setting forth a lot and block of 42 / 140 and metes and bounds for a

property known as 7 Geraldine Road,  North Arlington, Bergen County

New Jersey, 07031, not 9 Spindletop Lane, Willingboro, New Jersey

08046 as required by N.J.S.A. 25:1-11(a) and 46:3-16.;

d.   the instrument titled "ASSIGMENT OF MORTGAGE" annexed at Part

5 (pages 32 through 38 of 48) of POC #3 is void *ab initio*, displays

misrepresentations of fact, imposters, and a false notarization because:

(1) Mortgage Electronic Registration Systems, Inc. ("MERS") is

misrepresented to be the "nominee" for FGC on June 27, 2012 after

FGC filed a voluntary petition under Chapter 11 of the United States

Bankruptcy Code in the United States Bankruptcy Court for the Central

District of California, Santa Ana Division on June 18, 2008 (*In re*

*Fremont General Corporation*, a Nevada corporation, Case No. 8:08-

bk-13421), and after FGC emerged from Chapter 11 bankruptcy in Case

No. 8:08-bk-13421 under a court-approved reorganization plan, crafted

by private investment firm Signature Group Holdings ("SGH") and

order dated on June 9, 2010.; (2) MERS as the purported "nominee" for

FGC is declared to be the assignor of the "mortgage loan" in dispute on

June 27, 2012 when, at all relevant times, MERS had already admitted

it takes no interest in and is contractually prohibited from taking any

action upon mortgage loans.;[1] (3) WFB as Trustee for CMLT 2006-

FRE1 was unable to and did not take ownership and or possession of

the mortgage loan in dispute on June 27, 2012 or any other date after

the June 28, 2006 closing date set forth within the binding Pooling and

Servicing Agreement ("PSA") dated June 1, 2006 that was filed with

the United States Security and Exchange Commission ("SEC"),[2] for the

purported transfer and assignment after the closing date would

---

[1] See Exhibit A annexed hereto for MERS' own admissions on October 15, 2004 in Mortgage Electronic Registration Systems, Inc., Appellant v. Nebraska Department of Banking & Finance, Respondent (A-04-000786) (Id. at 22); See also Exhibit B annexed hereto for MERS' admissions before the Nebraska Supreme Court resulting in the opinion and order entered on October 15, 2005 in Mortgage Electronic Registration Systems, Inc. v. Nebraska Department of Banking & Finance, 704 N.W.2d 784, 788 (Neb. 2005); see also Exhibit C annexed hereto for the February 11, 2011 Certification of Mortgage Electronic Registration Systems, Inc., In Response to Administrative Order 01-2010 filed with the N.J. Sup. Ct. (Docket No.: F-238-11) wherein MERS declared in relevant part that: "MERS is not a mortgage servicer, nor does MERS own beneficial interests in promissory notes." (Id. at ¶9).

[2] See http://www.sec.gov/Archives/edgar/data/1365984/000095013606005696/file2.htm (last checked April 8, 2019).

5

jeopardize WFB as Trustee for CMLT 2006-FRE1's alleged status as a Real Estate Mortgage Investment Conduit ("REMIC") pursuant to 26 U.S.C. §§ 860G(a)(3)(4), 860(d)(1), and the alleged assignment in contravention of the aforementioned PSA is void pursuant to New York Consolidated Laws, Estates, Powers and Trusts Law - EPT § 7-2.4.[3];

e.   the names and purported signatures of Joe Loots and Besty Ostermann displayed within the aforementioned instrument as "Assistant Secretary" for MERS, and the alleged notarization by California notary public Rosario Navarro constitutes the crime of fictitious persons in violation of 18 U.S.C. § 1342 and notary fraud because, at all relevant times: (1) Joe Loots, Besty Ostermann, and Rosario Navarro were employees of CMS for MERS has never had any such employees, and Rosario Navarro never witnessed identification from Joe Loots and Besty Ostermann to confirm their purported identities as officers of MERS.;[4] and (2) Joe Loots and Besty Ostermann lacked knowledge about the whereabouts, ownership, and transfer of the "mortgage loan"

---

[3] See New York Consolidated Laws, Estates, Powers and Trusts Law - EPT § 7-2.4 stating: "If the trust is expressed in the instrument creating the estate of the trustee, every sale, conveyance or other act of the trustee in contravention of the trust, except as authorized by this article and by any other provision of law, is void."; see also Allison & Ver Valen Co. v. McNee, 9 N.Y.S. 2D 708 (N.Y. Sur. 1939); Dye v. Lewis (New York, Sup. Crt., 1971) 67 Misc.2d 426, 324 N.Y.S.2d 172. (The authority of the trustee is subject to any limitations imposed by the trust instrument [EPTL, s 11—1.1, subd. (b)(8)], and every act in contravention of the Trust is void. [EPT, s 7—2.4]).  See also In re Saldivar, Case No. 11-1-0689 (June 5, 2013); Glaski v. Bank of America, N.A., 218 Cal. App. 4th 1079 (2013); Horace vs. LaSalle Bank, N.A. from the Alabama Circuit Court of Russell County (Case No.: 57-CV-2008-000362.00).

[4] See the April 7, 2010 deposition of William Hultman as an executive of MERSCORP Holdings, Inc. ("MERSCORP") in Bank of New York as trustee vs. Victor Ukpe, et al. (Docket No. F-10209-08) from the Superior Court of New Jersey (Id. at Page 69, Lines 13 - 18, 25, and Page 70, Lines 1-9)

in dispute, and they never physically held and or inspected the same.;
and

f.  the purported "modification" annexed at Part 5 (pages 38 through 48)
of POC #3 is defective, predatory, unexecuted, and void ab initio
because: (1) the debtor is the only person who allegedly signed the
instrument on May 24, 2011 without any notarization to acknowledge
debtor's alleged signature.; (2) the instrument is dated May 24, 2011
while, at all relevant times, MERS remained the purported "mortgagee"
of record for the mortgage loan in dispute, and CMS has failed to
demonstrate its authority to modify the mortgage loan.; and (3) the
instrument displays an unconscionable balloon feature which is
prohibited under applicable state and federal laws.

Further, the debtor avers for the record that an instrument similar to the aforementioned
document submitted in this matter by CMS, KML, and WFB as Trustee for CMLT 2006-
FRE1 on April 4, 2019 titled "ASSIGNMENT OF MORTGAGE", which misrepresents a
transfer of a mortgage loan to a trust entity after the latter closed, and displays the names
and alleged signatures of CMS' employees impersonating officers of a non-existing entity,
resulted in a jury award on November 6, 2015 for $5.4 Million that is annexed hereto as
Exhibit G in <u>Wolfe v. Wells Fargo Bank, as Trustee, and Carrington Mortgage Services</u>
from the District Court of Harrison County, Texas (Cause No. 2011-36476).

## C. <u>POC #3 Does Not Comply With Rule 3001(d).</u>

6.  For the foregoing reasons set forth above within ¶5 and its subparts, and re-
stated herein as though fully incorporated by reference, CMS, KML, and WFB as Trustee

7

for CMLT 2006-FRE1 have failed to present to this Court "Evidence of Perfection of Security Interest" as provided by Fed. R. Bankr. P. 3001(d) which provides: "If a security interest in property of the debtor is claimed, the proof of claim shall be accompanied by evidence that the security interest has been perfected."

7.     Specifically, because the "Mortgage" a/k/a "Security Instrument" annexed at Part 5 (pages 11 through 31 of 48) of POC #3 does not comply with N.J.S.A. 25:1-11(a) and 46:3-16 upon including a defective legal description setting forth a lot and block of 42 / 140 and metes and bounds for a property known as 7 Geraldine Road, North Arlington, Bergen County New Jersey, 07031, not 9 Spindletop Lane, Willingboro, New Jersey 08046, CMS, KML, and WFB as Trustee for CMLT 2006-FRE1 have failed to present "Evidence of Perfection of Security Interest" as provided by Fed. R. Bankr. P. 3001(d).

**D. POC #3 Constitutes Criminal Conduct in Violation of 18 U.S.C. §§ 152, 157, and 3571.**

8.     For the foregoing reasons set forth above within ¶¶1-7, and re-stated herein as though fully incorporated by reference, CMS, KML, and WFB as Trustee for CMLT 2006-FRE1 knew or should have known POC #3 and the documents annexed thereto in support constitutes concealment, false oaths and claims in violation of 18 U.S.C. § 152 because CMS, KML, and WFB as Trustee for CMLT 2006-FRE1: (1) knowingly and fraudulently made false oaths or accounts in or in relation to debtor's case under title 11; (2) knowingly and fraudulently made false declarations or statements under penalty of perjury in or in relation to debtor's case under title 11; (3) knowingly and fraudulently presented a false claim for proof against the estate of debtor; and (4) after the filing of debtor's case under title 11 or in contemplation thereof, knowingly and fraudulently concealed, destroyed, mutilated, falsified, or made false entries in any recorded information

(including books, documents, records, and papers) relating to the property or financial affairs of debtor.

9.     For the foregoing reasons set forth above within ¶¶1-7, and re-stated herein as though fully incorporated by reference, CMS, KML, and WFB as Trustee for CMLT 2006-FRE1 knew or should have known POC #3 and the documents annexed thereto in support constitutes bankruptcy fraud in violation of 18 U.S.C. § 157 because CMS, KML, and WFB as Trustee for CMLT 2006-FRE1: (1) devised or intended to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so, they filed documents in debtor's proceeding under title 11; and (2) made a false or fraudulent representation, or claim concerning or in relation to debtor's proceeding under title 11.

10.    For the foregoing reasons set forth above within ¶¶1-7, and re-stated herein as though fully incorporated by reference, CMS, KML, and WFB as Trustee for CMLT 2006-FRE1 knew or should have known POC #3 and the documents annexed thereto in support constitutes alteration and falsification of records in bankruptcy in violation of 18 U.S.C. §1519 because CMS, KML, and WFB as Trustee for CMLT 2006-FRE1 knowingly altered, concealed, covered up, falsified, and made false entries of record and documents, with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of the debtor's case filed under title 11.

11.    Additionally, CMS, KML, and WFB as Trustee for CMLT 2006-FRE1 knew about, should have known about, and or omitted and concealed from this Court:

  a.  the existence and location of the transferable record a/k/a electronic promissory note ("eNote") that is associated with the "mortgage loan"

in dispute, dated March 17, 2006, worth at least $151,920.00, and currently registered on the MERS® eRegistry and assigned an eighteen-digit Mortgage Identification Number ("MIN") of 1001944-8000081440-8 which serves as the unique identifier for eNotes registered on the MERS® System.;

b.  the mortgage loan in dispute is subject to and cover by the March 7, 2007 cease and desist issued by the Federal Deposit Insurance Corporation ("FDIC") against debtor's original creditor FGC[5] and the latter's subsidiary FIL for illegal mortgage origination practices including, but not limited to, baiting consumers with false and deceptive promises of fixed interest rate mortgage loans wherein the monthly installments would include an escrow for property taxes and hazard insurance premiums, and then switching mortgagors into predatory mortgage loans consisting of adjustable interest rates without an escrow for taxes and insurance causing unsuspecting consumers to experience "payment shocks" upon the interest rate adjustment and delinquency notices for unpaid property taxes and hazard insurance premiums.; and

c.  before the falsely declared transfer of the mortgage loan from MERS as the alleged nominee for FGC on June 27, 2012 as uttered within the instrument titled "ASSIGNMENT OF MORTGAGE" annexed to POC #3, debtor's original lender FGC filed a voluntary petition under

---

[5] See Exhibit D annexed hereto for the March 7, 2007 Order to Cease and Deist from In the Matter of Fremont Investment & Loan, et al. (Docket No. FDIC-07-035b).

Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Santa Ana Division on June 18, 2008 (See Exhibit E annexed hereto for the petition from *In re Fremont General Corporation, a Nevada corporation*, Case No. 8:08-bk-13421), and after FGC emerged from Chapter 11 bankruptcy in Case No. 8:08-bk-13421 under a court-approved reorganization plan, crafted by private investment firm Signature Group Holdings ("SGH"), and ordered dated on June 9, 2010 that is annexed hereto as Exhibit F.

12.    Last, and certainly not least, the debtor designated FGC, not WFB as Trustee for CMLT 2006-FRE1 (or any other party) as the secured creditor for the 1st mortgage loan in dispute designated in Line 2.1 of Form 106D filed in this matter on February 25, 2019 (Doc. 27) because WFB as Trustee for CMLT 2006-FRE1 has never forwarded a *"Notice of Sale / Transfer"* communication to debtor as required by 15 U.S.C. § 1641(g) - Notice of new creditor.

## CONCLUSION

13.    Wherefore, at a minimum, the debtor respectfully request this Court deny the POC filed by CMS through KML as the purported (emphasis added) servicing agent and attorneys, respectively, for WFB as Trustee for CMLT 2006-FRE1, and disallow Proof of Claim 3-1 pursuant to Rule 3001 and 11 U.S. Code § 502.

I certify that the foregoing statements made by me are true, and the motion along with the bankruptcy petition at bar, are made in good faith.   I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Dated: _04-08-2019_

Respectfully Submitted

Rodney Kelly
*"Debtor"*

# EXHIBIT A

KLUTZNICK LAW LIBRARY
CREIGHTON UNIVERSITY

A-04-000786

## IN THE NEBRASKA COURT OF APPEALS

MORTGAGE ELECTRONIC REGISTRATIONS SYSTEMS, INC.,
Plaintiff/Appellant

vs.

NEBRASKA DEPARTMENT OF BANKING AND FINANCE,
Defendant/Appellee

## BRIEF OF APPELLANT

APPEAL FROM THE DISTRICT COURT OF
LANCASTER COUNTY, NEBRASKA

The Honorable John A. Colborn

Prepared and submitted by:

James M. Pfeffer, #19177
Joseph T. Breckenridge, #21918
Abrahams Kaslow & Cassman LLP
8712 West Dodge Road, Suite 300
Omaha, Nebraska 68114
Telephone (402) 392-1250
Attorneys for Plaintiff/Appellant



FILED

OCT 1 5 2004

CLERK
NEBRASKA SUPREME COURT
COURT OF APPEALS

# TABLE OF CONTENTS

Page(s)

TABLE OF CASES AND STATUTES ..................................................... iii

STATEMENT OF THE BASIS OF JURISDICTION ................................. 1

STATEMENT OF THE CASE ................................................................. 1

    A.    Nature of the Case .................................................. 1

    B.    Issue Actually Tried in the Court Below ................. 2

    C.    How the Issue Was Decided and What Judgment Was
        Entered by the Court Below .................................... 2

    D.    Scope of Review ..................................................... 2

ASSIGNMENTS OF ERROR ................................................................ 2

PROPOSITIONS OF LAW ................................................................... 3

STATEMENT OF FACTS ..................................................................... 4

ARGUMENT

    I.    THE DISTRICT COURT ERRED IN CONCLUDING
        THAT MERS MEETS THE DEFINITION OF A
        "MORTGAGE BANKER" UNDER NEB. REV. STAT. §
        45-702(6) AND IS THEREFORE REQUIRED TO
        REGISTER AS A MORTGAGE BANKER ........................................... 7

    I.A.    MERS DOES NOT "ACQUIRE" MORTGAGE
        LOANS OR ENGAGE IN ANY OF THE OTHER
        MORTGAGE BANKING ACTIVITIES
        DESCRIBED IN § 45-702(6), AND MERS'
        ABILITY TO EXERCISE INTERESTS IN A
        MORTGAGE LOAN, INCLUDING THE RIGHT
        TO FORECLOSE, IS NOT SUFFICIENT TO
        DEEM THAT MERS ACQUIRES MORTGAGE
        LOANS BECAUSE MERS MERELY ACTS IN A
        NOMINEE CAPACITY FOR THE OWNER AND
        HOLDER OF THE PROMISSORY NOTE
        SECURED BY THE MORTGAGE. ..................................................... 7

I.B.   THE DISTRICT COURT SHOULD HAVE RECOGNIZED THAT MERS' OWNERSHIP OF A LEGAL INTEREST IN THE SECURITY DOCUMENT DOES NOT EQUATE TO MERS' OWNERSHIP OF THE PROMISSORY NOTE OR OTHER DEBT INSTRUMENT EVIDENCING THE LOAN MADE TO THE CONSUMER.................................. 12

II.   THE DISTRICT COURT ERRED BY FAILING TO DETERMINE THAT MORTGAGE LOAN CONSUMERS WILL NOT BE HARMED IF MERS IS NOT REGISTERED AS A MORTGAGE BANKER ...................................... 17

CONCLUSION ............................................................................................ 22

## TABLE OF CASES

Page(s)

*City of Grand Island v. County of Hall*, 196 Neb. 282, 242 N.W.2d 858 (1976)............ 14

*Connors v. Pantano*, 165 Neb. 515, 86 N.W.2d 367 (1957) ......................................... 14

*Craddock v. Brinkley*, 671 So.2d 662 (Miss. 1996).......................................................... 16

*DLH, Inc. v. Lancaster County Board of Commissioners*, 264 Neb. 358,
    648 N.W.2d 277 (2002) .......................................................................................... 13

*Equitable Building & Loan Ass'n. of Grand Island v. Equitable Mortgage Corp.*,
    11 Neb. App. 850, 662 N.W.2d 205 (2003)........................................................... 9

*Henkle & Joyce Hardware Co. v. Maco, Inc.*, 195 Neb. 565,
    239 N.W.2d 772 (1976) .......................................................................................... 2

*James v. Paulson*, 261 Neb. 980, 622 N.W.2d 857 (2001)............................................. 2

*Little Blue Natural Resources Dist. v. Lower Platte North Natural Resources Dist.*,
    206 Neb. 535, 294 N.W.2d 598 (1980)................................................................. 14

*Pettigrew v. Home Ins. Co.*, 191 Neb. 312, 214 N.W.2d 920 (1974) ............................. 14

*South Boston Sav. Bank v. Commissioner of Revenue*, 418 Mass. 695,
    640 N.E.2d 462 (1994).......................................................................................... 8

*State v. One 1972-Door Sedan Rambler*, 191 Neb. 462, 215 N.W.2d 845 (1974).......... 14

## STATUTES

Neb. Rev. Stat. § 25-1911 ............................................................................................... 2

Neb. Rev. Stat. § 45-702(6) ...............................................................................2, 3, 5, 7, 13

Neb. Rev. Stat. § 45-702(8) ................................................................................ 13, 14, 15

Neb. Rev. Stat. §§ 45-701 to 45-721 ............................................................................. 1

Neb. Rev. Stat. § 45-704 ................................................................................................. 6

Neb. Rev. Stat. §§ 84-901 to 84-920 .............................................................................. 6

Neb. Rev. Stat. §§ 76-1001 to 76-1018 ........................................................... 15

## OTHER CITATIONS

Merriam Webster's Collegiate Dictonary 683 (10th Ed. 1993) ........................................ 15

24 C.F.R. Part 3500.21 as of 4/1/03 (HUD's Reg. X) ..................................................... 20

## STATEMENT OF THE BASIS OF JURISDICTION

This appeal from the District Court of Lancaster County, Nebraska (the "District Court") is brought pursuant to Neb. Rev. Stat. § 25-1912. The trial judge entered the District Court's Order on May 27, 2004. The Notice of Intention to Appeal and requisite docket fee were filed with the District Court on June 25, 2004.

## STATEMENT OF THE CASE

### A.    Nature of the Case

Plaintiff/Appellant, Mortgage Electronic Registration Systems, Inc. ("MERS"), appeals from the Order entered by the District Court on May 27, 2004 in favor of Defendant/Appellee, the Nebraska Department of Banking and Finance (the "Department"). The District Court's Order came as the result of MERS' Petition for Review, which MERS filed in the District Court on November 5, 2003, appealing the decision of the Department that MERS meets the requirements of a mortgage banker under the Nebraska Mortgage Bankers Registration and Licensing Act (the "Act"), Neb. Rev. Stat. §§ 45-701 to 45-721 (1998 and Supp. 2003). (T38) In the District Court's Order, the trial judge, John A. Colborn, ruled that MERS acquires mortgage loans under the Act, and is therefore required to register under the Act in order to continue to conduct business in the State of Nebraska. (T42) The District Court did not find that there is a bifurcation of interests between the holder of the promissory note evidencing a mortgage loan and MERS, which only holds the beneficial interest in the mortgage itself, in a nominee capacity for the owner and holder of the promissory note secured by such mortgage. (T42) MERS then filed this appeal.

**B.      Issue Actually Tried in the Court Below**

      1.      Whether MERS acquires mortgages loans under the Act and is therefore required to register as a mortgage banker in Nebraska.

**C.      How the Issue Was Decided and What Judgment Was Entered by the Court Below**

      1.      The District Court ruled that MERS does acquire mortgage loans under the Act and is therefore required to register as a mortgage banker in Nebraska.

**D.      Scope of Review**

      "A judgment rendered or final order made by the district court may be reversed, vacated, or modified for errors appearing on the record." Neb. Rev. Stat. § 25-1911.

      "In actions at law, the findings of the trier of fact will not be set aside on appeal unless clearly wrong.  In determining the sufficiency of the evidence to sustain the judgment, that evidence must be considered in the light most favorable to the successful party.  Every controverted fact must be resolved in favor of the successful party, and the successful party is entitled to the benefit of any reasonably deducible inferences." *Henkle & Joyce Hardware Co. v. Maco, Inc.*, 195 Neb. 565, 239 N.W.2d 772 (1976).

      On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *James v. Paulson*, 261 Neb. 980, 622 N.W.2d 857 (2001).

**ASSIGNMENTS OF ERROR**

      1.      MERS does not meet the definition of a mortgage banker because MERS does not engage in any of the mortgage banking activities described in § 45-702(6) of the Act. Specifically, the District Court erred in determining that MERS "acquires" mortgage loans. Because MERS does not acquire mortgage loans and is therefore not a mortgage banker for

purposes of § 45-702(6), the District Court's Order and determination that MERS is required to register as a mortgage banker under the Act should be reversed and this Court should find that MERS is not a mortgage banker under the Act and is therefore not required to register under the Act.

2.      The District Court erred in concluding that MERS' ability to exercise interests in a mortgage loan, including the right to foreclose, is sufficient to deem MERS as acquiring mortgage loans under the Act because the District Court failed to recognize that MERS merely serves in a nominee capacity for the owner and holder of the promissory note secured by the mortgage.

3.      The District Court erred by not finding that MERS' ownership of a legal interest in the mortgage does not equate to MERS' ownership of the promissory note.

4.      The District Court erred by not finding that mortgage loan consumers will not be harmed if MERS is not registered as a mortgage banker under the Act.

## PROPOSITIONS OF LAW

### I.

THE COMMON PARLANCE OF THE WORD "ACQUIRE" IN THE MORTGAGE BANKING INDUSTRY REFERS TO AN INVESTOR'S ACQUISITION OF A MORTGAGE LOAN ON THE SECONDARY MARKET.

*South Boston Sav. Bank v. Commissioner of Revenue*, 640 N.E.2d 462 (Mass. 1994).

### II.

A MORTGAGE AND A PROMISSORY NOTE ARE SEPARATE AND DISTINCT INSTRUMENTS.

*Craddock v. Brinkley, 671 So. 2d 662* (Miss. 1996).

## III.

THE MERS® SYSTEM DOES NOT ADVERSELY AFFECT THE BORROWER'S RIGHT TO LOAN INFORMATION BECAUSE, UNDER FEDERAL LAWS, EACH TIME THE SERVICING RIGHTS TO A MORTGAGE LOAN CHANGE, THE BORROWER IS NOTIFIED OF THE NEW SERVICER OF THE LOAN.

24 C.F.R. Part 3500.21 as of 4/1/03 (HUD's Reg. X).

### STATEMENT OF FACTS

MERS is a private corporation and is a wholly owned subsidiary of MERSCORP, INC. MERS' sole purpose is to hold mortgage liens in a nominee (limited form of agency) capacity for its members. The mortgage information is registered on the MERS® System. The MERS® System is a national electronic registry created by the mortgage banking industry to track the transfer of ownership interests and servicing rights in mortgage loans. (T17) Over the life of a mortgage loan, the ownership of the mortgage loan and the servicing rights of the mortgage loan are likely to be sold and resold many times. (T16) Prior to MERS, an assignment or other appropriate document was required to be filed in the real estate records each time the servicing rights of a mortgage loan were transferred because the new servicer needed to appear in the land records in order to receive service of process. (T16) This process resulted in missed or inaccurate assignments causing an unclear or broken chain of title to a mortgage loan in the real estate records. (T16) As a consequence, the transfer of the ownership interest in, including legal title to, mortgage loans, and the servicing rights relating to mortgage loans, and the release of mortgage liens was a cumbersome and expensive process to all involved. (T16) Prior to MERS, consumers were especially hit hard because research and recording costs were often passed on to consumers. (T16)

To address these problems, in 1991 the Government National Mortgage Association ("Ginnie Mae"), the Mortgage Bankers Association of America ("MBA"), the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") and others within the mortgage banking industry created MERS to provide an electronic registration system and clearinghouse for title to mortgage loans and servicing rights that is similar to the process successfully used by the Depository Trust Company for the securities industry. (T16) The MERS® System has been endorsed by, and MERS' members include, the MBA and many large and prominent national and international lenders, agencies such as Fannie Mae, Freddie Mac, and the American Land Title Association and many of the largest and most well-known title companies. (T16, 17)

MERS serves as the mortgagee of record in a nominee (i.e., agency) capacity for the approximately 1600+ mortgage lenders registered in the MERS® System. MERS becomes the mortgagee of record with respect to such mortgage loans, as nominee for the beneficial owner of the mortgage loan, in one of two ways: (1) the borrower and the lender name MERS as the mortgagee of record at the time the mortgage loan is originated, or (2) the lender causes a mortgage lien for which the lender previously originated or acquired the note secured by the mortgage to be assigned of record to MERS, so that MERS becomes the mortgagee of record in the real estate records in which the mortgage was recorded. (E3, 4:3, Vol. II)

By letter dated July 11, 2002, the Department notified MERS that MERS meets the definition of a mortgage banker under Neb. Rev. Stat. § 45-702(6) (1998 & Supp. 2003) of the Act because MERS is "acquiring loans as a nominee for lenders in Nebraska". The Department indicated that MERS must register as a mortgage banker in Nebraska pursuant to § 45-704 or

notify the Department of an exemption under the Act. (E2, E1, 14:3, Vol. II) MERS is not registered as a mortgage banker in any other state. (5:11-19)

After the Department's July 11, 2002 correspondence, MERS and the Department exchanged numerous faxes, letters and phone calls concerning whether MERS is required to register as a mortgage banker under the Act. (E2, E1, 1-13:3, Vol. II) On June 19, 2003, MERS filed a Petition for Declaratory Order ("Petition For Declaratory Order") with the Department seeking a formal determination as to whether MERS is a mortgage banker within the meaning of the Act, and therefore, required to register as such under the Act. (E3, 1:3, Vol. II) A hearing on MERS' Petition for Declaratory Order was held before Samuel P. Baird (the "Director"), Director of the Department, on August 13, 2003. During oral arguments, MERS and the Department narrowed the issue before the Director to the question of whether MERS' activities in Nebraska constitute, directly or indirectly, "acquiring mortgage loans" within the meaning of the Act. (E3, 26:3, Vol. II) The Department issued its Declaratory Order on October 7, 2003, finding that MERS is a mortgage banker under the Act. As the basis for its decision, the Department stated that MERS directly or indirectly acquires mortgage loans. As the result, the Department declared that MERS is required to register as a mortgage banker. (E3, 25-29:3, Vol. II)

On November 5, 2003, MERS commenced its action in the District Court pursuant to the Administrative Procedure Act, Neb. Rev. Stat. §§ 84-901 to 84-920 (1999 & Supp. 2003), petitioning the District Court to review the Department's determination that MERS meets the definition of a mortgage banker under the Act. In its Order, the District Court upheld the Department's determination that MERS acquires mortgage loans under the Act and is therefore required to be licensed as a mortgage banker under the Act. (T41-43)

## ARGUMENT

### I.

**THE DISTRICT COURT ERRED IN CONCLUDING THAT MERS MEETS THE DEFINITION A "MORTGAGE BANKER" UNDER NEB. REV. STAT. § 45-702(6).**

### I.A.

**MERS DOES NOT "ACQUIRE" MORTGAGE LOANS OR ENGAGE IN ANY OF THE OTHER MORTGAGE BANKING ACTIVITIES DESCRIBED IN § 45-702(6), AND MERS' ABILITY TO EXERCISE INTERESTS IN A MORTGAGE LOAN, INCLUDING THE RIGHT TO FORECLOSE, IS NOT SUFFICIENT TO DEEM THAT MERS ACQUIRES MORTGAGE LOANS BECAUSE MERS MERELY ACTS IN A NOMINEE CAPACITY FOR THE OWNER AND HOLDER OF THE PROMISSORY NOTE SECURED BY THE MORTGAGE.**

Section 45-702(6) of the Act provides: "Mortgage banker means any person not exempt under section 45-703 who, for compensation or gain or in the expectation of compensation or gain, directly or indirectly makes, originates, services, negotiates, acquires, sells, arranges for, or offers to make, originate, service, negotiate, acquire, sell, or arrange for ten or more mortgage loans in a calendar year". Neb. Rev. Stat. § 45-702(6) (1998 & Supp. 2003) (emphasis added).

MERS does not take applications for, underwrite or negotiate mortgage loans. MERS does not make or originate mortgage loans to consumers. MERS does not extend any credit to consumers. MERS does not service mortgage loans. MERS does not sell mortgage loans. Most

importantly, MERS is not an investor who acquires mortgage loans on the secondary market. (E3, 18:3, Vol. II)

The Department and MERS agree that MERS does not underwrite, make, originate, service, negotiate, sell, arrange for or offer to make, originate, service, negotiate, sell or arrange for mortgage loans. Therefore, the Department and MERS are in agreement that the only statutory activity at issue, and the only issue for this Court to decide, is whether MERS <u>acquires</u> mortgage loans. (E3, 26:3, Vol. II)

Although the legislative history of the Act does not discuss why the term "acquire" was used in § 45-702(6), the common parlance of the word "acquire" in the mortgage banking industry refers to an investor's acquisition of a mortgage loan on the secondary market. For instance, in *South Boston Sav. Bank v. Commissioner of Revenue*, 640 N.E.2d 462 (Mass. 1994), a Massachusetts court characterized the two ways a bank may come into possession of a mortgage loan. The court, in *South Boston Sav. Bank*, stated: "A bank may come into possession of a mortgage loan either by directly issuing a loan secured by the mortgage of real estate <u>or by acquiring a loan previously issued by another lender</u>." *Id.* at 466-67 (emphasis added).

A brief history of why the secondary mortgage market was created helps illustrate this commonly understood meaning of the term "acquire". The secondary mortgage market evolved to facilitate the free flow of money available for mortgage loans to consumers. Without the secondary market, primary mortgage lenders would be limited in the amount of mortgage loans they could make to consumers because they only have so much capital available to make mortgage loans. Through the secondary market, investors acquire loans from the primary mortgage lenders, thus providing primary lenders with more capital to make additional mortgage loans. The secondary market ultimately provides a free-flow of cash to mortgage lenders to

make loans to consumers to purchase homes. The primary mortgage lenders benefit because they have additional capital to make more loans and they also receive their ordinary lender's fees/commissions for originating the loan. The investors benefit because, as owners of the loans, they are entitled to the interest income to be earned from the loans. Consumers benefit because there are more funds available for mortgage loans so more consumers can get mortgage financing.

Besides loan "servicing" activities, all of the mortgage banking activities described in § 45-702(6) involve the extension of credit. This Court has previously recognized that mortgage bankers lend money to consumers. In *Equitable Building and Loan Association of Grand Island v. Equitable Mortgage Corporation*, 11 Neb. App. 850, 662 N.W. 2d 205 (Neb. 2003), the court stated that "a mortgage banker actually lends its own money, closes the loans, earns a service premium for the loans, and then sells the loans to another bank." *Id.* at 209 (emphasis added). The question then becomes whether MERS lends money to consumers to purchase homes, either at the primary or secondary level. It is not disputed that MERS is not a primary lender who makes, originates, or negotiates or arranges for the making or originating of a mortgage loan directly to a consumer. Similarly, MERS is not an investor who acquires or negotiates or arranges for the acquisition of mortgage loans on the secondary market or a bank or servicing company which acquires the servicing rights to mortgage loans for fee income. (E3, 18:3, Vol. II)

There is no rational basis for determining that MERS acquires loans. In its Order, the District Court stated:

The procedures for members using the MERS system and documents used for recording the mortgages [or] other security documents reference MERS as having

9

the right "to exercise interests, including, but not limited to, the right to foreclose and sell the property, and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument." MERS' active participation in the mortgage loan industry of indirectly or directly acquiring legal title to mortgages along with the ability to exercise lender rights such as foreclosure are sufficient to classify MERS as "acquiring" mortgage loans as referenced under Neb. Rev. Stat. § 45-702(6). (T42)

In its Order, the District Court failed to recognize that MERS, in its agreement with its members, cannot exercise, and is contractually prohibited from exercising, any of the rights or interests in the mortgages or other security documents. MERS is named as the "nominee" owner unless and until it is authorized to do so by the real and beneficial owners of such security documents. (T38-43) In the Terms and Conditions between MERS and its members, MERS' authority is clearly limited as evidenced by the following provision from the Terms and Conditions:

MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. (E3,13:3, Vol. II)

MERS only acts when directed to by its members and for the sole benefit of the owners and holders of the promissory notes secured by the mortgage instruments naming MERS as nominee owner. For this reason, MERS' ability to exercise any interests in mortgage loans, including the right to foreclose, is not sufficient to deem MERS as acquiring mortgage loans under the Act because MERS does not receive any of the benefits from taking such actions. MERS has no interest at all in the promissory note evidencing the mortgage loan. MERS has no financial or other interest in whether or not a mortgage loan is repaid. As described above, MERS simply holds mortgage liens in a nominee capacity and through its electronic registry, tracks changes in the ownership of mortgage loans and the servicing rights related thereto. MERS is clearly listed as a nominee in the mortgage, which is recorded in the real estate records. When a MERS member sells or transfers a mortgage loan or the servicing rights thereunder, MERS tracks such sale or transfer in the MERS® System and there is no need for filing anything in the real estate records because the mortgage lien remains with MERS. Once MERS becomes the mortgagee of record of a mortgage, MERS remains the mortgagee of record of the mortgage even when the beneficial ownership interest in the promissory note secured by the mortgage or the servicing rights are sold or transferred from one MERS member to another. (E3, 3-5:3, Vol. II) In addition, MERS is required by the various State recording statutes to have a recordable interest in the mortgage in order for MERS to be named in the mortgage. Consequently, MERS is named as the mortgagee in a nominee capacity for the actual owner and holder of the promissory note secured by the mortgagee as described above.

MERS is not the owner of the promissory note secured by the mortgage and has no rights to the payments made by the debtor on such promissory note. Rather, MERS holds the mortgage lien as nominee for the owner of the promissory note. MERS is not the owner of the servicing

rights relating to the mortgage loan and MERS does not service loans. The beneficial interest in the mortgage (or the person or entity whose interest is secured by the mortgage) runs to the owner and holder of the promissory note. In essence, MERS immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur. (E3,5:3, Vol. II)

For the foregoing reasons, MERS cannot be deemed to be acquiring mortgage loans under the Act and does not otherwise meet the definition of a mortgage banker. Consequently, the Court should reverse the District Court's Order that MERS is required to register as a mortgage banker.

### I.B.

**THE DISTRICT COURT SHOULD HAVE RECOGNIZED THAT MERS' OWNERSHIP OF A LEGAL INTEREST IN THE SECURITY DOCUMENT DOES NOT EQUATE TO MERS' OWNERSHIP OF THE PROMISSORY NOTE OR OTHER DEBT INSTRUMENT EVIDENCING THE LOAN MADE TO THE CONSUMER.**

Each of the categories of persons listed in § 45-702(6) directly or indirectly receive consideration from mortgage loans and have an ownership or servicing interest in the <u>notes</u> secured by mortgages. As more fully explained below, MERS does not make or acquire promissory notes or debt instruments of any nature and therefore cannot be said to be acquiring mortgage loans. MERS simply holds legal title to mortgages and deeds of trust as a nominee for the owner of the promissory note. MERS has no interest in the notes secured by mortgages or the servicing rights related thereto.

The Department asserts that MERS directly or indirectly acquires mortgage loans because MERS holds legal title to deeds of trust or mortgages in a nominee capacity for lenders. At the hearing on MERS' Petition for Declaratory Order, counsel for the Department stated: "MERS is the mortgage nominee or beneficiary nominee. Therefore, it acquires the <u>legal title to the mortgage loan</u> when the conveyance is recorded." (E2, 5:3, Vol. II)  Furthermore, the Department asserts that MERS holds title to Nebraska real property. (E3, 4-5:3, Vol. II)  These assertions by the Department are in error.  MERS holds legal title to the mortgage or deed of trust in a nominee capacity simply to immobilize the mortgage lien in MERS and to provide MERS with a recordable interest to comply with the recording statutes of various states.  The mortgage loan refers to the promissory note to which MERS does not acquire any interest.

The Department's analysis is fundamentally flawed because it fails to recognize an important distinction between a loan instrument and a security instrument.  By stating that MERS acquires legal title to the "mortgage loan", the Department confuses the analysis.  MERS does not acquire any interest (legal or beneficial) in the <u>loan instrument</u> (i.e., the promissory note or other debt instrument).  Rather, MERS, in a nominee capacity for lenders, merely acquires legal title to the <u>security instrument</u> (i.e., the deed of trust or mortgage that secures the loan).

The Department's position that "mortgage loans are not legally divided under the Act" is incorrect.  In § 45-702(6), the word "mortgage" modifies the word "loans" to specify certain types of loans -- loans secured by interests in real property.  The Act's definition of a "mortgage loan" in § 45-702(8) makes this point even more certain.  Section 45-702(8) of the Act defines "mortgage loan" to mean "<u>any loan or extension of credit</u> secured by a lien on real property, including a refinancing of a contract of sale or an assumption or refinancing of a prior loan or extension of credit." Neb. Rev. Stat. § 45-702(8) (1998 and Supp. 2003) (emphasis added).

Absent anything to the contrary, statutory language is to be given its plain meaning, and a court will not look beyond a statute or interpret it when the meaning of its words are plain, direct and unambiguous. *DLH, Inc. v. Lancaster County Board of Commissioners*, 264 Neb. 358, 648 N.W.2d 277 (2002). Further, in *Little Blue Natural Resources District v. Lower Platte North Natural Resources District*, 206 Neb. 535, 294 N.W.2d 598 (1980), the court stated:

> Cardinal rules of statutory construction, however, prohibit us from ignoring entire phrases of a statute or giving the plain meaning of a statute a strained or absurd interpretation. "Where the language of a statute is plain and unambiguous, no interpretation is needed and the court is without authority to change the language." *City of Grand Island v. County of Hall*, 196 Neb. 282, 286, 242 N.W.2d 858, 861 (1976).
>
> In interpreting the meaning of a statutory provision, the whole provision should be read in order to arrive at a conclusion as to its proper meaning. *Pettigrew v. Home Ins. Co.*, 191 Neb. 312, 214 N.W.2d 920 (1974). Moreover, courts should give statutory language its plain and ordinary meaning. *State v. One 1970 2-Door Sedan Rambler*, 191 Neb. 462, 215 N.W.2d 849 (1974); *Connors v. Pantano*, 165 Neb. 515, 86 N.W.2d 367 (1957).

*Little Blue Natural Resources District*, 294 N.W.2d at 603 (emphasis added).

From the plain face of § 45-702(8), it is clear that the Act is intended to regulate and to require the licensure of persons who, *inter alia*, acquire "loans", not persons who acquire mortgages, deeds of trust or other security instruments. The words "any loan or extension of credit" set forth in § 45-702(8) clearly suggest that the lending of money or extending of credit or arranging for or negotiating the lending of money (for example a loan broker) is the conduct

being regulated by the Act.   This "plain meaning" interpretation of the Act's definition of "mortgage loan" is in accord with the commonly understood meaning of the word "loan".

Webster's Dictionary defines "loan" as: money lent at interest; something lent usually for the borrower's temporary use; etc.  Merriam Webster's Collegiate Dictionary 683 (10th ed. 1993). Since MERS does not acquire any interest in a debt instrument evidencing a loan (i.e., money being lent at interest) and does not make loans, arrange for loans or negotiate the terms of loans, it cannot be said to be acquiring loans, including mortgage loans, and therefore it logically cannot be deemed a mortgage banker.  Thus, under a "plain meaning" interpretation of the Act, including the definition of a mortgage banker, in order for a person to acquire a mortgage loan, such person must acquire a legal or beneficial interest in the promissory note or other debt instrument evidencing such mortgage loan.

As demonstrated above, the Act distinguishes the interests in the promissory note or debt instrument on the one hand, from interests in the deed of trust or security instrument on the other. It is important to understand that MERS may acquire a legal interest in a mortgage or deed of trust (as nominee for the actual lender) without acquiring any corresponding interest, legal or beneficial, in the promissory note secured by such deed of trust.  This is because the note owner appoints MERS to be its agent to only hold the mortgage lien interest, not to hold any interest in the note.  Besides MERS, other parties acquire legal interests in deeds of trust without being deemed mortgage bankers under the Act.  For instance, under the Nebraska Trust Deeds Act, Neb. Rev. Stat. §§ 76-1001 to 76-1018 (1996 and Supp. 2003), a borrower may convey real property by a trust deed to a third party trustee as security for the performance of the borrower's obligations to his/her lender.  Although a trustee under the Nebraska Trust Deeds Act receives legal title to the trust deed securing the borrower's obligations, the trustee often does not hold an

interest (legal or beneficial) in the promissory note or debt instrument evidencing the borrower's obligations. As such, the trustee merely holds legal title in a nominee capacity for the lender, much like MERS. Yet, neither the Trust Deeds Act nor the Mortgage Bankers Act requires such trustees to register as a mortgage banker, despite holding legal title.

In addition to the foregoing, courts have frequently noted the critical difference between loan instruments and security instruments. A mortgage and a promissory note are separate and distinct documents. *Craddock v. Brinkley*, 671 So. 2d 662, 665 (Miss. 1996).

Accordingly, a person may hold legal title to a note while appointing another entity to hold legal title to the mortgage securing such note. In the mortgage banking industry, it is standard industry practice for an investor, such as Fannie Mae or Freddie Mac, to hold legal title to notes secured by mortgages and use a separate servicing entity to hold title to the mortgage via a recorded mortgage or assignment. With the development of MERS, these interests are now split three ways instead of two. The investor continues to own and hold the promissory note, but under the MERS® System, the servicing entity only holds contractual servicing rights and MERS holds legal title to the mortgage as nominee for the benefit of the investor (or owner and holder of the note) and not for itself. MERS does not hold any interest (legal or beneficial) in the promissory notes that are secured by such mortgages or in any servicing rights associated with the mortgage loan. The debtor on the note owes no obligation to MERS and does not pay MERS on the note. MERS holds legal title to the mortgage for the benefit of the owner of the note. In effect, the mortgage lien becomes immobilized by MERS continuing to hold the mortgage lien when the note is sold from one investor to another via an endorsement and delivery of the note or the transfer of the servicing rights from one MERS member to another MERS member via a purchase and sale agreement which is a non-recordable contractual right. Legal title to the

mortgage remains in MERS after such transfers and is tracked by MERS in its electronic registry. (E3, 4-5:3, Vol. II)

As demonstrated above, MERS cannot be deemed to be acquiring mortgage loans under the Act because it does not obtain legal or beneficial title in loan instruments. MERS does not acquire an interest in promissory notes or debt instruments of any nature. Plainly interpreted, the Act requires the licensure of persons who acquire loans of the mortgage variety (i.e., loans secured by mortgages). For these reasons, the Court should recognize that MERS' ownership of a legal interest in the security documents registered on the MERS® System does not equate to MERS ownership of the debt instruments evidencing the loans made to consumers. The Court should further recognize that without owning an interest in the debt instruments, MERS cannot be deemed to be acquiring mortgage **loans** under the Act. As a result, the Court should reverse the District Court's Order that MERS is required to be registered as a mortgage banker.

For the foregoing reasons, the District Court erred in concluding that MERS meets the definition of a "mortgage banker" under Neb. Rev. Stat. § 45-702(6). Consequently, the Court should reverse the District Court's Order and determination that MERS is required to register as a mortgage banker under the Act and the Court should find that MERS is not a mortgage banker under the Act and is therefore not required to register under the Act.

## II.

## THE DISTRICT COURT ERRED BY FAILING TO DETERMINE THAT MORTGAGE LOAN CONSUMERS WILL NOT BE HARMED IF MERS IS NOT REGISTERED AS A MORTGAGE BANKER.

The Department asserts that a number of potential problems for mortgage loan customers could arise if MERS is not registered as a mortgage banker, including:

1.  MERS keeps all of its records for mortgage transactions in its central database, which is accessible only to its clients with a legal interest in the mortgage.

2.  Without licensure, MERS is not required to post a surety bond or other form of security to protect consumers from damages resulting from its potential inaction or action.

3.  Due to the private nature of MERS' business, if MERS goes out of business, its records may become completely inaccessible to the public and the expenses to update the public records may be significant.

4.  MERS may fail to timely release the security interest it holds legal title to under a deed of trust or mortgage when a mortgage loan is paid off.

5.  Consumers may discover that real estate liens are not properly recorded, and if MERS is not required to maintain a license, MERS does not have an incentive to answer consumer complaints and consumers would not have a venue. (E2, 10-11:3, Vol. II)

The Department's concern with each of these potential problems is misplaced. In the mortgage banking industry, after a mortgage loan is made, it is standard practice for the promissory note evidencing the loan and the servicing rights associated with the loan to be transferred, sold and resold many times. Prior to MERS, an assignment or other appropriate document was required to be filed in the real estate records each time the servicing rights of a mortgage loan were transferred because the new servicer needed to appear in the land records in

order to receive service of process. This resulted in missed or inaccurate assignments causing an unclear or broken chain of title to a mortgage loan in the real estate records. As a consequence, the transfer of the ownership interest in, including legal title to, mortgage loans, and the servicing rights relating to mortgage loans, and the release of mortgage liens was a cumbersome and expensive process to all involved, including consumers because the research and recording costs are often passed on to the consumer. (E3, 3:3, Vol. II)

The MERS® System provides an enormous cost benefit to consumers because these recording and research costs, which were formally passed on to the consumers, no longer exist under the MERS® System. The MERS® System simply is a way to increase the efficiency and accuracy of tracking the ownership of the rights associated with mortgage loans so that the mortgage industry can better and more economically serve a greater number of people. What MERS tracks are non-recordable transfers. Servicing rights are transferred vis-à-vis a purchase and sale agreement which is a non-recordable contract right. The beneficial note interests are transferred by endorsement and delivery of the note which is also a non-recordable event. The mortgage lien remains with MERS so no assignment of the mortgage lien is needed when these non-recordable transfers occur and are tracked on the MERS® System.

Other than the cost savings that the MERS® System passes on to consumers of loans from MERS members, consumers are largely unaffected by MERS' involvement in the mortgage banking industry. It is true that MERS' registry or database (tracking the ownership interest and servicing rights) is only accessible by MERS' members, the public, at no cost, has access to the name and telephone number of the current mortgage servicer 7 days a week, 24 hours a day. It is the servicer that the consumer needs to contact for specific loan information, not MERS. Moreover, the MERS® System does not adversely affect the borrower's right to such

information because, under federal laws, each time the servicing rights to a mortgage loan change, the borrower is notified of the new servicer of the loan. *See* 24 C.F.R. Part 3500.21 as of 4/1/03 (HUD's Reg. X).

Furthermore, none of the other potential problems noted above by the Department adversely affect consumers.  MERS is largely transparent to the consumer.  Original lenders of mortgage loans, investors who purchase or acquire mortgage loans on the secondary market, and servicers of mortgage loans are the "persons" under the Act that mortgage loan consumers need to be protected from because it is these persons who actually underwrite loans, make loans, service loans, acquire loans, and ultimately decide whether or not a consumer is in default on the loan.

MERS does not collect mortgage payments.  MERS does not hold escrows for taxes and insurance.  MERS does not provide any servicing functions on mortgage loans, whatsoever. Those rights are typically held by the servicer of the loan, who may or may not also be the holder of the note.  The beneficial interest in the mortgage (or the person or entity whose interest is secured by the mortgage) runs to the owner and holder of the promissory note and/or servicing rights thereunder.

From a consumer protection standpoint, MERS is invisible to a consumer.  In the event a consumer has a problem with his/her mortgage loan, such consumer is not going to contact MERS, but the servicer of the loan.  As MERS merely holds legal title to the security instrument as nominee for the lender, it lacks authority to do anything more than notify the lender or loan servicer of the consumer's complaint.  Other than holding legal title to the security instrument in order to immobilize the lien in the real estate records, any other action taken by MERS with

respect to a consumer's mortgage loan is taken at the direct instruction of the lender or loan servicer and for such lender or loan servicer's benefit.

To further illustrate this lack of authority, the Terms and Conditions governing the relationship with MERS and its members provides:

> MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. (E3, 13:3, Vol. II)

Based upon the foregoing, there is no benefit to mortgage loan consumers in requiring MERS to be licensed as a mortgage banker. MERS' sole function to the mortgage banking industry is to track changes in the ownership and servicing rights in mortgage loans on its electronic registry. In order for MERS to track such changes, the recording laws require MERS to hold legal title to the deed of trust securing the consumer's mortgage loan in a nominee or administrative capacity for the real lender. The Act is intended to protect consumers from lenders and loan service providers, not MERS, because these are the parties that make decisions with respect to consumers' mortgage loans. Any action taken by MERS with respect to a consumer's mortgage loan is taken at the direct instruction of the lender or loan service provider. Because consumers will not be harmed if MERS is not registered as a mortgage banker, the

Court should reverse the District Court's Order that MERS is required to be registered as a mortgage banker.

## CONCLUSION

MERS does not meet the Act's definition of a mortgage banker. MERS does not directly or indirectly make, originate, service negotiate, acquire, sell, arrange for or offer to make, originate, service, negotiate, acquire, sell, arrange for mortgage loans. MERS does not receive compensation or gain in consideration for its performance of any of the mortgage banking activities described in the Act. MERS does not obtain legal or beneficial title to promissory notes or other debt instruments; therefore, under a "plain meaning" interpretation of the Act, it cannot be deemed to be acquiring mortgage loans. Finally, mortgage loan consumers will not be harmed if MERS is not required to register as a mortgage banker. For the foregoing reasons, MERS is not a mortgage banker for purposes of § 45-702(6), and the District Court's Order and conclusion that MERS is required to register as a mortgage banker under the Act should be reversed.

DATED this 14th day of October, 2004.

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC., Plaintiff/Appellant

By: _____
Joseph T. Breckenridge, #21918
James M. Pfeffer, #19177
ABRAHAMS KASLOW & CASSMAN LLP
8712 West Dodge Road, Suite 300
Omaha, Nebraska 68114
(402) 392-1250
Attorneys for Petitioner/Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Brief Of Appellant was served upon Defendant/Appellee by mailing two copies of same to the following addresses by regular United States mail, postage prepaid, this 14th day of October, 2004:

Nebraska Department of Banking and Finance
Samuel P. Baird, Director
1200 N St., Ste. 311, The Atrium
Lincoln, Nebraska 68509

Nebraska Department of Banking and Finance
c/o Attorney General
2115 State Capitol Bldg.
Lincoln, Nebraska 68509
Attention:  Fredrick F. Neid

Joseph T. Breckenridge

# EXHIBIT B

8/19/2017        Mers v. Nebraska Dept. of Banking :: 2005 :: Nebraska Supreme Court Decisions :: Nebraska Case Law :: Nebraska Law :: US Law :: Justia

# Mers v. Nebraska Dept. of Banking

**704 N.W.2d 784 (2005)**

**270 Neb. 529**

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., appellant, v.
NEBRASKA DEPARTMENT OF BANKING AND FINANCE, appellee.

No. S-04-786.

**Supreme Court of Nebraska.**

October 21, 2005.

*785 James M. Pfeffer and Joseph T. Breckenridge, of Abrahams, Kaslow & Cassman,
L.L.P., Omaha, for appellant.

Jon Bruning, Attorney General, and Fredrick F. Neid, Lincoln, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and
MILLER-LERMAN, JJ.

GERRARD, J.

NATURE OF CASE

Mortgage Electronic Registration Systems, Inc. (MERS), appealed an order of the
Department of Banking and Finance (the Department), declaring that MERS is a
"mortgage banker" under Neb.Rev.Stat. § 45-702 (Reissue 2004) and therefore subject
to the license and registration requirements of the Mortgage Bankers Registration and
Licensing Act (the Act), Neb. Rev.Stat. § 45-701 et seq. (Reissue 2004). The district
court affirmed the order, and MERS appealed. For the reasons that follow, we conclude
that MERS is not a mortgage banker as defined by the Act and, therefore, reverse the
judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

MERS is a private corporation that administers the MERS System, a national electronic registry that tracks the transfer of ownership interests and servicing rights in mortgage loans. Through the MERS System, MERS becomes the mortgagee of record for participating members through assignment of the members' interests to MERS. MERS is listed as the grantee in the official records maintained at county register of deeds offices. The lenders retain the promissory notes, as well as the servicing rights to the mortgages. The lenders can then sell these interests to investors without having to record the transaction in the public record. MERS is compensated for its services through fees charged to participating MERS members.

MERS filed a petition with the Department, requesting a declaratory order that MERS is not a "mortgage banker" under § 45-702(6) and therefore not subject to the license and registration requirements of the Act. At the hearing before the director of the Department, the parties narrowed the issue to whether MERS directly or indirectly "acquires" mortgage loans within the meaning of the Act. The Department concluded that MERS is a mortgage banker under the Act and is therefore required to obtain a mortgage banker's license from the Department pursuant to § 45-705.

MERS filed a petition for review under the Administrative Procedure Act. The district court affirmed the order of the Department, and MERS appealed.

## *786 ASSIGNMENTS OF ERROR

MERS assigns, summarized and restated, that the district court erred in affirming the order of the Department, finding that MERS "acquires" mortgage loans and is, therefore, a "mortgage banker" subject to the requirements of the Act.

## STANDARD OF REVIEW

A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record. When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. Troshynski v. Nebraska State Bd. of Pub. Accountancy, 270 Neb. 347, 701 N.W.2d 379 (2005).

## ANALYSIS

MERS assigns that the district court erred in affirming the Department's order finding MERS to be a "mortgage banker" subject to the license and registration requirements of the Act. Pursuant to the Act, persons acting as or using the title of "mortgage banker" may not do so without first obtaining a license or registering with the Department under the Act or obtaining a license under the Nebraska Installment Loan Act. § 45-705(1). Section 45-702(6) defines "mortgage banker" as

any person not exempt under section 45-703 who, for compensation or gain or in the expectation of compensation or gain, directly or indirectly makes, originates, services, negotiates, acquires, sells, arranges for, or offers to make, originate, service, negotiate, acquire, sell, or arrange for ten or more mortgage loans in a calendar year.

Section 45-702(8) states that "[m]ortgage loan means any loan or extension of credit secured by a lien on real property, including a refinancing of a contract of sale or an assumption or refinancing of a prior loan or extension of credit." In this case, the parties agree that the inquiry is limited to whether MERS "acquires" mortgage loans under § 45-702(6). Further, although § 45-703 contains several exemptions to the Act, the parties agree that MERS does not fall under any of the exemptions.

In its order, the district court accurately characterized MERS' services as follows:

The MERS system was created to facilitate the transfer of ownership interests and servicing rights in mortgage loans. Under the System, MERS serves as mortgagee of record for participating members through assignment of the members' interests to MERS. Mortgage lenders participate in the MERS System as members upon completion of a membership application.

The district court went on to discuss the elements of the contract between MERS and its members, referring specifically to a document entitled "Terms and Conditions," that states, in part:

The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account

of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged *787 properties securing such mortgage loans. MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties.

The document also states that "MERS shall at all times comply with the instructions of the beneficial owner of mortgage loans as shown on the MERS® System."

MERS argues that it does not acquire mortgage loans and is therefore not a mortgage banker under § 45-702(6) because it only holds legal title to members' mortgages in a nominee capacity and is contractually prohibited from exercising any rights with respect to the mortgages (i.e., foreclosure) without the authorization of the members. Further, MERS argues that it does not own the promissory notes secured by the mortgages and has no right to payments made on the notes. MERS explains that it merely "immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur." Brief for appellant at 12.

The Department argues that MERS, through the assignment of lenders' interests in mortgage loans, indirectly acquires mortgage loans and therefore falls within the scope of the Act. The Department further asserts that a loan and corresponding mortgage or deed of trust are inextricably intertwined and that, accordingly, the interests acquired by MERS are interests in mortgage loans, making MERS a mortgage banker subject to the requirements of the Act.

At the hearing before the Department, documents were offered and received into evidence, and the attorneys for both parties presented arguments before the hearing officer. During the hearing, counsel for the Department described MERS' function in the mortgage industry:

Mortgage lenders hire MERS to act as their nominee for mortgages, which allows the lenders to trade the mortgage note and servicing rights on the market without recording subsequent trades with the various register of deeds throughout Nebraska. To execute a MERS Mortgage, the borrower conveys the mortgage to MERS, who is acting as a contractual nominee. MERS becomes the recorded grantee, however, the lender retains the note and servicing right. The lender can then sell that note and servicing rights on the market and MERS records each transaction electronically on its files. When the mortgage loan is repaid, MERS, as agent grantor, conveys the property to the borrower.

8/19/2017   Mers v. Nebraska Dept. of Banking :: 2005 :: Nebraska Supreme Court Decisions :: Nebraska Case Law :: Nebraska Law :: US Law :: Justia

MERS represents that this system saves the lender and the consumer the transaction costs that would be associated with manually recording every transaction.

Subsequently, counsel for MERS explained that MERS does not take applications, underwrite loans, make decisions on whether to extend credit, collect mortgage payments, hold escrows for taxes and insurance, or provide any loan servicing functions whatsoever. MERS merely tracks the ownership of the lien and is paid for its services through membership fees charged to its members. MERS does not receive compensation from consumers. The Department does not take issue with this characterization of MERS' services.

Documents offered during the Department hearing support the limited nature of MERS' services. The hearing officer received several documents into evidence from the MERS website providing example forms for naming MERS as the original mortgagee of a mortgage or deed of trust or for assigning mortgages to MERS. The form naming MERS as original mortgagee of a mortgage states:

Borrower does hereby mortgage, grant and convey to MERS (solely as nominee *788 for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property....

(Emphasis omitted.) Similarly, the document naming MERS as original mortgagee of a deed of trust states:

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.

(Emphasis omitted.) Both documents go on to state:

Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

Although we agree with the district court's characterization of the services provided by MERS and its contractual relationship with its members, we conclude that such services are not equivalent to acquiring mortgage loans, as defined by the Act. In other words,

through its services to its members as characterized by the district court, MERS does not acquire "any loan or extension of credit secured by a lien on real property." MERS does not itself extend credit or acquire rights to receive payments on mortgage loans. Rather, the lenders retain the promissory notes and servicing rights to the mortgage, while MERS acquires legal title to the mortgage for recordation purposes.

MERS serves as legal title holder in a nominee capacity, permitting lenders to sell their interests in the notes and servicing rights to investors without recording each transaction. But, simply stated, MERS has no independent right to collect on any debt because MERS itself has not extended credit, and none of the mortgage debtors owe MERS any money. Based on the foregoing, we conclude that MERS does not acquire mortgage loans, as defined in § 45-702(8), and therefore, MERS is not subject to the requirements of the Act.

CONCLUSION

The district court erred in affirming the judgment of the Department finding MERS to be a mortgage banker under the Act. Thus, we reverse the judgment of the district court, and remand the cause to the district court with directions to reverse the determination made by the Department.

REVERSED AND REMANDED WITH DIRECTIONS.

# EXHIBIT C

MORGAN LEWIS & BOCKIUS LLP
502 Carnegie Center
Princeton, New Jersey 08540-6289
Telephone: (609) 919-6614
Facsimile: (609) 919-6639

MORGAN LEWIS & BOCKIUS LLP
5300 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 415-3456
Facsimile: (305) 415-3001

*Attorneys for Mortgage Electronic*
*Registration Systems, Inc.*

| | |
|---|---|
| IN THE MATTER OF RESIDENTIAL MORTGAGE FORECLOSURE PLEADING AND DOCUMENT IRREGULARITIES | **Administrative Order 01-2010**<br>**Docket # F-238-11**<br><br>**CERTIFICATION OF MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. IN RESPONSE TO ADMINISTRATIVE ORDER 01-2010** |

I, Brandie H. Peeples, of full age, certify as follows:

1.      I have been employed as an in-house counsel by MERSCORP, Inc.

("MERSCORP") – the parent company of Mortgage Electronic Registration Systems, Inc.

("MERS") – since January, 2008, and I am responsible for monitoring litigation involving

MERS and advising local counsel who represents MERSCORP and MERS.

2.      I am submitting this Certification in response to the Administrative Order

Directing Submissions Of Information From Residential Mortgage Foreclosure Plaintiffs

Concerning Their Document Execution Practices To A Special Master (No. 01-2010) entered on

December 20, 2010 and the Supplemental Administrative Order entered on January 31, 2011

(collectively, the "Administrative Order").

### A.    MERS and MERSCORP, Inc. Are Neither Lenders Nor Mortgage Servicers

3.    MERS is a Delaware corporation with its principal place of business in Reston, Virginia.  MERS is a wholly owned subsidiary of MERSCORP, a membership organization formed by and comprised of lenders, servicers, and other industry companies in the mortgage market.  MERSCORP owns and operates the MERS® System, which is an electronic registration system that tracks changes in both the beneficial ownership interests in, and servicing rights to, mortgage loans that are registered on the system as they change hands throughout the life of the loans.

4.    MERS and MERSCORP are not lenders.

5.    MERS and MERSCORP are not servicers of loans, and neither MERS nor MERSCORP services loans.

6.    When a member of MERSCORP lends money to a borrower, in certain instances it secures the repayment of loans with a mortgage that names MERS as the mortgagee of record, as the nominee of the lender and its successors and assigns.  Two of the documents that are typically obtained from a borrower at the time of loan origination are: (1) a promissory note; and (2) a mortgage instrument granting secured interests in the property as collateral to repay the note.  Attached as Exhibit "A" is an example of a mortgage that names MERS as the mortgagee of record as the nominee for the lender (i.e., the MERSCORP member), and the lender's successors and assigns (i.e., other MERSCORP members).

7.    The promissory note is typically a negotiable instrument under Article 3 of the Uniform Commercial Code, and as such, it is often bought and sold.  The mortgage or secured instrument, as distinguished from the note, establishes a lien on the property that secures

the repayment of the loan. It is the mortgage, not the note, that is recorded in the public, local land records.

8.      Two aspects of the mortgage loan are then usually bought and sold -- the servicing rights and the beneficial ownership interests. The servicing rights include the right to collect monthly escrow, principal, and interest payments from the borrower, and the beneficial ownership interests include the right to receive the repayment of the loan itself.

9.      MERS is not a mortgage servicer, nor does MERS own beneficial interests in promissory notes. Instead, MERS serves solely as the mortgagee of record on behalf of, or as the nominee for, the lender and for the lender's successors and assigns.

**B.      How MERS Works**

10.      At loan origination, the lender (a member of MERSCORP) typically takes possession of the note (and becomes the holder of the note), and the borrower and lender designate MERS (as the lender's nominee) to serve as the mortgagee of record, whereby title to the lender's secured interest in the property is held by MERS as the lender's nominee or agent.

11.      At the time of the loan origination, the borrower contractually agrees in the mortgage that MERS, as the nominee of the lender, will serve as the mortgagee of record. In the event of a default on the repayment of the loan, MERS is authorized to foreclose on the home. *See* Exhibit "A."[1]

---

[1]      The MERS mortgage typically reads: "MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument** ... Borrower understands and agrees that MERS holds only legal title to the [secured] interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors

12.     Thus, under the mortgage contract, MERS is authorized by the debtor to foreclose on the debtor's property (i.e., the collateral for the loan) in the event of a default on the payment of the promissory note.  After the borrower signs the mortgage, it is recorded in the public, local land records naming MERS as the mortgagee of record.

13.     When MERS is the mortgagee, MERSCORP obtains information from its members regarding who owns the beneficial ownership interests and servicing rights to the mortgage loan.  When the note is sold by the original lender to others, the sale of the note is tracked on the MERS® System, and MERS remains the mortgagee of record as long as a MERS member is involved with the note, and continues to act as the mortgagee of record as the nominee for the new beneficial owner of the note.  The seller of the note need not assign the mortgage because MERS remains the mortgagee of record as the nominee for the purchaser of the note, who is the lender's successor and assign.

14.     This relationship is memorialized in the security instrument that the borrower signs and is a party to, as well as by the MERSCORP membership agreements that are entered into between MERS, MERSCORP, and its members.

15.     If, however, a MERSCORP member is no longer involved with the note after it is sold, an assignment from MERS to the non-MERSCORP member is provided by MERS, that assignment is recorded in the county where the real estate is located, and the mortgage is "deactivated" from the MERS® System.

---

and assigns) has the right to exercise any and all of those interests, including but not limited to the right to foreclose and sell the Property . . ." *Id* (emphasis in original).

**C.     MERS as Plaintiff in New Jersey Foreclosure Proceedings**

16.     A borrower's relationship for the repayment of the loan is not with MERS,
but rather is with the mortgage servicer. MERS is not responsible for the day-to-day
management of loan accounts, handling customer inquires, collecting and crediting loan
payments, payment of taxes and insurance, engaging in loss mitigation efforts to keep borrowers
in their homes, and pursuing foreclosure. The mortgage loan servicer generally engages local
foreclosure counsel and directs the foreclosure action as the client contact of the foreclosure
firm. This is true regardless of whether the foreclosure is brought in the name of the servicer, in
the name of the owner of the beneficial interests in the loan, or in the name of MERS – a
decision guided by the servicer's agreement with the owner or holder of the note or debt
instrument.

17.     Unlike other respondents to the Administrative Order, MERS is neither a
lender nor a servicer. Instead, lenders and servicers are members of MERSCORP. A complete
list of MERSCORP's members is available on *http //www.mersinc.org*.

18.     MERS operates in part through a network of Certifying Officers, who are
appointed as officers with limited authority to act on behalf of MERS. Such Certifying Officers
are officers of the members or they are third parties with whom the members have a relationship
(frequently attorneys). Members may request a corporate resolution appointing a Certifying
Officer under the MERS Rules of Membership.

19.     MERS Certifying Officers are appointed by corporate resolution as Vice
Presidents and Assistant Secretaries of MERS. The corporate resolution authorizes the
Certifying Officer to act on behalf of MERS in order to carry out specific functions identified in

the corporate resolution. MERS Certifying Officers are only authorized to exercise their

authority under the corporate resolution with respect to loans that are registered to the member

on the MERS® System. A copy of the standard corporate resolution used by MERS to appoint

an officer of a MERSCORP Member as a MERS Certifying Officer is attached as Exhibit "B."

      20.    When accepting a position as a MERS Certifying Officer, the employee of

the lender or servicer is expected to carry out his or her duties as a Certifying Officer in

compliance with all applicable laws and regulations.

      21.    MERS also may appoint a third party such as an attorney as a MERS

Certifying Officer. This appointment is pursuant to a signing authority agreement and corporate

resolution. In such circumstances, MERS, MERSCORP, the member, and the third party enter

into an agreement, in which all agree that the Certifying Officer is granted limited authority to

act on behalf of MERS at the specific instruction of the member, and only with respect to loans

registered to that member. The authority granted to the third party under a signing authority

agreement and corporate resolution is more limited than that granted to a member under its

corporate resolution. Additionally, the member is responsible for providing the third party with

the appropriate instructions and information in order to perform their duties as a Certifying

Officer.

22.    Foreclosure actions brought in New Jersey in the name of MERS are filed and managed by the members (i e. the lenders and/or the servicers). Such foreclosure proceedings are filed and managed by the lender and/or the servicer, through MERS Certifying Officers.

I certify that the foregoing statements made by me are true. I am aware that if any are willfully false that I am subject to punishment.

Brandie H. Peoples

Dated: February _11_, 2011

DB1/66418659 7

# EXHIBIT D

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

|  |  |
|---|---|
| In the Matter of<br><br>FREMONT INVESTMENT & LOAN<br>BREA, CALIFORNIA<br><br>FREMONT GENERAL CREDIT CORPORATION,<br>FREMONT GENERAL CORPORATION,<br>as institution-affiliated parties of<br>FREMONT INVESTMENT AND LOAN<br><br>(INSURED STATE NONMEMBER BANK) | ORDER TO<br>CEASE AND DESIST<br><br>Docket No. FDIC-07-035b |

Fremont Investment & Loan, Brea, California ("Bank"), and Fremont General Credit Corporation ("FGCC") and Fremont General Corporation ("FGC"), institution-affiliated parties of the Bank, having been advised of their right to a Notice of Charges and of Hearing detailing the unsafe or unsound banking practices and violations of law and/or regulations alleged to have been committed by the Bank, FGCC and FGC and of their right to a hearing on the alleged charges under section 8(b)(1) of the Federal Deposit Insurance Act ("Act"), 12 U.S.C. §1818(b)(1), and having waived those rights, entered into a STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST ("CONSENT AGREEMENT") with counsel for the Federal Deposit Insurance Corporation ("FDIC"), dated March 7, 2007, whereby solely for the purpose of this proceeding and without admitting or denying the alleged charges of unsafe or unsound banking practices and violations of law and/or

- 2 -

regulations, the Bank, FGCC and FGC consented to the issuance of an ORDER TO CEASE

AND DESIST ("ORDER") by the FDIC.

The FDIC considered the matter and determined that it had reason to believe that the

Bank, FGCC and FGC had engaged in unsafe or unsound banking practices and had committed

violations of law and/or regulations. The FDIC, therefore, accepted the CONSENT

AGREEMENT and issued the following:

<u>ORDER TO CEASE AND DESIST</u>

IT IS HEREBY ORDERED, that the Bank, its institution-affiliated parties, as that term is

defined in section 3(u) of the Act, 12 U.S.C. §1813(u), and its successors and assigns cease and

desist from the following unsafe and unsound banking practices and violations of law and/or

regulations:

(a)     operating with management whose policies and practices are detrimental to the

Bank;

(b)     operating the Bank without effective risk management policies and procedures in

place in relation to the Bank's primary line of business of brokered subprime mortgage lending;

(c)     operating the Bank without effective risk management policies and procedures in

place in relation to the Bank's other primary line of business of commercial real estate

construction lending;

(d)     operating with inadequate underwriting criteria and excessive risk in relation to

the kind and quality of assets held by the Bank;

(e)     operating without an accurate, rigorous and properly documented ALLL

methodology;

- 3 -

(f)    operating with a large volume of poor quality loans;

(g)    engaging in unsatisfactory lending practices;

(h)    operating without an adequate strategic plan in relation to the volatility of the Bank's business lines and the kind and quality of assets held by the Bank;

(i)    operating with inadequate capital in relation to the kind and quality of assets held by the Bank;

(j)    operating in such a manner as to produce low and unsustainable earnings;

(k)    operating with inadequate provisions for liquidity in relation to the volatility of the Bank's business lines and the kind and quality of assets held by the Bank;

(l)    marketing and extending adjustable-rate mortgage ("ARM") products to subprime borrowers in an unsafe and unsound manner that greatly increases the risk that borrowers will default on the loans or otherwise cause losses to the Bank, including ARM products with one or more of the following characteristics:

(i)    qualifying borrowers for loans with low initial payments based on an introductory or "start" rate that will expire after an initial period, without an adequate analysis of the borrower's ability to repay the debt at the fully-indexed rate;

(ii)    approving borrowers without considering appropriate documentation and/or verification of their income;

(iii)    containing product features likely to require frequent refinancing to maintain an affordable monthly payment and/or to avoid foreclosure;

(iv)    including substantial prepayment penalties and/or prepayment penalties that extend beyond the initial interest rate adjustment period;

- 4 -

(v)      providing borrowers with inadequate and/or confusing information relative to product choices, material loan terms and product risks, prepayment penalties, and the borrower's obligations for property taxes and insurance;

(vi)      approving borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses; and/or

(vii)      approving loans or "piggyback" loan arrangements with loan-to-value ratios approaching or exceeding 100 percent of the value of the collateral;

(m)      making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms;

(n)      operating in violation of section 23B of the Federal Reserve Act, 12 U.S.C. §371c-1, made applicable to state nonmember insured institutions by section 18(j)(1) of the Act, 12 U.S.C. §1828(j)(1), in that the Bank engaged in transactions with its affiliates on terms and under circumstances that in good faith would not be offered to, or would not apply to, nonaffiliated companies; and

(o)      operating inconsistently with the FDIC's Interagency Advisory on Mortgage Banking and Interagency Expanded Guidance for Subprime Lending Programs.

IT IS FURTHER ORDERED, that the Bank, its institution-affiliated parties, and its successors and assigns, take affirmative action as follows:

- 5 -

## MANAGEMENT REQUIREMENTS AND OVERSIGHT OF BANK OPERATIONS

1.      The Bank shall have and retain qualified management acceptable to the Regional

Director of the San Francisco Regional Office ("Regional Director") and the Commissioner of

the Department of Financial Institutions for the State of California ("Commissioner").

      (a)      Each member of management shall have qualifications and experience

commensurate with his or her duties and responsibilities at the Bank.  Management shall

include a chief executive officer with proven ability to manage a bank of comparable size, and

experience in upgrading a low quality loan portfolio, improving earnings, and other matters

needing particular attention.  Management shall also include a qualified chief operating officer

and a chief risk officer with proven abilities in risk management of subprime lending programs.

Such officers shall develop and establish an independent centralized risk management program.

Each member of management shall be provided appropriate written authority from the Bank's

board of directors to implement the provisions of this ORDER.

      (b)      The qualifications of management shall be assessed on its ability to:

          (i)      comply with the requirements of this ORDER;

          (ii)      operate the Bank in a safe and sound manner;

          (iii)      comply with applicable laws and regulations; and

          (iv)      restore all aspects of the Bank to a safe and sound condition,

including asset quality, capital adequacy, earnings, management effectiveness, liquidity, and

sensitivity to market risk.

      (c)      During the life of this ORDER, the Bank shall notify the Regional

Director and the Commissioner in writing when it proposes to add any individual to the Bank's

- 6 -

board of directors or employ any individual as a senior executive officer. The notification must be received at least 30 days before such addition or employment is intended to become effective and should include a description of the background and experience of the individual or individuals to be added or employed. The Bank shall not employ a senior executive who is associated in any manner with an affiliate as defined in 12 U.S.C. §371c without the Regional Director's and the Commissioner's prior written approval.

2.    Within 60 days from the effective date of this ORDER, the Bank's board of directors shall obtain an independent study of the management and personnel structure of the Bank to determine whether additional personnel are needed for the safe and profitable operation of the Bank. Such a study shall include, at a minimum, a review of the duties, responsibilities, qualifications, and remuneration of the Bank officers. The Bank shall formulate a plan to implement the recommendations of the study. Such plan shall be provided to the Regional Director and the Commissioner for review and approval prior to implementation.

3.    (a)    Within 120 days from the effective date of this ORDER, and during the life of this ORDER, independent directors shall comprise a majority of the Bank's board of directors.

(b)    The addition of any new Bank directors required by this paragraph may be accomplished, to the extent permissible by state statute or the Bank's by-laws, by means of appointment or election at a regular or special meeting of the Bank's shareholders. For purposes of this ORDER, an independent director shall be any individual who is not an officer or former officer of the Bank, any subsidiary, or any of its affiliated organizations; who does not own more than 10 percent of the outstanding shares of FGCC and FGC; who is not related by blood or

- 7 -

marriage to an officer or director of the Bank or to any shareholder owning more than 10 percent

of FGCC's and FGC's outstanding shares and does not otherwise have a common financial

interest with such officer, director or shareholder; who is not indebted to the Bank directly or

indirectly, including the indebtedness of any entity in which the individual has a substantial

financial interest, in an amount exceeding 10 percent of the Bank's total Tier 1 capital and

allowance for loan and lease losses; or who is deemed to be an independent director for purposes

of this ORDER by the Regional Director and the Commissioner.

      (c)    In addition to the foregoing, within 120 days from the effective date of this

ORDER, and during the life of this ORDER, the Bank shall limit the representation of FGC and

FGCC in the aggregate to no more than 25 percent of the Bank's board of directors.

      4.    The Bank shall not enter into any contract for services essential to the operations

of the Bank with FGCC or FGC or any subsidiary thereof, without the prior written approval of

the Regional Director and the Commissioner.

      5.    Within 60 days from the effective date of this ORDER, the Bank shall correct all

violations of law and all practices inconsistent with Interagency Statements of Policy as cited in

paragraphs (n) and (o) of this ORDER. In addition, the Bank shall take all necessary steps to

ensure future compliance with all applicable laws and regulations.

      6.    Within 30 days from the effective date of this ORDER, the Bank shall establish a

Directors Compliance Committee ("Compliance Committee") composed of at least three

independent directors. For purposes of this provision of the ORDER, an independent director is

defined as set forth in paragraph 3(b) of this ORDER. The Compliance Committee shall perform

their duties required by this ORDER and otherwise monitor compliance with this ORDER. In

- 8 -

addition, within 60 days from the effective date of this ORDER, and every 30 days thereafter

during the life of this ORDER, it shall submit to the board of directors for consideration at its

regular monthly meeting a written report detailing the Bank's compliance with this ORDER.

The monthly compliance report shall be incorporated into the minutes of the corresponding

board of directors' meeting. Nothing herein contained shall diminish the responsibility of the

entire board of directors to ensure compliance with the provisions of this ORDER.

7.    Following the effective date of this ORDER, the Bank shall send to its

shareholders or otherwise furnish a description of this ORDER in conjunction with the Bank's

next shareholder communication and also in conjunction with its notice or proxy statement

preceding the Bank's next shareholder meeting. The description shall fully describe the ORDER

in all material respects. The description and any accompanying communication, statement, or

notice shall be sent to the FDIC, Registration and Disclosure Unit, Washington, D.C., 20429, at

least 15 days prior to dissemination to shareholders. Any changes requested to be made by the

FDIC shall be made prior to dissemination of the description, communication, notice, or

statement.

8.    Within 30 days of the end of the first calendar quarter following the effective date

of this ORDER, and within 30 days of the end of each calendar quarter thereafter, the Bank shall

furnish written progress reports to the Regional Director and the Commissioner detailing the

form and manner of any actions taken to secure compliance with this ORDER and the results

thereof. Such reports may be discontinued when the corrections required by this ORDER have

been accomplished and the Regional Director and the Commissioner have released the Bank in

writing from making further reports.

- 9 -

## CORRECTIVE PLANS AND POLICIES ON RESIDENTIAL LENDING

9.    (a)    Within 90 days from the effective date of this ORDER, the Bank shall revise, adopt, and implement written lending policies to provide effective guidance and control over the Bank's residential lending function.  In addition, the Bank shall obtain adequate and current documentation to fully support the prudence of the Bank's underwriting for all loans in the Bank's residential loan portfolio, whether such loans are held for sale or held for investment. Such policies shall be provided to the Regional Director and the Commissioner for review and approval prior to implementation and their implementation shall be in a form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

(b)    The initial revisions to the Bank's residential loan policy and practices, required by this paragraph, at a minimum, shall include the following:

(i)    Provisions which require that the Bank's analysis of a borrower's debt-to-income ratio include an assessment of the borrower's ability to meet his or her overall level of indebtedness and common housing expenses, including, but not limited to, real estate taxes, hazard insurance, homeowners' association dues, and private mortgage insurance.  In addition, the Bank's qualifying standards shall include an analysis of the borrower's ability to repay the debt at the fully indexed rate, assuming a fully amortizing repayment schedule.  The Bank shall not increase the 50 percent debt-to-income ratio set forth in its loan policy, and to the extent that the policy allows routine extension of loans resulting in higher debt-to-income ratios, shall reduce such ratios to 50 percent.  In any case in which a loan would result in a debt-to-income ratio greater than 50 percent, the Bank's policy should set forth

- 10 -

specific mitigating factors (e.g., higher credit scores, significant liquid assets, mortgage

insurance) that will permit the Bank to determine that the borrower possesses the demonstrated

ability to repay the loan. For purposes of the foregoing debt-to-income measurement, "debt"

shall include a realistic estimate of taxes and insurance associated with the loan; and projected

loan payments shall be calculated at the fully indexed and fully amortized rate;

       (ii)      Provisions which require that the Bank analyze the risk

inherent in a loan, both from the features of the loan and the borrower's characteristics, and

further require that the Bank must verify the borrower's income, assets, and liabilities, including

the use of recent W-2 statements, pay stubs, tax returns, or similarly reliable documentation, and

verify that the borrower remains employed;

       (iii)     Provisions which require that when the Bank uses risk-layered

features, such as reduced documentation loans or simultaneous-second lien mortgages, the Bank

shall demonstrate the existence of effective mitigating factors that support the underwriting

decision and the borrower's repayment capacity, which mitigating factors cannot solely be based

on a higher interest rate;

       (iv)     Provisions which require that the Bank inform borrowers of the

option to escrow funds for payment of taxes and insurance if such escrows are not required as a

condition of the loan; and

       (v)      Provisions that describe the efforts that the Bank will make to

restructure loans in distress, consistent with marketability of such loans, with sound principles of

underwriting as set forth in paragraph 9 of this ORDER, and in full compliance with applicable

consumer protection laws.

- 11 -

10.     (a)     Within 90 days from the effective date of this ORDER, the Bank shall develop, adopt, and implement a policy governing communications with consumers to ensure that the borrowers are provided with sufficient information to enable them to understand all material terms, costs, and risks of loan products at a time that will help the consumer select products and choose among payment options ("Policy on Consumer Communications"). Such policy and its implementation shall be in a form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

(b)     The provisions of the Bank's Policy on Consumer Communications required by this paragraph shall, at a minimum, include the following:

(i)     Provisions which require that all communications with consumers, including advertisements, oral statements, and promotional materials, provide clear and balanced information about the relative benefits and risks of the products, and that such communications shall be provided in a timely manner to assist consumers in the product selection process, not just upon submission of an application or at the consummation of the loan;

(ii)     Provisions which require that all mortgage product descriptions and advertisements provide clear, detailed information about all of the costs, terms, features, and risks of the loan to the borrower, including, but not limited to, the following:

(A)     Potential payment increases, including how the new payment will be calculated when the introductory fixed rate expires;

(B)     The existence of any prepayment penalty, how it will be calculated, and when it may be imposed;

(C)     The existence of any balloon payment;

- 12 -

(D)    Whether there is a pricing premium attached to a reduced documentation or stated income program; and

(E)    Whether the borrower will be required to make payments for real estate taxes and insurance in addition to the loan payment, if not escrowed, and the fact that tax and insurance costs can be substantial.

11.    (a)    Within 90 days from the effective date of this ORDER, the Bank shall develop, adopt, and implement strong control systems to monitor whether the Bank's actual practices are consistent with their policies and procedures.  These systems shall address consumer information concerns and underwriting standards, as required by paragraphs 9 and 10 above, and shall encompass both Bank personnel and all applicable third parties, including mortgage brokers and correspondents.  Such systems and their implementation shall be in a form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

(b)    The Bank's control systems as required by this paragraph, shall, at a minimum, include the following components:

(i)    Adopting and implementing appropriate criteria for hiring and training loan personnel, entering into and maintaining relationships with third parties, and conducting initial and ongoing due diligence with third parties;

(ii)    Adopting and implementing compensation programs that avoid providing incentives for originations inconsistent with sound underwriting and consumer protection principles;

- 13 -

(iii)    Monitoring compliance with appropriate laws and regulations, applicable third party agreements, and internal policies;

(iv)    Taking appropriate corrective actions in the event of the failure to comply with applicable laws, regulations, third party agreements, or internal policies;

(c)    Maintaining adequate procedures to review consumer complaints to identify potential compliance problems or other negative trends; and

(d)    Maintaining accurate centralized records of consumer and broker-related complaints.

12.    Within 90 days from the effective date of this ORDER, the Bank shall develop and implement a third party mortgage broker monitoring program and plan ("Monitoring Plan"). Such plan shall be in a form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations. At a minimum, the Monitoring Plan shall provide for the following:

(a)    A functional and validated due diligence process and establishment of other criteria for entering and maintaining relationships with such third party brokers;

(b)    An acceptable selection process that fully evaluates the integrity, character and financial viability of potential brokers and includes the establishment of criteria for third party compensation designed to avoid providing incentives for originations inconsistent with sound underwriting and consumer protection principles;

(c)    Procedures and systems for monitoring compliance with applicable agreements, bank policies, and applicable laws, rules and regulations;

- 14 -

(d)    Appropriate corrective actions in the event that the third party fails to comply with applicable agreements, bank policies or laws, rules and regulations; and

(e)    Procedures and systems for determining which residential mortgage loan brokers generate substantial putbacks (measured as a fraction of the broker's loan volume), and for implementing appropriate corrective action by the Bank with respect to such brokers.

13.    Within 90 days from the effective date of this ORDER, the board and management shall develop a five year strategic plan, which includes policies and procedures for diversifying the Bank's loan portfolio composition, achieving balanced risk tolerance, assessing the Bank's strengths and weaknesses based on different economic scenarios and stress tests, and strategies to mitigate the Bank's concentrations of credit.  In addition, the provisions of the strategic plan should address the Bank's policies and procedures to, among other things, mitigate the risk of the Bank's reliance on third party broker loan originations, diversify the Bank's business plan and/or lending operations including product lines with lower risk profiles, limit the Bank's acquisition of high loan to value subprime mortgages, and develop a contingency funding plan that utilizes economic scenarios that includes market risks, volatility in loan prices and market spreads and dislocations.  Such strategic plan shall be provided to the Regional Director and the Commissioner for review and approval prior to implementation.

14.    Within 90 days from the effective date of this ORDER, the Bank shall develop, adopt, and implement a comprehensive policy covering the Bank's capital analysis on subprime residential loans.  Such analysis shall meet the criteria set forth in the Interagency Guidance on Subprime Lending dated March 1, 1999 and the Interagency Expanded Guidance for Subprime Lending Programs dated January 31, 2001.  Such policy and its implementation shall be in a

- 15 -

form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

15.    Within 90 days from the effective date of this ORDER, the Bank shall perform quarterly valuations and cash flow analyses on the Bank's residual interests and mortgage servicing rights from its residential lending operation. The valuation should compare actual results to estimated results on a regular and ongoing basis and revise assumptions as needed. At a minimum, review of assumptions shall include prepayment speeds, changes in delinquency and loss estimates, cost of servicing as compared to other subprime lenders, and changes in established discount rates based on a subprime portfolio with similar characteristics. The Bank shall also obtain an annual independent valuation of the residual interests and mortgage servicing rights. The Bank will not enter into a contract or any other agreement to conduct the valuation without the prior written consent of the Regional Director and the Commissioner.

## CORRECTIVE PLANS ON COMMERCIAL REAL ESTATE LENDING

16.    (a)    Beginning with the effective date of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any commercial real estate borrower who has a loan or other extension of credit from the Bank that has been charged off or classified, in whole or in part, "Loss" and is uncollected. Subparagraph 16(a) of this ORDER shall not prohibit the Bank from renewing or extending the maturity of any credit in accordance with the Financial Accounting Standards Board Statement Number 15, concerning troubled debt restructurings.

(b)    Beginning with the effective date of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any commercial real

- 16 -

estate borrower who has a loan or other extension of credit from the Bank, that has been

classified, in whole or part, "Substandard" without the prior approval of a majority of the board

of directors of the Bank.

   (c)  The Board shall not approve any extension of credit, or additional credit to

a commercial real estate borrower in paragraphs 16(a) and 16(b) above without first collecting in

cash all past due interest.

  17.  Within 90 days from the effective date of this ORDER, the Bank shall revise,

adopt, and implement a written lending and collection policy to provide effective guidance and

control over the Bank's commercial real estate lending function, which policy shall include a

planned material reduction in the volume of funded and unfunded nonrecourse lending and loans

for condominium conversion and construction as a percentage of Tier 1 capital. Such plan shall

ultimately reduce nonrecourse funding to no more than 200 percent of Tier 1 capital and the

funding of condominium conversion and construction loans to no more than 100 percent of Tier

1 capital within two years. Such policies shall be provided to the Regional Director and the

Commissioner for review and approval prior to implementation and their implementation shall

be in a form and manner acceptable to the Regional Director and the Commissioner as

determined at subsequent examinations and/or visitations.

CAPITAL PROVISIONS

  18.  (a)  Within 90 days from the effective date of this ORDER, the Bank shall

develop, adopt and implement a Capital Adequacy Plan ("CAP") to maintain adequate Tier 1

capital in relation to the risk profile of the Bank. In no event shall Tier 1 capital fall below 14

percent of the Bank's total assets during the life of this ORDER. The CAP shall be provided to

- 17 -

the Regional Director and the Commissioner for review and approval prior to implementation.

Such implementation shall be in a form and manner acceptable to the Regional Director and the

Commissioner as determined at subsequent examinations and/or visitations.

(b)     Within 90 days from the effective date of this ORDER, the Bank shall

develop and adopt a plan to meet and thereafter maintain the minimum risk-based capital

requirements as described in the FDIC Statement of Policy on Risk-Based Capital contained in

Appendix A to Part 325 of the FDIC Rules and Regulations, 12 C.F.R. Part 325, Appendix A.

The Plan shall be in a form and manner acceptable to the Regional Director and the

Commissioner as determined at subsequent examinations.

(c)     The level of Tier 1 capital to be maintained during the life of this ORDER

pursuant to Subparagraph 18(a) shall be in addition to a fully funded allowance for loan and

lease losses, the adequacy of which shall be satisfactory to the Regional Director and the

Commissioner as determined at subsequent examinations and/or visitations.

(d)     Any increase in Tier 1 capital necessary to meet the requirements of

Paragraph 18 of this ORDER may be accomplished by the following:

(i)     the sale of common stock; or

(ii)     the sale of noncumulative perpetual preferred stock; or

(iii)     the direct contribution of cash by the board of directors and/or

shareholders of the Bank's parent company; or

(iv)     any other means acceptable to the Regional Director and the

Commissioner; or

(v)     any combination of the above means.

- 18 -

Any increase in Tier 1 capital necessary to meet the requirements of Paragraph 18 of this ORDER may not be accomplished through a deduction from the Bank's allowance for loan and lease losses without the prior written consent of the Regional Director and the Commissioner.

(e)    If all or part of the increase in Tier 1 capital required by Paragraph 18 of this ORDER is accomplished by the sale of new securities, the board of directors shall forthwith take all necessary steps to adopt and implement a plan for the sale of such additional securities, including the voting of any shares owned or proxies held or controlled by them in favor of the plan. Should the implementation of the plan involve a public distribution of the Bank's securities (including a distribution limited only to the Bank's existing shareholders), the Bank shall prepare offering materials fully describing the securities being offered, including an accurate description of the financial condition of the Bank and the circumstances giving rise to the offering, and any other material disclosures necessary to comply with the Federal securities laws. Prior to the implementation of the plan and, in any event, not less than 15 days prior to the dissemination of such materials, the plan and any materials used in the sale of the securities shall be submitted to the FDIC, Registration and Disclosure Unit, Washington, D.C. 20429, for review. Any reasonable changes requested to be made in the plan or materials by the FDIC shall be made prior to their dissemination. If the increase in Tier 1 capital is provided by the sale of noncumulative perpetual preferred stock, then all terms and conditions of the issue, including but not limited to those terms and conditions relative to dividend rate and convertibility factor, shall be presented to the Regional Director and the Commissioner for prior approval.

(f)    In complying with the provisions of Paragraph 18 of this ORDER, the Bank shall provide to any subscriber and/or purchaser of the Bank's securities, a written notice

- 19 -

of any planned or existing development or other changes which are materially different from the information reflected in any offering materials used in connection with the sale of Bank securities. The written notice required by this paragraph shall be furnished within 10 days from the date such material development or change was planned or occurred, whichever is earlier, and shall be furnished to every subscriber and/or purchaser of the Bank's securities who received or was tendered the information contained in the Bank's original offering materials.

(g)    For the purposes of this ORDER, the terms "Tier 1 capital" and "total assets" shall have the meanings ascribed to them in Part 325 of the FDIC Rules and Regulations, 12 C.F.R. §§325.2(v) and 325.2(x).

19.    Within 90 days from the effective date of this ORDER, the Bank shall formulate and implement a written profit plan. Such plan shall be provided to the Regional Director and the Commissioner for review and approval prior to implementation. At a minimum, the profit plan shall include the following:

(a)    goals and strategies for improving and sustaining the earnings of the Bank, including:

(i)    an identification of the major areas in, and means by which, the board of directors will seek to improve the Bank's operating performance;

(ii)    realistic and comprehensive budgets;

(iii)    a budget review process to monitor the income and expenses of the Bank to compare actual figures with budgetary projections; and

(iv)    a description of the operating assumptions that form the basis for, and adequately support, major projected income and expense components; and

- 20 -

(b)     coordination of the Bank's loan, investment, and operating policies, and budget and profit planning, with the funds management policy.

20.     During the life of this ORDER, the Bank shall not pay cash dividends without the prior written consent of the Regional Director and the Commissioner.

21.     Within 90 days from the effective date of this ORDER, the Bank shall develop or revise, adopt, and implement a written liquidity and funds management policy to provide effective guidance and control over the Bank's liquidity position and needs.  Such policy shall also include a comprehensive contingency plan for a market dislocation strategy.  Such policy and its implementation shall be in a form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

22.     Upon the effective date of this ORDER, the Bank shall not accept, renew, or rollover brokered deposits without obtaining a Brokered Deposit Waiver approved by the FDIC pursuant to section 29 of the Act, 12 U.S.C. §1831f.

## ASSET MANAGEMENT

23.     (a)     Within 180 days from the effective date of this ORDER, the Bank shall have reduced the assets classified "Substandard" and listed as "Special Mention" in the Report of Examination to not more than $2,676,000,000.

(b)     Within 360 days from the effective date of this ORDER, the Bank shall have reduced the assets classified "Substandard" and listed as "Special Mention" in the Report of Examination to not more than $1,784,000,000.

- 21 -

(c)     Within 540 days from the effective date of this ORDER, the Bank shall

have reduced the assets classified "Substandard" and listed as "Special Mention" in the Report of

Examination to not more than $892,000,000.

(d)     The requirements of subparagraphs 23(a), 23(b), and 23(c) of this ORDER

are not to be construed as standards for future operations and, in addition to the foregoing, the

Bank shall eventually reduce the total of all adversely classified assets. Reduction of these assets

through proceeds of other loans made by the Bank is not considered collection for the purpose of

this paragraph.  As used in subparagraphs 23(a), 23(b), and 23(c), the word "reduce" means:

(i)      to collect;

(ii)     to sell on a non-recourse basis;

(iii)    to charge-off; or

(iv)     to sufficiently improve the quality of assets adversely classified

as to warrant removing any adverse classification, as determined in subsequent on-site

examinations by the FDIC and the Department of Financial Institutions for the State of

California ("DFI").

24.     Within 90 days from the effective date of this ORDER, the board of directors

shall develop or revise, adopt and implement a comprehensive plan for the methodology for

determining the adequacy of the allowance for loan and lease losses.  For the purpose of this

determination, the adequacy of the reserve shall be determined after the charge-off of all loans or

other items classified "Loss." The policy shall provide for a review of the allowance at least

once each calendar quarter.  Said review should be completed prior to the filing of the quarterly

Call Report, in order that the findings of the board of directors with respect to the loan and lease

- 22 -

loss allowance may be properly reported in the quarterly Reports of Condition and Income. The

review should be transparent, justified and should focus on the results of the Bank's internal loan

review, loan loss experience, trends of delinquent and non-accrual loans, an estimate of potential

loss exposure of significant credits, concentrations of credit, and present and prospective

economic conditions. A deficiency in the allowance shall be remedied in the calendar quarter it

is discovered, prior to submitting the Report of Condition, by a charge to current operating

earnings. The minutes of the board of directors meeting at which such review is undertaken shall

indicate the results of the review. Upon completion of the review, the Bank shall increase and

maintain its allowance for loan and lease losses consistent with the allowance for loan and lease

loss policy established. Such policy and its implementation shall be acceptable to the Regional

Director and the Commissioner as determined at subsequent examinations and/or visitations.

<u>PARENT COMPANIES' PROVISIONS</u>

25.    Beginning with the effective date of this ORDER, FGCC and FGC shall:

(a)    Submit to the Regional Director and the Commissioner an annual listing

of their subsidiaries, which will be updated every year thereafter;

(b)    Consent to their examination and to the examination of their subsidiaries

to monitor compliance with the provisions of the Act or any other Federal law that the FDIC has

specific jurisdiction to enforce against FGCC, FGC, or their subsidiaries and those governing

the transactions and relationships between the Bank and its affiliates; and

(c)    Maintain the Bank's capital in accordance with the provisions of

paragraph 18 of this ORDER and liquidity at such levels as the FDIC and the DFI deem

appropriate, and/or take such other actions as the FDIC and the DFI deem appropriate to

- 23 -

provide the Bank with a resource for additional capital and liquidity including, for example, pledging assets, obtaining and maintaining a letter of credit, and indemnifying the Bank.

<u>SAVINGS CLAUSE</u>

26.    The provisions of this ORDER shall not bar, estop or otherwise prevent the FDIC or any other Federal or State agency or department from taking any other action or seeking further remedies against the Bank or any of the Bank's current or former institution-affiliated parties or agents including third party brokers for violations of any laws, engaging in unsafe or unsound banking practices, or unfair or deceptive practices.

This ORDER shall become effective upon its issuance by the FDIC. The provisions of this ORDER shall remain effective and enforceable except to the extent that, and until such time as, any provisions of this ORDER shall have been modified, terminated, suspended, or set aside by the FDIC.

Pursuant to delegated authority.

Dated at San Francisco, California, this 7th day of March, 2007.

John F. Carter
Regional Director
Division of Supervision and Consumer Protection
San Francisco Region
Federal Deposit Insurance Corporation

# EXHIBIT E

(Official Form 1) (10/06)

**United States Bankruptcy Court**
**Central District of California**

**Voluntary Petition**

| Name of Debtor (If individual, enter Last, First, Middle):<br>Fremont General Corporation | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by joint debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec./Complete EIN or other Tax I.D. No. (if more than one, state all): 95-2815260 | Last four digits of Soc. Sec./Complete EIN or other Tax I.D. No. (If more than one, state all): |
| Street Address of Debtor (No. and Street, City and State)<br>2727 East Imperial Highway<br>Brea, California                    92821 | Street Address of Joint Debtor (No. and Street, City and State)<br>ZIPCODE |
| County of Residence or of the Principal Place of Business:<br>Orange county | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (If different from street address)<br>ZIPCODE | Mailing Address of Joint Debtor (If different from street address)<br>ZIPCODE |
| Location of Principal Assets of Business Debtor (If different from street address above):<br>ZIPCODE | |

**Type of Debtor**
(Form of Organization)
(Check one box.)
See Exhibit D on page 2 of this form.
- ☐ Individual (Includes Joint Debtors)
- ☒ Corporation (includes LLC and LLP)
- ☐ Partnership
- ☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.)

**Nature of Business**
(Check one box.)
- ☐ Health Care Business
- ☐ Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)
- ☐ Railroad
- ☐ Stockbroker
- ☐ Commodity Broker
- ☐ Clearing Bank
- ☒ Other

**Tax-Exempt Entity**
(Check box, if applicable.)
- ☐ Debtor is a tax-exempt organization under Title 26 of the United States Code (the Internal Revenue Code.)

**Chapter of Bankruptcy Code Under Which the Petition is Filed** (Check one box)
- ☐ Chapter 7
- ☐ Chapter 9
- ☒ Chapter 11
- ☐ Chapter 12
- ☐ Chapter 13
- ☐ Chapter 15 Petition for Recognition of a Foreign Main Proceeding
- ☐ Chapter 15 Petition for Recognition of a Foreign Nonmain Proceeding

**Nature of Debts**
(Check one box.)
- ☐ Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."
- ☒ Debts are primarily business debts.

**Filing Fee** (Check one box.)
- ☒ Full Filing Fee attached.
- ☐ Filing Fee to be paid in installments (applicable to individuals only). Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.
- ☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B.

**Chapter 11 Debtors**
Check one box:
- ☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).
- ☒ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).

Check if:
- ☐ Debtor's aggregate noncontingent liquidated debts owed to insiders or affiliates are less than $2 million.

Check all applicable boxes:
- ☐ A plan is being filed with this petition.
- ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

**Statistical/Administrative Information**
- ☒ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☐ Debtor estimates that after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

**Estimated Number of Creditors**

| 1-<br>49 | 50-<br>99 | 100-<br>199 | 200-<br>999 | 1,000-<br>5,000 | 5,001-<br>10,000 | 10,001-<br>25,000 | 25,001-<br>50,000 | 50,001-<br>100,000 | Over<br>100,000 |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**Estimated Assets**

| ☐ $0 to $10,000 | ☐ $10,001 to $100,000 | ☐ $100,000 to $1 million | ☐ $1 million to $100 million | ☒ More than 100 million |
|---|---|---|---|---|

**Estimated Liabilities**

| ☐ $0 to $50,000 | ☐ $50,000 to $100,000 | ☐ $100,000 to $1 million | ☐ $1 million to $100 million | ☒ More than 100 million |
|---|---|---|---|---|

(Official Form 1) (10/06)                                                                                                    FORM B1, Page 2

| Voluntary Petition *(This page must be completed and filed in every case)* | Name of Debtor(s): |
|---|---|

**Prior Bankruptcy Cases Filed Within Last 8 Years** (If more than one, attach additional sheet)

| Location Where Filed: | Case Number: | Date Filed: |
|---|---|---|
| Location Where Filed: | Case Number: | Date Filed: |

**Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor** (If more than one, attach additional sheet)

| Name of Debtor: | Case Number: | Date Filed: |
|---|---|---|
| District: | Relationship: | Judge: |

| Exhibit A | Exhibit B |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.) | (To be completed if debtor is an individual whose debts are primarily consumer debts) I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I have delivered to the debtor the notice required by § 342(b). |
| ☑  Exhibit A is attached and made a part of this petition. | X _____ Signature of Attorney for Debtor(s)        (Date) |

**Exhibit C**

Does the debtor own or have possession of any property that poss or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐    Yes, and Exhibit C is attached and made a part of this petition.

☑    No

**Exhibit D**

(To be completed by every individual debtor.  If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☐    Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

☐    Exhibit D completed and signed by the joint debtor is attached and made a part of this petition.

**Information Regarding the Debtor – Venue**
(Check any applicable box.)

☑    Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐    There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐    Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Statement by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes.)

☐    Landlord has a judgment against the debtor for possession of debtor's residence.  (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐    Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐    Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

FORM B1, Page 3

(Official Form 1) (10/06)

| Voluntary Petition *(This page must be completed and filed in every case)* | Name of Debtor(s): |
|---|---|

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and chose to proceed under chapter 7.
[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States code, specified in this petition.

X _____
  Signature of Attorney for Debtor(s)

X _____
  Signature of Joint Debtor

  _____
  Telephone Number (if not represented by attorney)

  _____
  Date

### Signature of Attorney*

X _____
  Signature of Attorney for Debtor(s)

  Theodore Stolman
  Printed Name of Attorney for Debtor(s)

  Stutman Treister & Glatt
  Firm Name

  1901 Avenue of the Stars, 12th Floor
  Los Angeles, CA 90067
  Address

  (310) 228-5650
  Telephone Number
  June 18, 2008
  Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
  Signature of Authorized Individual
  Richard A. Sanchez
  Printed Name of Authorized Individual
  Executive Vice President/Chief Administrative Officer
  Title of Authorized Individual
  June 18, 2008
  Date

### Signature of a Foreign Representative

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only one box.)

☐  I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by § 1515 of title 11 are attached.

☐  Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
  (Signature of Foreign Representative)

  _____
  (Printed Name of Foreign Representative)

  _____
  Date

### Signature of Non-Attorney Bankruptcy Petition Preparer

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.

  _____
  Printed Name and title, if any, of Bankruptcy Petition Preparer

  Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)

  _____
  Address

X _____

  _____
  Date

Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose social security number is provided above.

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual.

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.*

026463.0101\471634.01

(Official Form 1) (10/06)                                                                                                   FORM B1, Page 3

| Voluntary Petition _(This page must be completed and filed in every case)_ | Name of Debtor(s): |
|---|---|

**Signatures**

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of a Foreign Representative |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct. [If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and chose to proceed under chapter 7. [If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b). I request relief in accordance with the chapter of title 11, United States code, specified in this petition. | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition. (Check only one box.) ☐  I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by § 1515 of title 11 are attached. ☐  Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached. |

**Signature(s) of Debtor(s) (Individual/Joint)** column signature lines:

X _____  
    Signature of Attorney for Debtor(s)

X _____  
    Signature of Joint Debtor

_____  
Telephone Number (if not represented by attorney)

_____  
Date

**Signature of a Foreign Representative** column:

X _____  
    (Signature of Foreign Representative)

X _____  
    (Printed Name of Foreign Representative)

_____  
Date

| Signature of Attorney* | Signature of Non-Attorney Bankruptcy Petition Preparer |
|---|---|
| X _____ Signature of Attorney for Debtor(s)  Theodore Stolman Printed Name of Attorney for Debtor(s)  Stutman Treister & Glatt Firm Name  1901 Avenue of the Stars, 12th Floor Los Angeles, CA 90067 Address  (310) 228-5650 Telephone Number June 18, 2008 Date | I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.  _____ Printed Name and title, if any, of Bankruptcy Petition Preparer  _____ Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.) |

| Signature of Debtor (Corporation/Partnership) | |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor. The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.  X _____ Signature of Authorized Individual  Richard A. Sanchez Printed Name of Authorized Individual  Executive Vice President/Chief Administrative Officer Title of Authorized Individual  June 18, 2008 Date | _____ Address  X _____  _____ Date  Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose social security number is provided above.  Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual.  If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.  _A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156._ |

026463.0101\471634.01

475148v1

Form B1, Exhibit A - (Rev. 3/98)                                    1998 USBC, Central District of California

## Exhibit "A"

[If debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11 of the Bankruptcy Code, this Exhibit "A" shall be completed and attached to the petition.]

*[Caption as in Form 16B]*

## Exhibit "A" to Voluntary Petition

1.  If any of the debtor's securities are registered under Section 12 of the Securities Exchange Act of 1934, the SEC file number is _001-08007_____.

2.  The following financial data is the latest available information and refers to the debtor's condition on _9/30/2007_____

    a.  Total assets                                              $ 643,197,000 (unaudited)_____

    b.  Total debts (including debts listed in 2.c., below)        $ 320,630,000 (unaudited)_____

<table>
<tr><td></td><td></td><td></td><td>Approximate<br>Number<br>of holders</td></tr>
<tr><td>c. Debt securities held by more than 500 holders.</td><td></td><td></td><td></td></tr>
<tr><td>☐ secured   ☐ unsecured   ☐ subordinated</td><td>$ _____</td><td></td><td>_____</td></tr>
<tr><td>☐ secured   ☐ unsecured   ☐ subordinated</td><td>$ _____</td><td></td><td>_____</td></tr>
<tr><td>☐ secured   ☐ unsecured   ☐ subordinated</td><td>$ _____</td><td></td><td>_____</td></tr>
<tr><td>☐ secured   ☐ unsecured   ☐ subordinated</td><td>$ _____</td><td></td><td>_____</td></tr>
<tr><td>☐ secured   ☐ unsecured   ☐ subordinated</td><td>$ _____</td><td></td><td>_____</td></tr>
<tr><td>d. Number of shares of preferred stock</td><td>_____</td><td></td><td>_____</td></tr>
<tr><td>e. Number of shares common stock</td><td>82,116,179</td><td></td><td>_____</td></tr>
</table>

    Comments, if any:

    Shares of common reported as of 5/7/08.  Asset and debt values taken from 10-K for YE
    12/31/06.  Actual values remain under investigation.

3.  Brief description of debtor's business:

    The Debtor (combined with subsidiaries) is in the financial services business.

4.  List the names of any person who directly or indirectly owns, controls, or holds, with power to vote, 5% or more of the voting securities of debtor:
    James Albert McIntyre  (10.235%); as of 5/27/08.

471800v1

# EXHIBIT F

1    John P. Schafer (State Bar No. 205638)
   jps@mandersonllp.com
2    Chris Manderson (State Bar No. 211648)
   wcm@mandersonllp.com
3    MANDERSON, SCHAFER &
4    McKINLAY LLP
   4695 MacArthur Court, Suite 1270
5    Newport Beach, CA 92660
   Telephone: (949) 788-1038
6    Facsimile: (949) 743-8310

7

8    Attorneys for SIGNATURE GROUP
   HOLDINGS LLC

9    Mark B. Frazier (State Bar No. 107221)
   mfrazier@rutan.com
10    Brendt C. Butler (State Bar No. 211273)
   bbutler@rutan.com
11    RUTAN & TUCKER, LLP
12    611 Anton Boulevard, Fourteenth Floor
   Costa Mesa, California 92626-1931
13    Telephone: (714) 641-5100
14    Facsimile: (714) 546-9035

15    Attorneys for JAMES A. MCINTYRE,
   SR.

   Christopher E. Prince (State Bar No. 183553)
   cprince@lesnickprince.com
   LESNICK PRINCE LLP
   185 Pier Avenue, Suite 103
   Santa Monica, CA 90405
   Tel: (213) 291-8984; Fax: (310) 396-0963

   Carole Neville, Esq. (Pro Hac Vice)
   cneville@sonnenschein.com
   SONNENSCHEIN, NATH & ROSENTHAL LLP
   1221 Avenue of the Americas
   New York, New York 10020
   Tel: (212) 768-6700; Fax: (212) 768-6800

   Attorneys for NEW WORLD ACQUISITION, LLC

FILED & ENTERED

JUN 09 2010

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY reid          DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### SANTA ANA DIVISION

In re

FREMONT GENERAL CORPORATION,
a Nevada corporation.

       Debtor.

Taxpayer ID No. 95-2815260

Case No. 8:08-bk-13421-ES
Chapter 11 Case

**AMENDED ORDER CONFIRMING
"SIGNATURE GROUP HOLDINGS, LLC'S
FOURTH AMENDED CHAPTER 11 PLAN OF
REORGANIZATION OF FREMONT GENERAL
CORPORATION, JOINED BY JAMES
MCINTYRE AS CO-PLAN PROPONENT
(DATED MAY 24, 2010)"**

**Confirmation Hearings**

**Date:**      April 27-29, 2010
**Time:**      9:00 a.m.
**Courtroom:**    5A
**Judge:**     Hon. Erithe A. Smith

1    The Court held hearings ("Confirmation Hearings") on March 12, 19 and 31, 2010, and April

2    2, 23, 27, 28 and 29, 2010 regarding confirmation of *Signature Group Holdings, LLC's Chapter 11*

3    *First Amended Plan of Reorganization of Fremont General Corporation, Joined by Certain TOPrS*

4    *Holders and James McIntyre as Co-Plan Proponents, Dated March 18, 2010* [Docket No. 1784],

5    which plan has been non-materially modified by the filed *Signature Group Holdings, LLC's Third*

6    *Amended Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by James*

7    *McIntyre as Co-Plan Proponent (Dated April 9, 2010)* [Docket No. 1888], which plan has been non-

8    materially modified and supplemented by the filed *Notice Of Submission And Submission Of*

9    *Additional Plan Supplements To Signature Group Holdings, LLC's Second Amended Chapter 11*

10    *Plan Of Reorganization Of Fremont General Corporation, Joined By Certain TOPrS Holders And*

11    *James McIntyre As Co-Plan Proponents (Dated April 9, 2010)* [Docket No. 1947] (the "Plan

12    Supplement"), which plan has been non-materially modified by the filed *Signature Group Holdings,*

13    *LLC's Third Amended Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined*

14    *by James McIntyre as Co-Plan Proponent (Dated April 26, 2010)* [Docket No. 2030], which plan has

15    been non-materially modified by the filed *Signature Group Holdings, LLC's Fourth Amended Chapter*

16    *11 Plan of Reorganization of Fremont General Corporation, Joined by James McIntyre as Co-Plan*

17    *Proponent (Dated May 11, 2010)* and all exhibits appended thereto [Docket No. 2094], which plan

18    has been non-materially modified by the filed *Signature Group Holdings, LLC's Fourth Amended*

19    *Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by James McIntyre as*

20    *Co-Plan Proponent (Dated May 24, 2010)* and all exhibits appended thereto [Docket No. 2113] (the

21    "Final Plan") (collectively, the Final Plan and the Plan Supplement documents (as superseded by the

22    revised form of documents attached as exhibits to the Final Plan), the "Signature Plan").[1]  The

23    Signature Plan is jointly proposed by Signature Group Holdings, LLC ("Signature") and James A.

24    McIntyre, Sr. ("McIntyre") for the above-captioned debtor and debtor in possession, Fremont General

25

26

27    _____

1    All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Signature
28    Plan.  The rules of interpretation set forth in the Signature Plan shall apply to this Order.

1    Corporation ("Fremont" or "Debtor").  The record of the Confirmation Hearings reflects all

2    appearances that were made by counsel or parties in interest.

3    　　　The Court, having reviewed and considered the following, among others:

4    •    the Signature Plan (including the Plan Supplement);

5    •    the *Fourth Amended Disclosure Statement for Signature Group Holdings, LLC's
     *Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by
6    *Certain TOPrS Holders and James McIntyre as Co-Plan Proponents Dated January
     *20, 2010* [Docket No. 1450] ("Signature Disclosure Statement");
7

8    •    the *Declaration of John S. Hekman in Support of Valuation and Reserve Analysis
     Prepared by LECG for Fremont Reorganizing Corporation* [Docket No. 1515];

9    •    the *Declaration of Thomas J. Donatelli in Support of Confirmation of Signature
     Group Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont General
10   Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan
     Proponents, Dated January 20, 2010* [Docket No. 1526];
11

12   •    the *Declaration of Kyle Ross in Support of Confirmation of Signature Group
     Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont General
13   Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan
     Proponents, Dated January 20, 2010* [Docket No. 1528];

14   •    the *Initial Brief of Signature Group Holdings, LLC in Support of Confirmation of
     Signature group Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont
15   General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-
     Plan Proponents, Dated January 20, 2010* [Docket No. 1529];
16

17   •    the *Order Approving Fremont General Corporation's: (1) Form of Plan Solicitation
     Cover Letter and Summary Exhibits; and (2) Guidelines Regarding Plan Solicitation
18   Practices* [Docket No. 1561] ("Solicitation Order");

19   •    the *Order Approving "Fourth Amended Disclosure Statement for Signature Group
     Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont General
20   Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan
     Proponents Dated January 20, 2010"* [Docket No. 1618];
21

22   •    the *Notice of Submission and Submission of Schedule of Assumed Agreements With
     Respect to Signature Group Holdings, LLC's Chapter 11 Plan of Reorganization of
23   Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre
     as Co-Plan Proponents, Dated January 20, 2010* [Docket No. 1626];

24   •    the *Order Approving (A) the Form, Scope, and Nature of Solicitation, Balloting,
     Tabulation, and Notices with Respect to the Chapter 11 Plans For Fremont General
25   Corporation and (B) Related Confirmation Procedures, Deadlines and Notices, dated
     February 24, 2010* [Docket No. 1635] ("Scheduling Order");
26

27   •    the omnibus objection to chapter 11 plans proposed by Signature, the Official
     Committee of Creditors Holding Unsecured Claims ("Creditors Committee"), New
28

1    World Acquisition, LLC ("New World"), and the Official Equity Committee ("OEC"),
filed by Denise Fuleihan [Docket No. 1681];

2
•    the omnibus objection to chapter 11 plans proposed by Signature, the Creditors
3    Committee, New World and the OEC, filed by Alan W. Faigin [Docket No. 1655];

4    •    the omnibus objection to chapter 11 plans proposed by Signature, the Creditors
Committee, New World and the OEC, filed by the New York State Teachers'
5    Retirement System [Docket No. 1656];

6    •    the omnibus objection to chapter 11 plans proposed by Signature, the Creditors
Committee, New World and the OEC, filed by the California Franchise Tax Board
7    [Docket No. 1657];

8    •    the *Limited Objections and Reservation of Rights of Official Committee of Unsecured
Creditors to Chapter 11 Plans for Fremont General Corporation* [Docket No. 1659];
9
•    the *Official Committee of Equity Holders' Limited Opposition and Comments to the
10    Plans of Reorganization Filed by: (1) New World Acquisition, LLC; (2) Signature
group Holdings, LLC; and (3) the Official Committee of Unsecured Creditors* [Docket
11    No. 1660];

12    •    the *Declaration of Kyle Ross in Support of Signature Group Holdings, LLC's
Objections as of March 1, 2010 to Confirmation of: (1) New World Acquisition, LLC's
13    Amended Chapter 11 Plan of Reorganization for Fremont General Corporation
(Dated January 19, 2010), and (2) Official Committee of Equity Holders' Fourth
14    Amended Chapter 11 Plan of Reorganization (Dated January 20, 2010)* [Docket No.
15    1662];

16    •    the omnibus objection to assumption of executory contract (employment agreement)
and to chapter 11 plans proposed by Signature, the Creditors Committee, New World
17    and the OEC, filed by Richard Sanchez [Docket No. 1666];

18    •    the omnibus objection to assumption of executory contract (employment agreement)
and to chapter 11 plans proposed by Signature, the Creditors Committee, New World
19    and the OEC, filed by Donald Royer [Docket No. 1667];

20    •    the omnibus objection to assumption of executory contract (employment agreement)
and to chapter 11 plans proposed by Signature, the Creditors Committee, New World
21    and the OEC, filed by Thea Stuedli [Docket No. 1668];

22    •    the *Statement of HSBC Bank USA, National Association, as Indenture Trustee, in
Support of Confirmation of Chapter 11 Plans of Reorganization for Fremont General
23    Corporation Proposed by The Official Committee Of Unsecured Creditors, New
World Acquisition, LLC, Signature Group Holdings, LLC, and the Official Committee
24    of Equity Holders* [Docket No. 1679];

25    •    the *Initial Omnibus Objection and Response of Wells Fargo Bank, N.A., and Wells
Fargo Delaware Trust Company, as Trustee to Proposed Competing Plans of
26    Reorganization and Reservation of Rights* [Docket No. 1680];

27

28

1   • the omnibus objection to chapter 11 plans proposed by Signature, the Creditors
2   Committee, New World and the OEC, filed by Gwyneth E. Colburn [Docket No. 1693];

3   • the *Interim ERISA Lead Plaintiff's Limited Objection To Four Chapter 11 Plans of
4   Reorganization* [Docket No. 1738];

5   • the *Declaration of Seth W. Hamot in Support of Signature Group Holdings, LLC's
    Response to Objections to Confirmation of Signature Group Holdings, LLC's Chapter
6   11 Plan of Reorganization of Fremont General Corporation, Joined by Certain
7   TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated January 20, 2010
    Made by (1) New World Acquisition, LLC, and (2) Official Committee of Equity
    Holders* [Docket No. 1708];

8   • the *Response of Signature Group Holdings, LLC and Statement Regarding: (1)
9   Limited Objections and Reservation of Rights with Respect to Signature Group
    Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont General
10  Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan
    Proponents, Dated January 20, 2010 Made by the Official Committee of Unsecured
11  Creditors, (2) Non-Opposition to Comments Submitted to Signature Group Holdings,
12  LLC by HSBC Bank USA as Trustee for the Class 3B Senior Notes, and (3) Non-
    Opposition to Comments Submitted to Signature Group Holdings, LLC by Wells
13  Fargo, NA, as Trustee for the Class 3C TOPrS* [Docket No. 1709];

14  • the *First Response of Wells Fargo Bank, N.A. and Wells Fargo Trust Company, as
    Trustee to Proposed Competing Plans of Reorganization and Reservation of Rights
15  Regarding Non-Vote Determinative Issues* [Docket No. 1713];

16  • the *Omnibus Reply of the Official Committee of Equity Holders to the Objections to
    Confirmation of its Fourth Amended Chapter 11 Plan of Reorganization (Date
17  January 20, 2010) and Limited Joinder to Objection of New World Acquisition, LLC,
    to Confirmation of Signature Group, LLC's Chapter 11 Plan of Reorganization of
18  Fremont General Corporation (Dated January 20, 2010)* [Docket No. 1718];

19  • the *Declaration of Lawrence Hershfield in Support of Omnibus Reply of the Official
20  Committee of Equity Holders to the Objections to Confirmation of its Fourth Amended
    Chapter 11 Plan of Reorganization (Date January 20, 2010)* [Docket No. 1719];

21  • the *Declaration of Jeff Nerland in Support of Omnibus Reply of the Official
22  Committee of Equity Holders to the Objections to Confirmation of its Fourth Amended
    Chapter 11 Plan of Reorganization (Date January 20, 2010)* [Docket No. 1720];

23  • the *Declaration of Frank E. Williams in Support of Omnibus Reply of the Official
24  Committee of Equity Holders to the Objections to Confirmation of its Fourth Amended
    Chapter 11 Plan of Reorganization (Date January 20, 2010)* [Docket No. 1721];

25  • the *Signature Group Holdings, LLC's Response to Objection to Confirmation of
26  Signature Group Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont
    General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-
27  Plan Proponents, Dated January 20, 2010 Made by (1) New World Acquisition, LLC,
    and Official Committee of Equity Holders* [Docket No. 1722];

28

- the *Joinder of Ranch Capital, LLC to: (I) the Official Committee of Equity Holders' Limited Opposition and Comments to the Plans of Reorganization Filed By: (1) New World Acquisition, LLC; (2) Signature Group Holdings, LLC; and (3) the Official Committee of Unsecured Creditors; and (II) Omnibus Reply of the Official Committee of Equity Holders to the Objections to Confirmation of Its Fourth Amended Chapter 11 Plan of Reorganization (Dated January 20, 2010) and Limited Joinder to Objection of New World Acquisition, LLC to Confirmation of Signature Group Holdings, LLCs Chapter 11 Plan of Reorganization of Fremont General Corporation (Dated January 20, 2010)* [Docket No. 1723];

- the *Declaration of Craig Noell in Support of Signature Group Holdings, LLC's Response to Objections to Confirmation of Signature group Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont General Corporation Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated January 20 2010 Made by (1) New World Acquisition, LLC, and Official Committee of Equity Holders* [Docket No. 1724];

- the *Signature Group Holdings, LLC's Response to Common Objections to Plan Confirmation Made by: (1) Richard Sanchez, Donald E. Royer and Thea Stuedli, (2) Alan W. Faigin, (3) the California Franchise Tax Board, (4) the New York State Teacher's Retirement System (NYSTRS), (5) Denise H. Fuleihan, and (6) Gwyneth E. Colburn* [Docket No. 1725];

- the *Declaration of Craig Noell in Support of Signature Group Holdings, LLC's Response to Common Objections to Plan Confirmation Made by: (1) Donald E. Royer, Richard Sanchez, and Thea Stuedli, (2) Alan W. Faigin, (3) the California Franchise Tax Board, (4) the New York State Teacher's Retirement System (NYSTRS), (5) Denise H. Fuleihan, and (6) Gwenyth E. Colburn* [Docket No. 1726];

- the *Motion to Strike of James A. McIntyre, Sr. to "Omnibus Reply of the Official Committee of Equity Holders to Objections to Confirmation of its Fourth Amended Chapter 11 Plan of Reorganization (Dated January 20, 2010) and Limited Joinder to Objection of New World Acquisition, LLC to Confirmation of Signature Group, LLC's Chapter 11 Plan of Reorganization of Fremont General Corporation (Dated January 20, 2010)"* [Docket No. 1742];

- the *Supplemental Declaration of James A. McIntyre, Sr. in Support of Motion to Strike of James A. McIntyre, Sr. to "Omnibus Reply of the Official Committee of Equity Holders to Objections to Confirmation of its Fourth Amended Chapter 11 Plan of Reorganization (Dated January 20, 2010) and Limited Joinder to Objection of New World Acquisition, LLC to Confirmation of Signature Group, LLC's Chapter 11 Plan of Reorganization of Fremont General Corporation (Dated January 20, 2010)"* [Docket No. 1743];

- the *Affidavit of Robert Q. Klamser Regarding Votes Accepting or Rejecting the (1) Chapter 11 Plan of Fremont General Corporation Presented by the Official Committee of Unsecured Creditors, (2) Official Committee of Equity Holders' Fourth Amended Chapter 11 Plan of Reorganization for Fremont General Corporation, (3) Ranch Capital, LLC's Second Amended Plan of Reorganization for Fremont General Corporation, (4) Signature Group Holding LLC's Chapter 11 Plan of Reorganization*

of *Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Proponents, and (5) New World Acquisition LLC's Amended Chapter 11 Plan of Reorganization for Fremont General Corporation* [Docket No. 1746];

- the *Notice of Errata to: Declaration of Craig Noell in Support of Signature Group Holdings, LLC's Response to Objections to Confirmation of Signature group Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont General Corporation Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated January 20 2010 Made by (1) New World Acquisition, LLC, and Official Committee of Equity Holders* [Docket No. 1747];

- the *Status Report of Official Committee of Unsecured Creditors Regarding Hearings on Confirmation of Chapter 11 Plans of Fremont General Corporation* [Docket No. 1748];

- the *Statement of James A. McIntyre, Sr. in Support of "Signature Group Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated March 18, 2010* [Docket No. 1778];

- the *Notice of Modification of Signature Group Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont General Corporation , Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated January 20, 2010* [Docket No. 1785];

- the *Official Committee of Equity Holders' Opposition to Motion to Strike of James A. McIntyre, Sr.* [Docket No. 1788];

- the *Motion of the Official Committee of Equity Holders for Order to Designate Votes of James A. McIntyre, Sr. Pursuant to 11 U.S.C. § 1126(e)* [Docket No. 1794];

- the *Signature Group Holdings, LLC's Motion to Strike New Arguments and Evidence Submitted by the Official Committee of Equity Holders in Support of its "Omnibus Reply of the Official Committee of Equity Holders to The Objections to Confirmation of its Fourth Amended Chapter 11 Plan of Reorganization (Dated January 20, 2010) and Limited Joinder to Objection of New World Acquisition, LLC, to Confirmation of Signature Group, LLC's Chapter 11 Plan of Reorganization of Fremont General Corporation (Dated January 20, 2010)"* [Docket No. 1812];

- the *Statement and Reservation of Rights of Official Committee of Unsecured Creditors Regarding Modifications to Chapter 11 Plans for Fremont General Corporation* [Docket No. 1819];

- the *Declaration of Craig Noell in Support of Signature Group Holdings, LLC's Objection to "Motion for Order Approving (1) Settlement With Certain TOPrS and (2) Further Non-Material Modification to Official Committee of Equity Holders' Fourth Amended Chapter 11 Plan of Reorganization (Dated January 20, 2010 Pursuant to 11 U.S.C. Section 1127(a)"* [Docket No. 1831];

- the *Omnibus Response and Reservation of Rights of Wells Fargo Bank, N.A. and Wells Fargo Delaware Trust Company, as Trustee to Proposed Modifications to Competing Plans of Reorganization* [Docket No. 1848];

1  • the *Motion of the Official Committee of Equity Holders for Order to Designate the Following Votes and/or Preference Elections Pursuant to 11 U.S.C. § 1126(e): (1) Seth W. Hamot; (2) Howard Amster; (3) Roark, Rearden & Hamot Capital Management, LLC; (4) Costa Brava Partnership III LP; (5) Kingstown Capital Management, LP; and (6) Raymond G. Meyers; Declaration of Evan D. Smiley in Support Thereof* [Docket No. 1889];

2

3

4

5  • the *Notice of Motion and Motion Pursuant to Rule 3018 for Order Approving Change of Votes of Shareholders to Acceptances of the New World Acquisition, LLC's Second Amended Chapter 11 Plan of Reorganization for Fremont General Corporation and Signature Group Holdings, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation* [Docket No. 1892];

6

7

8  • the *Official Committee of Equity Holders' Opposition to Motion to Strike of Signature Group Holdings, LLC* [Docket No. 1897];

9

10 • the *Joint Motion of Signature Group Holdings, LLC and James A. McIntyre, Sr. for Order Approving: (1) Settlement Agreement With Kenneth S. Grossman and New World Acquisition, LLC, Pursuant to Federal Rules of Bankruptcy Procedure 3018 and 9019; and (2) Non-Material Modifications to "Signature Group Holdings, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated April 9, 2010" Pursuant to 11 U.S. C. § 1127 and Federal Rule of Bankruptcy Procedure 3019* [Docket No. 1899];

11

12

13

14

15 • the *Declaration of Kenneth S. Grossman in Support of Joint Motion of Signature Group Holdings, LLC and James A. McIntyre, Sr. for Order Approving: (1) Settlement Agreement With Kenneth S. Grossman and New World Acquisition, LLC, Pursuant to Federal Rules of Bankruptcy Procedure 3018 and 9019; and (2) Non-Material Modifications to "Signature Group Holdings, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated April 9, 2010" Pursuant to 11 U.S. C. § 1127 and Federal Rule of Bankruptcy Procedure 3019* [Docket No. 1900];

16

17

18

19

20 • the *Declaration of Craig Noell in Support of Joint Motion of Signature Group Holdings, LLC and James A. McIntyre, Sr. for Order Approving: (1) Settlement Agreement With Kenneth S. Grossman and New World Acquisition, LLC, Pursuant to Federal Rules of Bankruptcy Procedure 3018 and 9019; and (2) Non-Material Modifications to "Signature Group Holdings, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated April 9, 2010" Pursuant to 11 U.S. C. § 1127 and Federal Rule of Bankruptcy Procedure 3019* [Docket No. 1902];

21

22

23

24

25

26 • the *Opposition of James A. McIntyre, Sr. to Motion of the Official Committee of Equity Holders for Order to Designate Votes of James A. McIntyre, Sr. Pursuant to 11 U.S.C. § 1126(e)* [Docket No. 1904];

27

28 • the *Submission of Deposition Transcript of James A. McIntyre, Sr. in Support of Opposition of James A. McIntyre, Sr. to Motion of the Official Committee of Equity*

1   *Holders for Order to Designate Votes of James A. McIntyre, Sr. Pursuant to 11 U.S.C.
§ 1126(e)* [Docket No. 1905];

2

3   • the *Notice of Withdrawal of Motion of the Official Committee of Equity Holders for
Order to Designate Votes of James A. McIntyre, Sr. Pursuant to 11 U.S.C. § 1126(e)*
[Docket No. 1930];

4

5   • the *Notice of Withdrawal of Objections; Docket Nos. 1669, 1674 and 1972, filed by
New World* [Docket No. 1931];

6   • the *Omnibus Objection of the Official Committee of Equity Holders to: (A) Motion of
Signature Group Holdings, LLC and James McIntyre, Sr. for Order Approving (1)
Settlement Agreement with Kenneth S. Grossman and New World Acquisition, LLC,
Pursuant to Federal Rules of Bankruptcy Procedure 3018 and 9019; and (2) Non-
Material Modifications to "Signature Group Holdings, LLC's Second Amended Plan
of Reorganization; (B) Motion for Approval of Non-Material Modifications of New
World Acquisition, LLC's Second Amended Chapter 11 Plan of Reorganization for
Fremont General Corporation (Dated April 9, 2010); and (C) Motion for Order
Pursuant to Rule 3018 for Order Approving Change of Votes of Shareholders to
Acceptances* [Docket No. 1938];

7

8

9

10

11

12   • the *Signature Group Holdings, LLC's Response to Official Committee of Equity
Holders' Opposition to Motion to Strike of Signature Group Holdings, LLC* [Docket
No. 1945];

13

14   • the *Opposition of James A. McIntyre, Sr. and Signature Group Holdings, LLC to
"Motion of the Official Committee of Equity Holders for Order to Designate the
Following Votes and/or Preference Elections Pursuant to 11 U.S.C. § 1126(e): (1)
Seth W. Hamot; (2) Howard Amster; (3) Roark, Rearden & Hamot Capital
Management, LLC; (4) Costa Brava Partnership III LP; (5) Kingstown Capital
Management, LP; and (6) Raymond G. Meyers"* [Docket No. 1949];

15

16

17

18   • the *Evidentiary Objections of James A. McIntyre, Sr. and Signature Group Holdings,
LLC to the Declaration Evan D. Smiley in Support of the "Motion of the Official
Committee of Equity Holders for Order to Designate the Following Votes and/or
Preference Elections Pursuant to 11 U.S.C. § 1126(e): (1) Seth W. Hamot; (2)
Howard Amster; (3) Roark, Rearden & Hamot Capital Management, LLC; (4) Costa
Brava Partnership III LP; (5) Kingstown Capital Management, LP; and (6) Raymond
G. Meyers"* [Docket No. 1950];

19

20

21

22   • the *Declaration of Robert Weingarten in Support of (1) Confirmation of "Signature
Group Holdings, LLC's Second Amended Chapter 11 Plan of Reorganization of
Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre
as Co-Plan Proponents, Dated April 9, 2010 and (2) New World Acquisition, LLC's
and Signature Group Holdings, LLC's Opposition to Plan Supplement for the Official
Committee of Equity Holders Fourth Amended Chapter 11 Plan of Reorganization
(Dated March 24, 2010)* [Docket No. 1952];

23

24

25

26

27   • the *Reply to Opposition of James A. McIntyre, Sr. and Signature Group Holdings,
LLC to "Motion of the Official Committee of Equity Holders for Order to Designate
the Following Votes and/or Preference Elections Pursuant to 11 U.S.C. § 1126(e): (1)*

28

*Seth W. Hamot; (2) Howard Amster; (3) Roark, Rearden & Hamot Capital Management, LLC; (4) Costa Brava Partnership III LP; (5) Kingstown Capital Management, LP; and (6) Raymond G. Meyers"; Declaration of Evan D. Smiley in Support Thereof* [Docket No. 1970];

- the *Reply to the Opposition of New World Acquisition, LLC and Signature Group Holdings, LLC to Plan Supplement for the Official Committee of Equity Holders Fourth Amended Chapter 11 Plan of Reorganization (Dated March 24, 2010) and Supplement to Omnibus Objection of the Official Committee of Equity Holders to: (A) Motion of Signature Group Holdings, LLC and James A. McIntyre, Sr. for Order Approving (1) Settlement Agreement With Kenneth S. Grossman and New World Acquisition, LLC, Pursuant to Federal Rules of Bankruptcy Procedure 3018 and 9019; and (2) Non-Material Modifications to "Signature Group Holdings, LLC's Second Amended Plan of Reorganization; (B) Motion for Approval of Non-Material Modifications of New World Acquisition, LLC's Second Amended Chapter 11 Plan of Reorganization for Fremont General Corporation (Dated April 9, 2010); and (C) Motion for Order Pursuant 3018 for Order Approving Change of Votes of Shareholders to Acceptances; Memorandum of Points and Authorities in Support Thereof* [Docket No. 1972];

- the *Declarations of Evan D. Smiley, Jeff Pies, and Lawrence Hershfield in Support of Reply to the Opposition of New World Acquisition, LLC and Signature Group Holdings, LLC to Plan Supplement for the Official Committee of Equity Holders Fourth Amended Chapter 11 Plan of Reorganization (Dated March 24, 2010) and Supplement to Omnibus Objection of the Official Committee of Equity Holders to: (A) Motion of Signature Group Holdings, LLC and James A. McIntyre, Sr. for Order Approving (1) Settlement Agreement With Kenneth S. Grossman and New World Acquisition, LLC, Pursuant to Federal Rules of Bankruptcy Procedure 3018 and 9019; and (2) Non-Material Modifications to "Signature Group Holdings, LLC's Second Amended Plan of Reorganization; (B) Motion for Approval of Non-Material Modifications of New World Acquisition, LLC's Second Amended Chapter 11 Plan of Reorganization for Fremont General Corporation (Dated April 9, 2010); and (C) Motion for Order Pursuant 3018 for Order Approving Change of Votes of Shareholders to Acceptances* [Docket No. 1974];

- the *Joint Reply of Signature Group Holdings, LLC, New World Acquisition, LLC, Kenneth S. Grossman, and James A. McIntyre, Sr. to the Omnibus Objection of the Official Committee of Equity Holders [DOCKET NO. 1938]* [Docket No. 1975];

- the *Joint Statement of the Debtor and the Creditors' Committee Regarding Plan Modifications & Solicitation* [Docket No. 1976];

- the *Declaration of Kyle Ross in Support of Joint Reply of Signature Group Holdings, LLC, New World Acquisition, LLC, Kenneth S. Grossman, and James A. McIntyre, Sr. to the Omnibus Objection of the Official Committee of Equity Holders [DOCKET NO. 1938]* [Docket No. 1977];

- the *Declaration of John P. Schafer in Support of Joint Reply of Signature Group Holdings, LLC, New World Acquisition, LLC, Kenneth S. Grossman, and James A.*

1    McIntyre, Sr. to the Omnibus Objection of the Official Committee of Equity Holders
     [DOCKET NO. 1938] [Docket No. 1979];

2
3  • the Declaration of Craig Noell in Support of Joint Reply of Signature Group
     Holdings, LLC, New World Acquisition, LLC, Kenneth S. Grossman, and James A.
4    McIntyre, Sr. to the Omnibus Objection of the Official Committee of Equity Holders
     [DOCKET NO. 1938] [Docket No. 1980];

5  • the Notice of Errata to: Joint Reply of Signature Group Holdings, LLC, New World
     Acquisition, LLC, Kenneth S. Grossman, and James A. McIntyre, Sr. to the Omnibus
6    Objection of the Official Committee of Equity Holders [DOCKET NO. 1938] [Docket
7    No. 1988];

8  • the Joinder of Michael J. Ball to Motion of the Official Committee of Equity Holders
     for Order to Designate the Following Votes and/or Preference Elections Pursuant to
9    11 U.S.C. § 1126(e): (1) Seth W. Hamot; (2) Howard Amster; (3) Rearden, Rearden &
     Hamot Capital Management, LLC; (4) Costa Brava Partnership III LP; (5) Kingstown
10   Capital Management, LP; and (6) Raymond G. Meyers; Declaration of Evan D.
     Smiley in Support Thereof [Docket No. 2055];
11
12 • the Declaration of Gideon Bernstein in Support of Opposition to Signature Plan
     Signature Group Holdings, LLC's Second Amended Plan of Reorganization and
13   Motion for Order Pursuant to 3018 for Order Approving Change of Votes of
     Shareholders to Acceptances [Docket No. 2012];

14 • the Witness List of the Official Committee of Equity Holders in Opposition to
15   Confirmation of Signature Group Holdings, LLC's Chapter 11 Plan of Reorganization
     of Fremont General Corporation, Joined by Certain TOPrS Holders and James
16   McIntyre (Dated April 9, 2010) [Docket No. 2013];

17 • the Declaration of Brendt C. Butler in Support of "Signature Group Holdings, LLC's
     Second Amended Chapter 11 Plan of Reorganization of Fremont General
18   Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan
     Proponents, Dated April 9, 2010" [Docket No. 2018];
19
20 • the Declaration of James A. McIntyre, Sr. in Support of "Signature Group Holdings,
     LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General
21   Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan
     Proponents, Dated April 9, 2010" [Docket No. 2019];

22 • the Notice of Nomination of John M. Koral as Existing Equity Holder Board Member
23   [Docket No. 2022];

24 • the Second Declaration of Brendt C. Butler in Support of "Signature Group Holdings,
     LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General
25   Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan
     Proponents, Dated April 9, 2010" [Docket No. 2023];

26 • the Declaration of John F. Nickoll in Support of "Signature Group Holdings, LLC's
27   Second Amended Chapter 11 Plan of Reorganization of Fremont General
     Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan
28   Proponents, Dated April 9, 2010" [Docket No. 2024];

- the *Declaration of Craig Noell in Support of Confirmation of "Signature Group Holdings, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated April 9, 2010"* [Docket No. 2027];

- the *Declaration of Thomas Donatelli in Support of "Signature Group Holdings, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated April 9, 2010"* [Docket No. 2028];

- the *Joint Notice of Motion and Motion of Signature Group Holdings, LLC and James A. McIntyre, Sr. for Order Approving Non-Material Modifications to "Signature Group Holdings, LLC's Third Amended Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by James McIntyre as Co-Plan Proponents (Dated April 26, 2010)," Pursuant to 11 U.S.C. § 1127 and Federal Rule of Bankruptcy Procedure 3019* [Docket No. 2029];

- the *Notice of Submission of Signature Group Holdings, LLC's Third Amended Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by James McIntyre as Co-Plan Proponent (Dated April 26, 2010)* [Docket No. 2030];

- the *Declaration of Kenneth S. Grossman in Support of New World Acquisition, LLC's Amended Chapter 11 Plan of Reorganization for Fremont General Corporation (Dated January 19, 2010) and Signature Group Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated April 9, 2010* [Docket No. 2031];

- the *Declaration of Kenneth S. Grossman in Response to Declaration of Gideon Bernstein [Docket No. 2012]* [Docket No. 2032];

- the *Second Amended Witness List for Confirmation of the "Signature Group Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, dated April 9, 2010"* [Docket No. 2033];

- the *Emergency Motion Pursuant to LBR 9075-1 for Order Pursuant to Rule 3018 Approving Change of Votes of Certain Shareholders to (A) Acceptances of Signature Group Holdings, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation and (B) Acceptances to New World Acquisition, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation; Declarations of Shareholders in Support Attached* [Docket No. 2043];

- the *Emergency Motion Pursuant to LBR 9075-1 for Order Pursuant to Rule 3018 Approving Change of Votes of Certain Shareholders to (A) Acceptances of Signature Group Holdings, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation and (B) Acceptances to New World Acquisition, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation, and (C) Rejection of the Official Committee of Equity Security Holders Fourth Amended Chapter 11 Plan of Reorganization; Declarations in Support* [Docket No. 2044];

1    • the *Declaration of John M. Mylnick With Respect to Vote Changes and Solicitation Thereof; And Other Matters Before This Court* [Docket No. 2048];

2    • All other pleadings and evidence that were submitted before or at the Confirmation Hearing;

3

4    • The record in the above-captioned chapter 11 case; and

5    • The arguments and representations of counsel at the Confirmation Hearings;

6    and the Court having entered its *Findings of Fact and Conclusions of Law re: Confirmation of*

7    *Signature Group Holdings, LLC's Fourth Amended Chapter 11 Plan of Reorganization of Fremont*

8    *General Corporation, Joined by James McIntyre as Co-Plan Proponent (Dated May 11, 2010)*

9    ("Findings and Conclusions"), and good cause being found therefor;

10    **IT IS HEREBY ORDERED THAT:**

11    1.    The Signature Plan is approved and confirmed under 11 U.S.C. § 1129.[2]  The exhibits

12    appended to the Final Plan, the documents contained in the Plan Supplement not otherwise superseded

13    by the exhibits attached to the Final Plan, and the Schedule of Assumed Agreements are authorized

14    and approved, shall be deemed a part of the Signature Plan, and are incorporated by this reference.

15    The failure to reference or discuss any particular provision of the Signature Plan in this Order shall

16    have no effect on this Court's approval and authorization of, or the validity, binding effect and

17    enforceability of, such provision; and each provision of the Signature Plan is authorized and approved

18    and shall have the same validity, binding effect and enforceability as every other provision of the

19    Signature Plan, whether or not mentioned in this Order.

20    2.    The provisions of the Signature Plan and this Order will bind the Debtor, the

21    Reorganized Debtor, and all creditors and shareholders of the Debtor, whether or not the Claims or

22    Equity Interests of these Persons are impaired under the Signature Plan, whether or not these Persons

23    have voted to accept or reject the Signature Plan, and whether or not these Persons have filed proofs

24    of Claim or Equity Interest or are deemed to have filed proofs of Claim or Equity Interest in the Case.

25

26    ───────────────

27    2    Unless otherwise indicated, all chapter, section, and rule references are to 11 U.S.C. §§ 101 through 1532 ("Bankruptcy Code"), to the Federal Rules of Bankruptcy Procedure, Rules 101 through 9037 ("Bankruptcy Rules"), and to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, Rules 1001-1 through 9075-1 ("Local Bankruptcy Rules").

28

3.    The Reorganized Debtor may enter into, execute and deliver any and all agreements, documents and/or instruments and take any and all actions necessary or desirable to implement the Signature Plan, this Order, the Management Agreement between CP Management and the Reorganized Debtor, the Warrant Agreement, the Subscription Agreement, the Merger transactions (including without limitation, the merger of FGCC into the Debtor or Reorganized Debtor (as applicable) and then the merger of FRC into the Debtor or Reorganized Debtor (as applicable)), the amendment of corporate governance documents (such as certificates of incorporation, bylaws, or similar charter documents) to the extent necessary to authorize the transactions discussed in Section IV.G of the Signature Plan, the "Leucadia Provision" restricting the transfer of Common Stock, the establishment of the Administrative Claims Reserve (defined below), the establishment of the Repurchase Claims Reserve, the $39 million New Note to the TOPrS, the New Indenture, the $10 million capital contribution into the Reorganized Debtor, the issuance of Common Stock and Warrants, the Registration Rights Agreement, each Subscription Agreement, and any other transaction contemplated under those documents or the Signature Plan.  To effectuate these transactions and the Signature Plan, the officers and directors of the Debtor and the Reorganized Debtor, or any other Person designated by the Board of Directors of the Reorganized Debtor, are authorized -- without further notice or application to or order from this Court -- to enter into, execute, deliver, file, and/or record any and all agreements, documents and/or instruments and to take any other actions that those officers or directors may determine to be necessary or desirable, regardless of whether such agreements, documents, instruments or actions are specifically referred to in the Signature Plan or this Order, provided, however, that any corporate actions necessary to effectuate the Signature Plan shall be taken by the new Board of Directors and officers appointed pursuant to the terms of the Signature Plan, and none of the current officers or directors of the Debtor, FGCC, or FRC shall be required to take any such action.  To the extent that, under applicable non-bankruptcy law, any of these actions otherwise would require the consent or approval (including execution of agreements, documents and/or instruments) of the shareholders or the Debtor or the directors or officers of the Debtor, this Order constitutes that consent and approval. No further documents or actions shall be required to effectuate the merger, authorize the issuance of stock and warrants provided for by the Signature Plan,

or otherwise effectuate the Signature Plan, and the Board of Directors of the Reorganized Debtor shall be authorized to ratify any actions taken by the Reorganized Debtor to effectuate the Signature Plan on or after the Effective Date, and such action shall be deemed to have occurred on the Effective Date.

4. On the Effective Date, all directors of the Board of Directors of the Debtor and its subsidiaries shall be deemed to have resigned from such positions, including without limitation, from their positions on any committees of the Boards of Directors, without the need for any further notice, action, order, or approval of this Court, or other act or action under applicable laws. On the Effective Date, the new members of the Board of Directors of the Reorganized Debtor shall be deemed appointed, without the need for any further notice, action, order or approval of this Court, or other act or action under applicable laws. Concurrently, on the Effective Date, the Reorganized Debtor shall be authorized to immediately take all necessary action to appoint directors for any of the Reorganized Debtor's remaining subsidiaries, without the need for any further notice, action, order, or approval of this Court, or other act or action under applicable laws.

5. On and as of the Effective Date, the Board of Directors of the Reorganized Debtor and all subsidiaries thereof shall consist of the following nine (9) members: Craig F. Noell, Kenneth S. Grossman, John Nickoll, Robert Schwab, John M. Koral, Norman Matthews, Richard A. Rubin, and two directors to be nominated by the TOPrS Group and approved in accordance with the Signature Plan. If the TOPrS Group has not made its nominations by the Effective Date, then such nominations shall be made within thirty (30) days of the Effective Date. Notice of the TOPrS Group nominations shall be filed with the Court and served on the U.S. Trustee and those parties who have requested special notice.

6. The issuance of stock pursuant to the Signature Plan shall be exempt from any securities laws regulation requirements to the fullest extent permitted by Bankruptcy Code section 1145, Section 4(2) of the Securities Act, and any other applicable exemptions.

7. All commercially reasonable arrangements with Signature and other parties regarding funding of the $10 million capital contribution into the Reorganized Debtor in return for 12,500,000 shares of Common Stock at $0.80 per share are approved. Such funds shall be placed into segregated

1  account(s) by May 14, 2010 and shall be held solely for disbursement in accordance with the Signature

2  Plan.

3       8.    On the Effective Date, the Reorganized Debtor is authorized to issue and shall issue

4  twelve million five hundred thousand (12,500,000) shares of Common Stock to the Signature

5  Investors in accordance with the Signature Plan.

6       9.    All arrangements with Signature regarding paying up to an aggregate of $300,000 to

7  acquire Warrants to purchase 15 million shares of Common Stock at an exercise price of $1.03 per

8  share, including the vesting schedule of such Warrants under Section IV.A of the Signature Plan, are

9  approved.

10       10.    On the Effective Date, the Reorganized Debtor is authorized to issue and shall issue

11  twenty-one million (21,000,000) shares of Common Stock to the Holders of Class 3C Claims in

12  accordance with the Signature Plan.

13       11.    As of the Effective Date and upon the payment of the cure payments under Bankruptcy

14  Code section 365(b)(1) (if applicable), pursuant to Section III of the Signature Plan, each of the

15  Assumed Agreements (as defined in the Findings and Conclusions) shall be deemed assumed by the

16  Reorganized Debtor and shall be in full force and effect, except to the extent that they have been

17  modified consensually with the agreement of the parties thereto.

18       12.    To the extent that the non-debtor party to any Assumed Agreement has filed a proof of

19  Claim against the Debtor asserting prepetition arrearages under an Assumed Agreement or asserting a

20  rejection damage claim, payment of the cure payment pursuant to Section III of the Signature Plan

21  shall be deemed to satisfy, in full, any prepetition arrearage or rejection damage claim, irrespective of

22  whether the cure payment is less than the amount set forth in any such proof of Claim.

23       13.    Each of the Rejected Agreements (as defined in the Findings and Conclusions) shall be

24  deemed rejected by the Debtor as of the Effective Date.  The deadlines, procedures and sanctions set

25  forth in Section III of the Signature Plan regarding the assertion of Claims for damages arising from

26  such rejection are approved and established.

27       14.    Any party wishing to assert a Professional Fee Claim or Non-Ordinary Course

28  Administrative Claim against the Estate must, on or before 30 days after the Effective Date, both file

1    with the Court a final fee application or a motion requesting allowance of the fees or claim and serve

2    the application or motion on the Reorganized Debtor and the U.S. Trustee.  Subject to the Indenture

3    Trustees providing invoices to counsel to Signature, which shall be subject only to Signature's review

4    for reasonableness under the applicable Indenture, the Reorganized Debtor shall pay or cause to be

5    paid in full and in cash as an Administrative Claim, without the need for application to, or approval of,

6    any court, or consent of any other party without reduction to the recovery of applicable holders of

7    allowed claims, any and all Indenture Trustee Fees and other amounts that are due to each of the

8    Indenture Trustees and their respective Professionals as of the Effective Date on or before the

9    Effective Date or within ten (10) days of the Indenture Trustee providing counsel to Signature such

10   invoices if the invoice is not provided prior to the Effective Date.  If Signature disputes any portion of

11   the fees and expenses sought by the Indenture Trustees by means of a written notification of such fee

12   or expense dispute delivered to the Indenture Trustee during such ten (10) day period, the

13   Reorganized Debtor shall pay or cause to be paid that undisputed portion of the requested fees and

14   costs within ten (10) days of receipt of the invoices from the Indenture Trustee and the Indenture

15   Trustee shall have the right to seek a determination by the Court of that disputed portion of the fees

16   and costs as reasonable under the applicable Indenture or assert its Charging Lien to pay such disputed

17   amounts.  In the event of any conflict between this Order and the Signature Plan with respect to those

18   matters covered by this paragraph 14, the terms of this paragraph 14 shall prevail.

19          15.    Within ten (10) Business Days after the Confirmation Date, the Debtor shall provide

20   Signature with an estimate of the amount of Administrative Claims it reasonably believes will be

21   outstanding as of and after the Effective Date (the "Administrative Claims Reserve Amount").  On the

22   Effective Date, the Reorganized Debtor shall fund into a segregated account cash in an amount equal

23   to the Administrative Claims Reserve Amount (the "Administrative Claims Reserve").  Absent further

24   order of the Court (obtained via an application by the Reorganized Debtor on at least fifteen (15)

25   days' notice to any Person holding an unpaid Administrative Claim as of the Effective Date (other than

26   an Ordinary Course Administrative Claim)), the funds in the Administrative Claims Reserve shall

27   remain in the segregated account (for the benefit of the holders of unpaid Administrative Claims (other

28   than Ordinary Course Administrative Claims)) except to the extent such funds are used by the

1    Reorganized Debtor to satisfy Allowed Administrative Claims (other than Ordinary Course

2    Administrative Claims) in accordance with the terms of the Signature Plan. For the avoidance of any

3    doubt whatsoever, the establishment and existence of the Administrative Claims Reserve shall not be

4    construed, in any way, as limiting the Reorganized Debtor's obligation to satisfy any and all Allowed

5    Administrative Claims in full in accordance with the terms of the Signature Plan (and without regard to

6    whether there are sufficient funds available in the Administrative Claims Reserve to satisfy any such

7    claim).

8        16.    Except as provided in the Signature Plan, upon the Effective Date, all Assets that are

9    property of the Estate as of the Effective Date, including all Causes of Action, Rights of Action, and

10    Avoidance Actions, will vest (and will be deemed to have vested as of the Effective Date) in the

11    Reorganized Debtor free and clear of the Claims of any Creditors. From and after the Effective Date,

12    the Reorganized Debtor, pursuant to the Management Agreement, may operate its business and use,

13    acquire and dispose of property and settle and compromise liabilities without supervision by the Court

14    and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions

15    expressly imposed by the Signature Plan and this Order.

16        17.    On the Effective Date, the Reorganized Debtor shall execute and deliver the New

17    Indenture and the $39 million new note to the TOPrS bearing 9% annual interest, payable quarterly

18    commencing one quarter after the Effective Date and continuing quarterly thereafter, with a final

19    maturity on December 31, 2016, as provided under and pursuant to the Signature Plan.

20        18.    The Disbursing Agent or the respective Indenture Trustee, as applicable, is authorized

21    to make all Distributions provided for under the Signature Plan in the manner set forth in Section VII

22    of the Signature Plan. Subject to the Indenture Trustee providing invoices to counsel to Signature,

23    which shall be subject only to Signature's review for reasonableness under the applicable Indenture,

24    the Reorganized Debtor shall pay or cause to be paid in full and in cash as an Administrative Claim,

25    without the need for application to, or approval of, any court, or consent of any other party without

26    reduction to the recovery of applicable holders of allowed claims, any and all Indenture Trustee Fees

27    and other amounts that are due to each of the Indenture Trustees and their respective Professionals as

28    of the Effective Date on or before the Effective Date or within ten (10) days of the Indenture Trustee

providing counsel to Signature such invoices if the invoice is not provided prior to the Effective Date.

If Signature disputes any portion of the fees and expenses sought by the Indenture Trustees by means

of a written notification of such fee or expense dispute delivered to the Indenture Trustee during such

ten (10) day post-Effective Date period, the Reorganized Debtor shall pay or cause to be paid that

undisputed portion of the requested fees and costs within ten (10) days of receipt of the invoices from

the Indenture Trustee and the Indenture Trustee shall have the right to seek a determination by the

Court of that disputed portion of the fees and costs as reasonable under the applicable Indenture or

assert its Charging Lien to pay such disputed amounts.  In the event of any conflict between this Order

and the Signature Plan with respect to those matters covered by this paragraph 18, the terms of this

paragraph 18 shall prevail.

19.    The discharge and injunction provisions set forth in Section IX.A of the Signature Plan

are approved and established as if fully set forth herein.

20.    The exculpation provision set forth in Section X.F of the Signature Plan is approved

and established.  The exculpation provision reads as follows:

*As of the Effective Date, neither the Debtor, FGCC or FRC
(including, without limitation, their successors or assigns, including,
without limitation, the Reorganized Debtor, the Disbursing Agent,
the Board of Directors and Board of Directors' Agents) or the
Creditors' Committee, the Equity Committee, the Indenture
Trustees, Signature, New World Acquisition, LLC, Kenneth S.
Grossman, Daniel Pfeiffer or James A. McIntyre, Sr., and, in each
case, none of their respective present or former officers, directors,
employees, members, agents, representatives, shareholders,
attorneys, accountants, financial advisors, investment bankers,
lenders, consultants, experts, and professionals and agents for the
foregoing shall have or incur any liability for, and are expressly
exculpated and released from, any claims (as such term is defined in
Section 101 of the Bankruptcy Code) (including, without limitation,
any claims whether known or unknown, foreseen or unforeseen,
then existing or thereafter arising, in law, equity or otherwise) for
any past or present or future actions taken or omitted to be taken
under or in connection with, related to, effecting, or arising out of
the Case, including those claims arising out of the discharge of the
powers and duties conferred upon the Indenture Trustee for the
Senior Notes and the Indenture Trustee for the Junior Notes by the
Senior Notes Indenture or Junior Notes Indenture, respectively, or
the Plan or any order of the Court entered pursuant to or in*

1        *furtherance of the Plan, or applicable law, including, without*

2  *limitation, the formulation, negotiation, documentation,*
*preparation, dissemination, implementation, administration,*

3  *confirmation, solicitation, or consummation of this Plan and the*
*Disclosure Statement; except only for actions or omissions to act to*

4  *the extent determined by a court of competent jurisdiction (in a*
*Final Order) to be by reason of such party's gross negligence, willful*

5  *misconduct, or fraud, and in all respects, such party shall be entitled*
*to rely upon the advice of counsel with respect to its duties and*

6  *responsibilities under this Plan. It, being expressly understood that*
*any act or omission with the approval of the Bankruptcy Court, will*

7  *be conclusively deemed not to constitute gross negligence, willful*
*misconduct, or fraud unless the approval of the Bankruptcy Court*

8  *was obtained by fraud or misrepresentation.*

9

10      21.    In addition to the exculpation set forth above and in Section X.F of the Signature Plan,

11  similar exculpation is hereby provided to and approved for each of U.S. Bank National Association,

12  Wells Fargo Bank, National Association, and Deutsche Bank National Trust Company, consistent with

13  the provisions of (1) paragraph 5 of that certain Order Granting Motion for Order Approving

14  Settlement and Mutual Release Agreement By and Among U.S. Bank National Association, as

15  Trustee, Fremont Reorganizing Corporation, and Fremont General Corporation [Docket No. 1661];

16  (2) paragraph 7 of that certain Order Granting Motion for Order Approving Settlement and Mutual

17  Release Agreement By and Among Wells Fargo Bank, National Association, as Trustee, Fremont

18  Reorganizing Corporation, and Fremont General Corporation [Docket No. 1987]; and (3) paragraph 5

19  of that certain Order Granting Motion for Order Approving Stipulations By and Among Deutsche

20  Bank National Trust Company, as Trustee, Fremont Reorganizing Corporation, and Fremont General

21  Corporation [Docket No. 1803].

22      22.    On the Effective Date, the Creditors' Committee and the Equity Committee shall be

23  disbanded, released and discharged from the rights and duties arising from or related to the Case,

24  except with respect to matters relating to final fee applications for Professionals' compensation. The

25  Professionals retained by the Creditors' Committee and the Equity Committee and the members

26  thereof, solely in their capacities as members of the Creditors' Committee or Equity Committee, shall

27  not be entitled to compensation or reimbursement of expenses for any services rendered after the

28  Effective Date, except for services rendered and expenses incurred in connection with any applications

1    by such professionals or Creditors' Committee or Equity Committee members for allowance of

2    compensation and reimbursement of expenses pending on the Effective Date or timely Filed after the

3    Effective Date as provided in the Signature Plan.

4         23.    In accordance with Bankruptcy Code section 1146(a), the issuance, transfer or

5    exchange of a security, or the making or delivery of an instrument of transfer under the Signature Plan

6    may not be taxed under any law imposing a stamp tax or similar tax.  All governmental officials and

7    agents shall forego the assessment and collection of any such tax or governmental assessment and

8    accept for filing and recordation any of the foregoing instruments or other documents without

9    payment of such tax or other governmental assessment.

10        24.    As provided by Section V.B of the Signature Plan, the Claims Objection Deadline shall

11   be 180 days after the Effective Date; provided, however, that this deadline may be extended by further

12   order of the Court upon a motion by the Reorganized Debtor demonstrating "cause" for such

13   extension(s).

14        25.    Any claim objections that could be made by the Debtor under that certain *Stipulation*

15   *Between Fremont General Corporation and the United States of America Regarding (1) the IRS*

16   *Proof of Claim and (2) the Debtor's Pending 9019 Motion Concerning a Closing Agreement* [Docket

17   No. 1636] or any other stipulation or agreement entered into by the Debtor during the Case may be

18   made by the Reorganized Debtor.

19        26.    As provided by Section V.A of the Signature Plan, the Register Update filed by the

20   Debtor [Docket No. 1620], as such may be amended or updated prior to the Effective Date, is hereby

21   deemed to supersede and supplant this Court's official claims register, and may hereafter be relied

22   upon by the Reorganized Debtor and any retained third party as the official Post-Confirmation Claims

23   Register.

24        27.    The Reorganized Debtor shall make all commercially reasonable efforts to become

25   current with its reporting requirements with the U.S. Securities and Exchange Commission ("SEC")

26   and to obtain a listing on a major U.S. securities exchange.

27        28.    Upon entry of this Order and subject solely to the Signature Plan becoming effective, in

28   consideration for Signature and James McIntyre's agreement, as co-plan proponents, to modify the

1  Signature Plan (through this Order) arising from requests by the Official Committee of Equity Holders

2  (the "OEC") to provide that the Reorganized Debtor will implement and adhere to the undertakings

3  listed below in items (a)-(e) (the "OEC Requested Undertakings"), the OEC shall upon the Signature

4  Plan becoming effective be deemed to have waived any and all right(s) it has to appeal or move for (or

5  otherwise seek) reconsideration, review, rehearing, or certiorari of, or relief from, this Order or any

6  other order entered in this Case or any ruling in this Case (which was not the subject of an order from

7  this Court or otherwise), or any of the Court's findings of fact or conclusions of law relative to the

8  confirmation of the Signature Plan or any other matter in the Case (collectively, the "Waived

9  Matters"), provided that the Waived Matters exclude those matters pertaining to approval of fee

10  applications by Professionals employed by the OEC.  Notwithstanding anything to the contrary in the

11  immediately preceding sentence, if any, nothing in this paragraph shall be construed as a finding or

12  ruling by this Court or an admission by Signature or James McIntyre that the OEC has any right to

13  appeal or move for (or otherwise seek) reconsideration, review, rehearing, certiorari of, or relief from

14  this Court with respect to any of the Waived Matters.

15      (a)    Commencing in the third quarter of 2010 and continuing until the Reorganized

16  Debtor has become current in its SEC reporting requirements, the Reorganized Debtor shall

17  hold a quarterly investor conference call in accordance with common practices of public

18  companies, the content and conduct of which shall be subject to management's discretion.

19      (b)    The Reorganized Debtor shall make all commercially reasonable efforts to call a

20  shareholders meeting once all conditions to calling such a meeting have been satisfied,

21  including, without limitation, the Reorganized Debtor becoming current in its SEC reporting

22  requirements.

23      (c)    The Reorganized Debtor shall not effect a reverse stock split in the Reorganized

24  Debtor's common stock within the first 18 months following the Effective Date, unless such

25  stock split is directly tied to its becoming listed on a national exchange.

26      (d)    Signature shall recommend to the compensation committee of the Reorganized

27  Debtor's Board of Directors a two year compensation package consisting of a $6,000-$9,000

28  cash per quarter base director fee and the remainder in equity compensation, such as 75,000-

100,000 stock options intended to qualify as incentive stock options or other forms of equity compensation of similar value per director vesting ratably over the two year period.

(e)    The Reorganized Debtor shall disseminate 8-K reports regarding post Effective Date material developments affecting the Reorganized Debtor, including, but not limited to:

- Changes in directors and officers;

- Changes in compensation of directors and officers;

- Entering into (and terminating) material agreements;

- The acquisition or disposal of significant assets, including costs associated with disposal activities;

- Loans or other investments in excess of $5 million;

- The creation of a financial obligation (or an obligation under an off-balance sheet arrangement);

- Events that trigger accelerations or increase amounts due with respect to financial obligations;

- Material impairment of assets;

- Material modification to the rights of security holders; and

- Any other disclosure that would be required under Regulation FD.

29.    This Order shall be effective upon its entry on the Court's docket, and the stay imposed by Bankruptcy Rule 3020(e) shall not apply.

30.    The Court reserves jurisdiction to enter appropriate orders in aid of implementation of the Signature Plan pursuant to section 1142.

31.    Prior to the Effective Date, Signature is authorized to make non-material technical modifications to the Signature Plan without further approval or order of this Court after notice to the Debtor, the Creditors Committee and the Equity Committee with the opportunity for such noticed parties to be heard.  After the Effective Date, Signature is authorized to make non-material technical modifications to the Signature Plan without further approval or order of this Court.

32.     Except as governed by the Signature Plan, on and after the Effective Date the Reorganized Debtor is authorized to make all settlements and dispositions of property without further approval or order of this Court.

33.     Once the Estate has been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtor shall file a motion with this Court to obtain a final decree to close the Case.

34.     The Reorganized Debtor shall mail notice of entry of this Order and of the Effective Date to all creditors of record and all shareholders of record as of the date of entry of this Order.

35.     Any and all objections to the Signature Plan or confirmation of the Signature Plan not previously withdrawn, settled or stricken are overruled by this Order.

36.     The Court reserves jurisdiction to enter appropriate orders in aid of implementation of the Signature Plan pursuant to Bankruptcy Code section 1142.  The Court may properly retain jurisdiction over the matters set forth in Section IV.K of the Signature Plan.

37.     In accordance with Local Bankruptcy Rule 3020-1(b), the Reorganized Debtor shall file a status report on or before **November 4, 2010** explaining what progress has been made toward consummation of the Plan.  The Reorganized Debtor shall serve such report on the U.S. Trustee, and those parties who have requested special notice.  Until the entry of the Final Decree, further status reports shall be filed every 180 days and served on the same Persons.  Following the Entry of the Final Decree, the Reorganized Debtor will post quarterly status reports on the Reorganized Debtor's website until the earlier of (a) eighteen months after the Effective Date, or (b) the date upon which the Reorganized Debtor has become current in its SEC reporting requirements.  A post-confirmation status conference will be held on **November 18, 2010 at 10:30 a.m.**, before the Honorable Erithe A. Smith, United States Bankruptcy Judge, in courtroom 5A located at 411 W. Fourth Street, Santa Ana, CA 92701.

# # #

DATED: June 9, 2010

_Erithe A. Smith_
United States Bankruptcy Judge

1    As to Paragraph 28 of this Order, it is so stipulated:

2

3    Dated:  May 11, 2010

4                                                    By: /s/ John P. Schafer
                                                    _____

5
                                                    JOHN P. SCHAFER, an attorney with
6                                                   MANDERSON, SCHAFER & McKINLAY
                                                    LLP, attorneys for and on behalf of
7                                                   SIGNATURE GROUP HOLDINGS, LLP

8

9

10                                                  By: /s/ Evan Smiley
                                                    _____

11
                                                    EVAN SMILEY, an attorney with
12                                                  WEILAND, GOLDEN, SMILEY, WANG
                                                    EKVALL & STROK, LLP, attorneys for and
13                                                  on behalf of the OFFICIAL COMMITTEE
                                                    OF EQUITY HOLDERS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPROVED AS TO FORM AND CONTENT; SUPPORT IMMEDIATE ENTRY OF THE ORDER

Dated: May 14, 2010

By: */s/ Whitman L. Holt*
  WHITMAN L. HOLT
  STUTMAN, TREISTER & GLATT, P.C.,
  Attorneys for the DEBTOR


By: */s/ Evan Smiley*
  EVAN SMILEY
  WEILAND, GOLDEN, SMILEY, WANG EKVALL
  & STROK, LLP, Attorneys for the OFFICIAL
  COMMITTEE OF EQUITY HOLDERS


By: */s/ Jonathan S. Shenson*
  JONATHAN S. SHENSON
  KLEE, TUCHIN, BOGDANOFF & STERN, LLP,
  Attorneys for the OFFICIAL COMMITTEE OF
  UNSECURED CREDITORS


By: */s/ Aram Ordubegian*
  ARAM ORDUBEGIAN
  ANDREW I. SILFEN (admitted pro hac vice)
  JEFFREY N. ROTHLEDER (admitted pro hac vice),
  Attorneys for WELLS FARGO BANK, N.A. and
  WELLS FARGO DELAWARE TRUST
  COMPANY

By: */s/ Christina M. Padien*
  CHRISTINA M. PADIEN
  AKIN GUMP STRAUSS HAUER & FELD LLP

  - and -

  MARK R. SOMERSTEIN (admitted pro hac vice)
  MENACHEM M. BENSIGNER (admitted pro hac
  vice)
  ROPES & GRAY LLP

  Attorneys for HSBC BANK USA, NATIONAL
  ASSOCIATION

| In re: | | CHAPTER: 11 |
| Fremont General Corporation Debtor(s). | | |
| | Debtor(s). | CASE NUMBER: 8:08-bk-13421-ES |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
611 Anton Blvd., Suite 1400, Costa Mesa, CA 92626
A true and correct copy of the foregoing document described as ORDER CONFIRMING "SIGNATURE GROUP HOLDINGS, LLC'S FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF FREMONT GENERAL CORPORATION, JOINED BY JAMES MCINTYRE AS CO-PLAN PROPONENT (DATED MAY 11, 2010)" _____ will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to
the document. On ___May 14, 2010___     I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addressed indicated below:

- Kyra E Andrassy    kandrassy@wgllp.com
- Kristen N Beall    kbeall@pattonboggs.com, bmcilwain@pattonboggs.com
- Reem J Bello    rbello@wgllp.com
- Ron Bender    rb@lnbrb.com
- Dustin P Branch    dustin.branch@kattenlaw.com
- Brendt C Butler    BButler@rutan.com
- Frank Cadigan    frank.cadigan@usdoj.gov
- Gary O Caris    gcaris@mckennalong.com, pcoates@mckennalong.com
- Lisa W Chao    lisa.chao@doj.ca.gov
- Eric A Cook    ecook@ebglaw.com
- Kristopher Davis    ksdavis@ebglaw.com
- Ted A Dillman    Ted.dillman@lw.com
- Willis B Douglass    Willis.B.Douglass@irscounsel.treas.gov
- Jesse S Finlayson    jfinlayson@faw-law.com, wmills@faw-law.com
- Philip A Gasteier    pag@lnbrb.com
- Peter J Gurfein    pgurfein@akingump.com
- Matthew Heyn    mheyn@ktbslaw.com
- Whitman L Holt    wholt@stutman.com
- Mark D Houle    mark.houle@pillsburylaw.com
- Michelle Hribar    mhribar@rutan.com
- Sean A Kading    skading@marshackhays.com
- Derek J Kaufman    derek.kaufman@mto.com
- William H. Kiekhofer    wkiekhofer@mcguirewoods.com
- Lewis R Landau    lew@landaunet.com
- Thomas A. Lee 2    notices@becket-lee.com
- Kerri A Lyman    klyman@irell.com
- Richard A Marshack    rmarshack@marshackhays.com, lbergini@marshackhays.com
- Robert S Marticello    Rmarticello@wgllp.com
- Neeta Menon    nmenon@stutman.com
- Sarah D Moyed    moyeds@sec.gov
- Mike D Neue    mneue@thelobelfirm.com, csolorzano@thelobelfirm.com
- Aram Ordubegian    ordubegian.aram@arentfox.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_January 2009_

**F 9013-3.1**

American LegalNet, Inc.
www.FormsWorkflow.com

- David L Osias    bcrfilings@allenmatkins.com, dosias@allenmatkins.com
- Christina M Padien    cmoore@akingump.com
- Jonathan Petrus    jpetrus@ktbslaw.com
- David M Poitras    dpoitras@jmbm.com
- Christopher E Prince    cprince@lesnickprince.com
- Michael B Reynolds    mreynolds@swlaw.com, kcollins@swlaw.com
- Neal Salisian    nsalisian@morganlewis.com
- John P Schafer    jps@mandersonllp.com
- Sarah Seewer    sarah.seewer@kirkland.com
- Jonathon Shenson    jshenson@ktbslaw.com
- Evan D Smiley    esmiley@wgllp.com
- Philip E Strok    pstrok@wgllp.com
- Samuel J Teele    steele@lowenstein.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Thomas J Welsh    tomwelsh@orrick.com
- Brian D Wesley    brian.wesley@doj.ca.gov
- Alan Z Yudkowsky    ayudkowsky@stroock.com
- Scott H Yun    syun@stutman.com

☐ Service information continued on attached page

## II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL (indicate method for each person or entity served):

On ___May 14, 2010_____    I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

## III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on__May 14, 2010_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method) by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed    *** I caused our attorney service to deliver .

Hon. Erithe A. Smith, U.S. Bankruptcy Ct.
411 W. Fourth Street, Santa Ana, CA 92701
(Bin Outside or Room 5097)

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 14, 2010 | Amie Tancas | /s/ Amie Tancas |
|---|---|---|
| Date | Type Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009

**F 9013-3.1**

American LegalNet, Inc.
www.FormsWorkflow.com

In re:
Fremont General Corporation Debtor(s).

CHAPTER: 11

CASE NUMBER: 08-13421-ES

Debtor(s).

**ADDITIONAL SERVICE INFORMATION (if needed):**

AMERICA'S SERVICING COMPANY
c/o McCalla Raymer LLC
1544 Old Alabama Rd
Roswell, GA 30076

James Bielan
1128 Cherry Hill Ln
Webster, NY 14580

Bocarsly Emden Cowan Esmail &
    Arndt LLP
633 West Fifth Street, 70th Floor
Los Angeles, CA 90071

Gregg Brugger
Walters McCluskey & Boehle
200 N Sepulveda Boulevard, Suite 300
El Segundo, CA 90245

Peter J Callaghan
8837 N Congress Ave Apt 717
Kansas City, MO 64153

Young Sook Chun
3525 Sawtelle Blvd #209
Los Angeles, CA 90066

Florence W Cook

Linda Deacon
Bate Peterson Deacon Zinn &
    Young LLP
888 S. Figueroa Street, 15th Fl
Los Angeles, CA 90017

Damian Donder
12 Ferry Crossing Dr SE
Rome, GA 30161

Charles E Elder
Irell & Manella LLP
1800 Ave of the Stars Ste 900
Los Angeles, CA 90067-4276

Federal Insurance Company

Eugene R Fiset
18162 Buena Vista
Yorba Linda, CA 92886-4011

Jack A Banan
15000 Emory Ln
Rockville, MD 20853

Don Bigelo
2635 E Serrano Ave
Orange, CA 92866

Michael D Braun
Braun Law Group, PC
10680 W. Pico Blvd., Suite 280
Los Angeles, CA 90064-7202

Larry J Caldwell
Caldwell Law Firm
1380 Lead Hill Ste 106
Roseville, CA 95661

George T Caplan
Epstein Becker & Green, PC
1925 Century Park E Ste 500
Los Angeles, CA 90067

Larry Cole
152 Piper Ln
Sonoma, CA 95476

Eugene Cowan
Bocarsly Emden Cowan Esmail &
    Arndt LLP
633 W Fifth Street, 70th Floor
Los Angeles, CA 90071

Deutsche Bank National Trust Co.,
    as Trustee
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126

William C. Dresser
4 N Second Street, Suite 1230
San Jose, CA 95113-1307

Evelyn Gofberg

Alex Feldman
1700 E 15th Apt #B4
Brooklyn, NY 11229

Randy Fox
14515 S Mullen
Olathe, KS 66062

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Glenn S Gardipee
3111 Liberty Bell Rd
Green Bay, WI 54313

Evelyn Gofberg
100 Alnwick
Malverne, NY 11565

Leonard Gumport
550 S Hope Street, #825
Los Angeles, CA 90071-2627

Katherine E Hay
200 N Sepulveda Blvd #300
El Segundo, CA 90245

James P Houpt
Orrick Herrington & Sutcliffe LLP
400 Capital Mall Ste 3000
Sacramento, CA 95814-4497

David V. Ing
3108 Kaohinani Drive
Honolulu, HI 96817-1039

Vivek Iyengar
627 E 6th St
Hinsdale, IL 60521

Robert W Jones
Patton Boggs LLP
2001 Ross Ave Ste 3000
Dallas, TX 75201-8001

Fritz Keller
3003 Memorial Ct Apt 1113
Houston, TX 77007

Melinda Kolpin
17747 Camino de Yatsto
Pacific Palisades, CA 90272

KPMG Corporate Finance LLC
Plaza Tower Ste 700
600 Anton Blvd
Costa Mesa, CA 92626-7651

Michael C Lieb
Willenken Wilson Loh & Lieb, LLP
707 Wilshire Blvd Ste 3850
Los Angeles, CA 90017

Terry L Mason
PO Box 14
Shasta Lake, CA 96019

George Miranda
12012 Arndt rd
Aurora, OR 97002

Norah D. Molnar
Patton Boggs LLP
2550 M Street NW
Washington, DC 20037-1350

Mennemeier Glassman & Stroud LLP
980 9th St Ste 1700
Sacramento, CA 95814

Ronald Groden

John Haack
2500 Village Ln
Foristell, MO

Jean M. Healey
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108

William M Iadarola
6B Liberty Ste 245
Aliso Viejo, CA 92656

Iron Mountain Information Management, Inc.
c/o Frank F McGinn
155 Federal St, 9th Fl
Boston, MA 02110

Zeb Jenkins
74 Mapleview Rd
Cheektowaga, NY 14225

Raymond B. Jue
300 S. Spring St. #500
Los Angeles, CA 90013

Shmuel Klein
268 Route 59 West
Spring Valley, NY 10977

William J Kostka

Kurtzman Carson Consultants LLC
Attn:  James Le
2335 Alaska Avenue
El Segundo, CA 90245

Anthony Lombardo
2014 Julius Ct
Walnut Creek, CA 94598

Colin Milner
4392 Forest Hill Rd
Stow, OH 44224

John M Mlynick
23 Mechanic St
Shelburne Falls, MA 01370

Andrey (Andre) Mutchnik
17, de la Poudriere #105
Montreal, Quebec, Canada, H4G 3J5

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1**

American LegalNet, Inc.
www.FormsWorkflow.com

Thomas P. DiNapoli New York State Comptroller

Simon T Ndongo
PO Box 66332
Mobile, AL 36660

Ronald J Nicolas
George B Piggott
2 Park Plaza, Ste 300
Irvine, CA 92614-0500

Jae Park
6152 Stanton Ave Apt B212
Buena Park, CA 90621

Dong Dang Pham
701 NE 20th St
Moore, OK 73160

Jonathan D. Plaut
Chardon Law Offices
One State Street, Suite 1200
Boston, MA 02109

Raymond C Prospero
3638 University Ave Ste 249
Riverside, CA 92501

Centrell Reed
11698 Capitan Lane
Frisco, TX 75034

John Schultheis

Greg Seidel
10297 N Sinclair Cir
Fresno, CA 93730

Feras Shammami

Greg Skypala
10200 Ashton Rd
Amarillo, TX 79119

Mark R Somerstein
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704

John M Stephan
Office of the Atty General
One Ashburton Pl 18th fl
Boston, MA 02108

Rosemarie Toon
9204 Wildwood St
Lorton, VA 22079

Robert Valade
HC 74 Box 21B
Pecos, NM 87552

Tarun Oberoi
90 Millers Lane
Ringwood, NJ 07456

Ramesh Pathak
31 Blaisdell Wy
Fremont, CA 94536

Daniel Pierro
1160 Manchester Way NE
Atlanta, GA 30319

Erik M Pritchard
Troutman Sanders LLP
5 Park Plaza Ste 1200
Irvine, CA 92614-8592

Donald J. Putterman
Kasowitz Benson Torres &
    Friedman LLP
101 California Street, Suite 2050
San Francisco, CA 94111

Stephanie M. Saito
Bate Peterson Deacon Zinn &
    Young LLP
888 S Figueroa Street, 15th Floor
Los Angeles, CA 90017

Milan Shah
8273 E Blackwillow
Anaheim, CA 92808

Surendra P Sinha
7734 Tailspin Ln
Scottsdale, AZ 85255

Solon Group, Inc.
350 E 57th Street, Suite 1A
New York, NY 10022

Squar Milner Peterson Miranda & Williamson LLP

William Kirt Toombs
PO Box 173
Ontario, OR 97914

Juan A Torres
Musick, Peeler & Garrett LLP
One Wilshire Blvd., Suite 2000
Los Angeles, CA 90017-3383

Thomas J Welch
Orrick, Herrington & Sutcliffe LLP
400 Capital Mall, Ste 3000
Sacramento, 95814-4497

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

American LegalNet, Inc.
www.FormsWorkflow.com

Wells Fargo Bank, N.A.                          Wells Fargo Delaware Trust Company

Thomas J Welsh                                  Thomas C Whitesell
Orrick, Herrington & Sutcliffe LLP              c/o Moses Lebovits
400 Capitol Mall Ste 3000                       1801 Century Park E 9th Fl
Sacramento, CA 95814-4497                       Los Angeles, CA 90067


Ronald Wilborn                                  Diane Winchester
P.O. Boc 170259                                 18018 N. 93rd Place
Atlanta, GA 30317                               Scottsdale, AZ 85255

Paul A. Witter                                  Bryan Wong
c/o  Pamela A. Ashby, Esq                       Beck & Jenkins
Baylor & Jackson                                6830 Palm Avenue
1025 Connecticut Avenue NW                      Riverside, CA 92506
Suite 1202
Washington, DC 20036

Tom Yoon
3525 Sawtelle Blvd #209
Los Angeles, CA 90066

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                              F 9013-3.1

American LegalNet, Inc.
www.FormsWorkflow.com

| | |
|---|---|
| In re:<br>Fremont General Corporation<br><br>Debtor(s). | CHAPTER: 11<br><br>CASE NUMBER: 2:08-bk-13421-ES |

## NOTE TO USERS OF THIS FORM:

1) Attach this form to the last page of a proposed Order or Judgment.  Do not file as a separate document.
2) The title of the judgment or order and all service information must be filled in by the party lodging the order.
3) **Category I. below:**  The United States trustee and case trustee (if any) will always be in this category.
4) **Category II. below:**  List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief.  <u>DO NOT</u> list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) **ORDER CONFIRMING "SIGNATURE GROUP HOLDINGS, LLC'S FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF FREMONT GENERAL CORPORATION, JOINED BY JAMES MCINTYRE AS CO-PLAN PROPONENT (DATED MAY 11, 2010)"** was entered on the date indicated as Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.   SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of___May 14, 2010_____, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

    Kyra E Andrassy    kandrassy@wgllp.com
- Kristen N Beall    kbeall@pattonboggs.com, bmcilwain@pattonboggs.com
- Reem J Bello    rbello@wgllp.com
- Ron Bender    rb@lnbrb.com
- Dustin P Branch    dustin.branch@kattenlaw.com
- Brendt C Butler    BButler@rutan.com
- Frank Cadigan    frank.cadigan@usdoj.gov
- Gary O Caris    gcaris@mckennalong.com, pcoates@mckennalong.com
- Lisa W Chao    lisa.chao@doj.ca.gov
- Eric A Cook    ecook@ebglaw.com
- Kristopher Davis    ksdavis@ebglaw.com
- Ted A Dillman    Ted.dillman@lw.com
- Willis B Douglass    Willis.B.Douglass@irscounsel.treas.gov
- Jesse S Finlayson    jfinlayson@faw-law.com, wmills@faw-law.com
- Philip A Gasteier    pag@lnbrb.com
- Peter J Gurfein    pgurfein@akingump.com
- Matthew Heyn    mheyn@ktbslaw.com
- Whitman L Holt    wholt@stutman.com
- Mark D Houle    mark.houle@pillsburylaw.com
- Michelle Hribar    mhribar@rutan.com
- Sean A Kading    skading@marshackhays.com
- Derek J Kaufman    derek.kaufman@mto.com
- William H. Kiekhofer    wkiekhofer@mcguirewoods.com
- Lewis R Landau    lew@landaunet.com
- Thomas A. Lee 2    notices@becket-lee.com
- Kerri A Lyman    klyman@irell.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9021-1.1**

| In re:<br>Fremont General Corporation<br><br>Debtor(s). | CHAPTER: 11<br><br>CASE NUMBER: 2:08-bk-13421-ES |
|---|---|

- Richard A Marshack    rmarshack@marshackhays.com, lbergini@marshackhays.com
- Robert S Marticello    Rmarticello@wgllp.com
- Neeta Menon    nmenon@stutman.com
- Sarah D Moyed    moyeds@sec.gov
- Mike D Neue    mneue@thelobelfirm.com, csolorzano@thelobelfirm.com
- Aram Ordubegian    ordubegian.aram@arentfox.com
- David L Osias    bcrfilings@allenmatkins.com, dosias@allenmatkins.com
- Christina M Padien    cmoore@akingump.com
- Jonathan Petrus    jpetrus@ktbslaw.com
- David M Poitras    dpoitras@jmbm.com
- Christopher E Prince    cprince@lesnickprince.com
- Michael B Reynolds    mreynolds@swlaw.com, kcollins@swlaw.com
- John P Schafer    jps@mandersonllp.com
- Sarah Seewer    sarah.seewer@kirkland.com
- Jonathon Shenson    jshenson@ktbslaw.com
- Evan D Smiley    esmiley@wgllp.com
- Philip E Strok    pstrok@wgllp.com
- Samuel J Teele    steele@lowenstein.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Thomas J Welsh    tomwelsh@orrick.com
- Brian D Wesley    brian.wesley@doj.ca.gov
- Alan Z Yudkowsky    ayudkowsky@stroock.com
- Scott H Yun    syun@stutman.com
- Brendt Butler bbutler@rutan.com

☐ Service information continued on attached page

**II. SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

AMERICA'S SERVICING COMPANY
c/o McCalla Raymer LLC
1544 Old Alabama Rd
Roswell, GA 30076
James Bielan
1128 Cherry Hill Ln
Webster, NY 14580
Bocarsly Emden Cowan Esmail &
   Arndt LLP
633 West Fifth Street, 70th Floor
Los Angeles, CA 90071

Gregg Brugger
Walters McCluskey & Boehle
200 N Sepulveda Boulevard, Suite 300
El Segundo, CA 90245

Jack A Banan
15000 Emory Ln
Rockville, MD 20853

Don Bigelo
2635 E Serrano Ave
Orange, CA 92866

Larry J Caldwell
Caldwell Law Firm
1380 Lead Hill Ste 106
Roseville, CA 95661

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9021-1.1**

| In re:<br>Fremont General Corporation | | CHAPTER: 11 |
|---|---|---|
| | Debtor(s). | CASE NUMBER: 2:08-bk-13421-ES |

Peter J Callaghan
8837 N Congress Ave Apt 717
Kansas City, MO 64153

Young Sook Chun
3525 Sawtelle Blvd #209
Los Angeles, CA 90066

Linda Deacon
Bate Peterson Deacon Zinn &
    Young LLP
888 S. Figueroa Street, 15th Fl
Los Angeles, CA 90017
Damian Donder
12 Ferry Crossing Dr SE
Rome, GA 30161
Charles E Elder
Irell & Manella LLP
1800 Ave of the Stars Ste 900
Los Angeles, CA 90067-4276

Eugene R Fiset
18162 Buena Vista
Yorba Linda, CA 92886-4011
Glenn S Gardipee
3111 Liberty Bell Rd
Green Bay, WI 54313

Evelyn Gofberg
100 Alnwick
Malverne, NY 11565
Leonard Gumport
550 S Hope Street, #825
Los Angeles, CA 90071-2627

Katherine E Hay
200 N Sepulveda Blvd #300
El Segundo, CA 90245

James P Houpt
Orrick Herrington & Sutcliffe LLP
400 Capital Mall Ste 3000
Sacramento, CA 95814-4497

George T Caplan
Epstein Becker & Green, PC
1925 Century Park E Ste 500
Los Angeles, CA 90067
Larry Cole
152 Piper Ln
Sonoma, CA 95476
Eugene Cowan
Bocarsly Emden Cowan Esmail &
    Arndt LLP
633 W Fifth Street, 70th Floor
Los Angeles, CA 90071
Deutsche Bank National Trust Co.,
    as Trustee
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126
William C. Dresser
4 N Second Street, Suite 1230
San Jose, CA 95113-1307

Alex Feldman
1700 E 15th Apt #B4
Brooklyn, NY 11229
Randy Fox
14515 S Mullen
Olathe, KS 66062
Eric J. Glassman
Mennemeier Glassman & Stroud LLP
980 9th St Ste 1700
Sacramento, CA 95814

John Haack
2500 Village Ln
Foristell, MO

Jean M. Healey
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
William M Iadarola
6B Liberty Ste 245
Aliso Viejo, CA 92656

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009

**F 9021-1.1**

In re:
Fremont General Corporation

Debtor(s).

CHAPTER: 11

CASE NUMBER: 2:08-bk-13421-ES

David V. Ing
3108 Kaohinani Drive
Honolulu, HI 96817-1039

Vivek Iyengar
627 E 6th St
Hinsdale, IL 60521
Robert W Jones
Patton Boggs LLP
2001 Ross Ave Ste 3000
Dallas, TX 75201-8001
Fritz Keller
3003 Memorial Ct Apt 1113
Houston, TX 77007
Melinda Kolpin
17747 Camino de Yatsto
Pacific Palisades, CA 90272

Michael C Lieb
Willenken Wilson Loh & Lieb, LLP
707 Wilshire Blvd Ste 3850
Los Angeles, CA 90017
Terry L Mason
PO Box 14
Shasta Lake, CA 96019
George Miranda
12012 Arndt rd
Aurora, OR 97002
Norah D. Molnar
Patton Boggs LLP
2550 M Street NW
Washington, DC 20037-1350
Simon T Ndongo
PO Box 66332
Mobile, AL 36660
Ronald J Nicolas
George B Piggott
2 Park Plaza, Ste 300
Irvine, CA 92614-0500

Jae Park
6152 Stanton Ave Apt B212
Buena Park, CA 90621

Dong Dang Pham
701 NE 20th St
Moore, OK 73160

Iron Mountain Information Management, Inc.
c/o Frank F McGinn
155 Federal St, 9th Fl
Boston, MA 02110
Zeb Jenkins
74 Mapleview Rd
Cheektowaga, NY 14225
Raymond B. Jue
300 S. Spring St. #500
Los Angeles, CA 90013

Shmuel Klein
268 Route 59 West
Spring Valley, NY 10977

Kurtzman Carson Consultants LLC
Attn: James Le
2335 Alaska Avenue
El Segundo, CA 90245
Anthony Lombardo
2014 Julius Ct
Walnut Creek, CA 94598

Colin Milner
4392 Forest Hill Rd
Stow, OH 44224
John M Mlynick
23 Mechanic St
Shelburne Falls, MA 01370
Andrey (Andre) Mutchnik
17, de la Poudriere #105
Montreal, Quebec, Canada, H4G 3J5

Tarun Oberoi
90 Millers Lane
Ringwood, NJ 07456

Ramesh Pathak
31 Blaisdell Wy
Fremont, CA 94536

Daniel Pierro
1160 Manchester Way NE
Atlanta, GA 30319

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009

F 9021-1.1

| In re:<br>Fremont General Corporation | | CHAPTER: 11 |
|---|---|---|
| | Debtor(s). | CASE NUMBER: 2:08-bk-13421-ES |

Jonathan D. Plaut
Chardon Law Offices
One State Street, Suite 1200
Boston, MA 02109
Raymond C Prospero
3638 University Ave Ste 249
Riverside, CA 92501

Centrell Reed
11698 Capitan Lane
Frisco, TX 75034

Greg Seidel
10297 N Sinclair Cir
Fresno, CA 93730

Greg Skypala
10200 Ashton Rd
Amarillo, TX 79119
Mark R Somerstein
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704

John M Stephan
Office of the Atty General
One Ashburton Pl 18th fl
Boston, MA 02108

Rosemarie Toon
9204 Wildwood St
Lorton, VA 22079

Robert Valade
HC 74 Box 21B
Pecos, NM 87552

Donald J. Putterman
Kasowitz Benson Torres &
  Friedman LLP
101 California Street, Suite 2050
San Francisco, CA 94111
Stephanie M. Saito
Bate Peterson Deacon Zinn &
  Young LLP
888 S Figueroa Street, 15th Floor
Los Angeles, CA 90017

Milan Shah
8273 E Blackwillow
Anaheim, CA 92808
Surendra P Sinha
7734 Tailspin Ln
Scottsdale, AZ 85255
Solon Group, Inc.
350 E 57th Street, Suite 1A
New York, NY 10022

William Kirt Toombs
PO Box 173
Ontario, OR 97914

Juan A Torres
Musick, Peeler & Garrett LLP
One Wilshire Blvd., Suite 2000
Los Angeles, CA 90017-3383
Thomas J Welch
Orrick, Herrington & Sutchliffe LLP
400 Capital Mall, Ste 3000
Sacramento, 95814-4497

Thomas J Welsh
Orrick, Herrington & Sutcliffe LLP
400 Capitol Mall Ste 3000
Sacramento, CA 95814-4497

Thomas C Whitesell
c/o Moses Lebovits
1801Century Park E 9th Fl
Los Angeles, CA 90067

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

F 9021-1.1

| In re: | | CHAPTER: 11 |
| Fremont General Corporation | | |
| | Debtor(s). | CASE NUMBER: 2:08-bk-13421-ES |

Ronald Wilborn
P.O. Boc 170259
Atlanta, GA 30317
Paul A. Witter
c/o  Pamela A. Ashby, Esq
Baylor & Jackson
1025 Connecticut Avenue NW
Suite 1202
Washington, DC 20036
Tom Yoon
3525 Sawtelle Blvd #209
Los Angeles, CA 90066

Diane Winchester
18018 N. 93rd Place
Scottsdale, AZ 85255
Bryan Wong
Beck & Jenkins
6830 Palm Avenue
Riverside, CA 92506

☐ Service information continued on attached page

III.  **TO BE SERVED BY THE LODGING PARTY:** Within 72 hours after receipt of a copy of this judgment or order which bears an Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below:

Neal Salisian    nsalisian@morganlewis.com

☐ Service information continued on attached page

Michael D Braun
Braun Law Group, PC
10680 W. Pico Blvd., Suite 280
Los Angeles, CA 90064-7202

KPMG Corporate Finance LLC
Plaza Tower Ste 700
600 Anton Blvd
Costa Mesa, CA 92626-7651

Erik M Pritchard
Troutman Sanders LLP
5 Park Plaza Ste 1200
Irvine, CA 92614-8592

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

F 9021-1.1

# EXHIBIT G

P-22

CAUSE NO. 2011-36476

| | | |
|---|---|---|
| MARY ELLEN WOLF AND | § | IN THE DISTRICT COURT OF |
| DAVID WOLF | § | |
| | § | |
| v. | § | |
| | § | |
| WELLS FARGO BANK, N.A., | § | HARRIS COUNTY, TEXAS |
| AS TRUSTEE FOR CARRINGTON | § | |
| MORTGAGE LOAN TRUST, TOM | § | |
| CROFT, NEW CENTURY MORTGAGE | § | |
| CORPORATION, AND CARRINGTON | § | |
| MORTGAGE SERVICES, LLC | § | 151ST JUDICIAL DISTRICT |

**FILED**
Chris Daniel
District Clerk

NOV - 6 2015
Time: 2:25 pm
Harris County, Texas
By_____
Deputy

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions.

1.    Do not let bias, prejudice, or sympathy play any part in your decision.

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging

2.    Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3.    You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4.    If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.    All the questions and answers are important. No one should say that any question or answer is not important.

6.    Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7.    Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.    Do not answer questions by drawing straws or by any method of chance.

9.    Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10.    Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way.".

11.    The answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

2

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

A party's conduct includes conduct of others that the party has ratified. Ratification may be express or implied. Implied ratification occurs if a party, though he may have been unaware of unauthorized conduct taken on his behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after he acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction.

## DEFINITIONS

"David Wolf" means the plaintiff David Wolf.

"Mary Wolf" means the plaintiff Mary Ellen Wolf.

"Plaintiffs" means the plaintiffs David Wolf and Mary Ellen Wolf.

"Wells Fargo" means defendant Wells Fargo Bank, N.A., as Trustee for Carrington Mortgage Loan Trust, Series 2006-NC3 Asset Backed Pass-Through Certificates.

"Carrington" means defendant Carrington Mortgage Services, LLC.

"PSA" means the Pooling And Servicing Agreement dated August 1, 2006 between Stanwich Asset Acceptance Company, L.L.C. (Depositor), New Century (Servicer), and Wells Fargo (Trustee).

## QUESTION NO. 1

Did any defendant make, present, or use a document with:

(1)    knowledge that the document was a fraudulent lien or claim against real property, or an interest in real property; and

(2)    the intent that the document be given the same legal effect as a valid lien or claim against real property, or an interest in real property; and

(3)    the intent to cause the Plaintiffs to suffer financial injury or mental anguish or emotional distress?

A lien is "fraudulent" if the person who files it has actual knowledge that the lien was not valid at the time it was filed.

"Lien" means a claim in property for the payment of a debt and includes a security interest.

Answer "Yes" or "No" as to the following:

**Wells Fargo:**      Yes

**Carrington:**      Yes

If you answered "Yes" to Question No. 1, then answer the following question. Otherwise, do not answer the following question and skip to Question No. 4.

## QUESTION NO. 2

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Plaintiffs for their damages, if any, that resulted from such conduct?

Consider the following elements of damages, if any, and none other. Answer separately in dollars and cents for damages, if any.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be.

Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

"Mental anguish or emotional distress" means a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger that resulted in a substantial disruption of the Plaintiffs' daily routine.

Answer separately in dollars and cents for damages, if any:

a. Financial injury sustained in the past by ~~the~~ David Wolf.

ANSWER: $ _75,000.00_

b. Financial Injury sustained in the past by Mary Ellen Wolf.

ANSWER: $ _75,000.00_

c. Financial injury that, in reasonable probability, will be sustained in the future by David Wolf.

ANSWER: $ _0.00_

d.  Financial injury that, in reasonable probability, will be sustained in the future by Mary Ellen Wolf.

    ANSWER: $ _0.00_

e.  Mental anguish or emotional distress experienced by David Wolf in the past.

    ANSWER: $ _20,000.00_ (struck through), _20,000.00_

f.  Mental anguish or emotional distress experienced by Mary Ellen Wolf in the past.

    ANSWER: $ _20,000.00_

g.  Mental anguish or emotional distress that, in reasonable probability, will be sustained by David Wolf in the future.

    ANSWER: $ _0.00_

h.  Mental anguish or emotional distress that, in reasonable probability, will be sustained by Mary Ellen Wolf in the future.

    ANSWER: $ _0.00_

7

Only answer Question No. 3 if you awarded damages to Plaintiffs in response to Question No. 2 and unanimously answered "Yes" to Question No. 1 as to any defendant. Otherwise, do not answer the following question.

## QUESTION NO. 3

Do you find by clear and convincing evidence that any of the Defendants engaged in the conduct that you found in answering Question No. 1?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Answer "Yes" or "No" as to the following:

**Wells Fargo:**      _Yes_

**Carrington:**      _yes_

To answer "Yes" to Question No. 3, your answer must be unanimous. You may answer "No" to Question 3 only on a vote of ten or more jurors. Otherwise you may not answer Question 3.

## <u>QUESTION NO. 4</u>

Were any of the Defendants unjustly enriched by the Plaintiffs?

"Unjustly enriched" means the entity has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.

Answer "Yes" or "No" as to the following:

**Wells Fargo:** _____Yes_____

**Carrington:** _____Yes_____

If you answered "Yes" as to any part of Question No. 4, then answer the following question. Otherwise, do not answer the following question and skip to Question No. 6.

## QUESTION NO. 5

How much money, if any, did the Defendant(s) receive from the Plaintiffs as a result of unjust enrichment?

Answer separately in dollars and cents for damages, if any:

**Wells Fargo:**        $___*0.00*___

**Carrington:**         $___*0.00*___

## QUESTION NO. 6

Do any of the Defendants hold money that, in equity and good conscience, belongs to the Plaintiffs?

Answer "Yes" or "No" as to the following:

**Wells Fargo:** _____NO_____

**Carrington:** _____NO_____

If you answered "Yes" to any part of Question No. 6, then answer the following question. Otherwise, do not answer the following question and skip to Question No. 8.

## **QUESTION NO. 7**

How much money, if any, do the Defendants hold that, in equity and good conscience, belongs to the Plaintiffs?

Answer separately in dollars and cents for damages, if any:

**Wells Fargo:**        $_____

**Carrington:**        $_____

## QUESTION NO. 8

Did Plaintiffs fail to comply with the terms of the Texas Home Equity Fixed/Adjustable Rate Note (Defendants' Exhibit 2)?

Answer "Yes" or "No":    _Yes_____

If you answered "Yes" to Question No. 8, then answer the following question. Otherwise, do not answer the following question and skip to Question No. 10.

## QUESTION NO. 9

How much money, if any, do Plaintiffs owe under the Texas Home Equity Fixed/Adjustable Rate Note (Defendants' Exhibit 2) as of November 6, 2015?

Answer in dollars and cents: $ _655,191,73_

## QUESTION NO. 10

Is Wells Fargo a Holder of the Texas Home Equity Fixed/Adjustable Rate Note (Defendants' Exhibit 2)?

"Holder" means the person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession.

"Bearer" means a person in control of a negotiable electronic document of title or a person in possession of a negotiable instrument, a negotiable tangible document of title, or a certificated security that is payable to bearer or indorsed in blank.

Answer "Yes" or "No": ___Yes_____

## QUESTION NO. 11

Does Wells Fargo own the Texas Home Equity Fixed/Adjustable Rate Note (Defendants'
Exhibit 2) and/or Texas Home Equity Security Instrument (Defendants' Exhibit 3)?

Answer "Yes" or "No" as to each:

Texas Home Equity Fixed/Adjustable Rate Note:     _____NO_____

Texas Home Equity Security Instrument:     _____NO_____

## QUESTION NO. 12

Was the "Transfer of Lien" (Plaintiffs' Ex. 23) filed on October 20, 2009 from New Century to Wells Fargo void?

"Void" with respect to Question No. 12 means, those documents that are of no effect whatsoever, and those that are an absolute nullity.

Answer "Yes" or "No.":


**ANSWER:** ___Yes___

## QUESTION NO. 13

Did Wells Fargo or Carrington violate the PSA?

Answer "Yes" or "No" as to each:

Wells Fargo: _____Yes_____

Carrington: _____Yes_____

If you answered "Yes" to Question No. 1, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 14

What is a reasonable fee for the necessary services of the Plaintiffs' attorneys in this case, stated in dollars and cents?

Factors to consider in determining a reasonable fee include:

- The time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly.

- The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer.

- The fee customarily charged in the locality for similar legal services.

- The amount involved and the results obtained.

- The time limitations imposed by the client or by the circumstances.

- The nature and length of the professional relationship with the client.

- The experience, reputation, and ability of the lawyer or lawyers performing the services.

- Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

1. For representation through trial and the completion of proceedings in the trial court.

    ANSWER: $ ~~140,000~~ $140,000.00

2. For representation through appeal to the court of appeals.

    ANSWER: $ 30,000

3. For representation at the Supreme Court of Texas.

    ANSWER: $ 20,000

**Presiding Juror:**

1.      When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2.      The presiding juror has these duties:

   a.   have the complete charge read aloud if it will be helpful to your deliberations;
   b.   preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;
   c.   give written questions or comments to the bailiff who will give them to the judge; .
   d.   write down the answers you agree on;
   e.   get the signatures for the verdict certificate; and
   f.   notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

**Instructions for Signing the Verdict Certificate:**

1.      You may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. This means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

2.      If ten jurors agree on every answer, those ten jurors sign the verdict. If eleven jurors agree on every answer, those eleven jurors sign the verdict. If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.      All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those ten or eleven who agree on every answer will sign the verdict.

4.      There are some special instructions before Question No. 3 explaining how to answer this question. Please follow the instructions. If all twelve of you answer this question, you will need to complete a second verdict certificate for this question.

Do you understand these instructions? If you do not, please tell me now.

_Judge Mike Engelhart, Presiding_

## VERDICT CERTIFICATE

Check one:

_____✓_____ Our verdict is unanimous.  All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

_____          _____Ryan Hurst_____
Signature of Presiding Juror                     Printed Name of Presiding Juror

_____ Our verdict is not unanimous.  Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

|  | SIGNATURE | NAME PRINTED |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |

## ADDITIONAL VERDICT CERTIFICATE

I certify that the jury was unanimous in answering the following questions:

### Question No. 1

### Question No. 3

All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

_____          _____
Signature of Presiding Juror                        Printed Name of Presiding Juror

22

P-3

CAUSE NO. 2011-36476

| | | |
|---|---|---|
| MARY ELLEN WOLF AND | § | IN THE DISTRICT COURT OF |
| DAVID WOLF | § | |
| | § | |
| v. | § | |
| | § | |
| WELLS FARGO BANK, N.A., | § | HARRIS COUNTY, TEXAS |
| AS TRUSTEE FOR CARRINGTON | § | |
| MORTGAGE LOAN TRUST, TOM | § | |
| CROFT, NEW CENTURY MORTGAGE | § | |
| CORPORATION, AND CARRINGTON | § | |
| MORTGAGE SERVICES, LLC | § | 151ST JUDICIAL DISTRICT |

## ADDITIONAL INSTRUCTION FOR BIFURCATED TRIAL

MEMBERS OF THE JURY:

In discharging your responsibility on this jury, you will observe all the instructions that have been previously given you.

_____
Judge Mike Engelhart, Presiding

**FILED**
Chris Daniel
District Clerk

NOV 10 2015

Time: _____
Harris County, Texas
By _____
Deputy

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging

## QUESTION NO. 15

You are instructed that you must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, should be assessed against one or more of the following Defendants and awarded to Plaintiffs as exemplary damages for the conduct found in response to Question Nos. 1 and 3?

"Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages includes punitive damages.

Factors to consider in awarding exemplary damages, if any, are:

1. The nature of the wrong.
2. The character of the conduct involved.
3. The degree of culpability of the wrongdoer.
4. The situation and sensibilities of the parties concerned.
5. The extent to which such conduct offends a public sense of justice and propriety.
6. The net worth of the defendant.

Answer in dollars and cents, if any.

Wells Fargo: $ _2,500,000.00_

Carrington: $ _2,500,000.00_

## <u>ADDITIONAL CERTIFICATE</u>

I certify that the jury was unanimous in answering the following question:

### Question No. 15

All eleven of us agreed to each of the answers. The presiding juror has signed the certificate for all eleven of us.

_____           _Ryan Hurst_____
Signature of Presiding Juror           Printed Name of Presiding Juror